# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

_____

## No. 200800393

_____

## UNITED STATES OF AMERICA
Appellee

v.

## LAWRENCE G. HUTCHINS III
Sergeant (E-5), U.S. Marine Corps
Appellant

_____

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain A.H. Henderson, JAGC, USN.
Convening Authority: Commander, U.S. Marine Corps Forces
Central Command, MacDill Air Force Base, FL.
Staff Judge Advocate's Recommendation: Colonel John R.
Woodworth, USMC.
For Appellant: Christopher Oprison, Esq.; Lieutenant Colonel S.
Babu Kaza, USMCR; Lieutenant Doug Ottenwess, JAGC, USN.
For Appellee: Major Cory A. Carver, USMC; Lieutenant James M.
Belforti, JAGC, USN.

_____

Decided 29 January 2018

_____

Before GLASER-ALLEN, MARKS, and HUTCHISON, *Appellate Military Judges*

_____

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

_____

MARKS, Senior Judge:

A general court-martial comprised of members with enlisted representation convicted the appellant, contrary to his pleas, of one specification each of conspiracy,[1] unpremeditated murder, and larceny in

---

[1] The sole specification of conspiracy alleged that the appellant conspired with the seven junior members of his squad to commit larceny, false official statements, murder, and obstruction of justice and enumerated 17 overt acts in support of the conspiracy. The members excepted two of the 17 overt acts:

violation of Articles 81, 118, and 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 918, and 921 (2005).[2] The members sentenced the appellant to 2,627 days' confinement[3] and a bad-conduct discharge. The convening authority (CA) approved the sentence as adjudged and, except for the punitive discharge, ordered the sentence executed.

The appellant raises 13 assignments of error (AOE): (1) the military judge's denial of the defense motion to suppress evidence of conduct for which the appellant was acquitted at his first trial; (2) admission of former testimony where the declarants were not unavailable and there was no similar motive for cross-examination; (3) unlawful command influence (UCI) from the Secretary of the Navy; (4) the military judge's finding that apparent UCI stemming from the prosecution's search of defense counsel's office in another case was harmless beyond a reasonable doubt; (5) denial of the defense motion for recusal; (6) denial of the defense request to abate proceedings until the appellant's attorney-client relationship was restored; (7) denial of the defense motion to dismiss based on the government's violation of the appellant's Article 13, UCMJ, rights; (8) denial of the defense request for a site visit; (9) admission of an exhibit founded on hearsay; (10) denial of the defense request for a mistrial after the members heard a government witness testify that the appellant asserted his right to remain silent; (11) the impact of the significant accumulation of errors on the outcome of the case; (12) the appellant's excessive and disproportionate sentence to roughly six years' confinement in light of companion cases; and (13) the legal and factual insufficiency of the findings.

---

m. The said Sergeant Hutchins did, on or about 28 April 2006, at or near Patrol Base Bushido, Iraq, submit a false written report regarding the facts and circumstances related to the unknown Iraqi man's death;

. . . .

o. The said Private First Class Jodka did, on or about 9 May 2006, at or near Hamdaniyah, Iraq, make a false statement to Special Agents [J.C.] and [S.L.], Naval Criminal Investigative Service, regarding the facts and circumstances related to the unknown Iraqi man's death;

Charge Sheet; Appellate Exhibit (AE) CXCIII at 3; Record at 2358.

[2] The members also acquitted the appellant of a single specification of making a false official statement.

[3] The adjudged confinement amounted to time the appellant had served pursuant to a sentence awarded at a prior court-martial for the same allegations.

After carefully considering the pleadings, oral arguments, and the record of trial, we find no error materially prejudicial to the substantial rights of the appellant and affirm the findings and sentence. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

First, a procedural orientation may be helpful. The appellant was originally convicted in August 2007 for his role in the shooting death of an unknown Iraqi man in Hamdaniyah, Iraq, the morning of 26 April 2006. This court set aside the findings and sentence for an improper severance of attorney-client relationship in April 2010. *United States v. Hutchins*, 68 M.J. 623, 631 (N-M. Ct. Crim. App. 2010) (*Hutchins I*). The Court of Appeals for the Armed Forces (CAAF) reversed that decision and remanded the case to this court to complete its review under Article 66, UCMJ, in January 2011. *United States v. Hutchins*, 69 M.J. 282, 293 (C.A.A.F. 2011) (*Hutchins II*). This court completed that review and affirmed the findings and sentence of the first court-martial in March 2012. *United States v. Hutchins*, No. 200800393, 2012 CCA LEXIS 93, *32, unpublished op. (N-M. Ct. Crim. App. 20 Mar 2012) (*Hutchins III*). Finding a violation of the appellant's Fifth Amendment rights against self-incrimination, the CAAF reversed our 2012 decision, set aside the findings and sentence of the 2007 court-martial, and remanded the case with authorization for a rehearing. *United States v. Hutchins*, 72 M.J. 294, 301 (C.A.A.F. 2013) (*Hutchins IV*). The results of that rehearing are before us here.

As for the events of the night and early morning of 25-26 April 2006, we revisit our summary from *Hutchins III*, which the CAAF republished in *Hutchins IV*:

> The appellant was assigned as squad leader for 1st Squad, 2nd Platoon, Kilo Company, 3rd Battalion, 5th Marines, assigned to Task Force Chromite, conducting counter-insurgency operations in the Hamdaniyah area of Iraq in April 2006. In the evening hours of 25 April 2006, the appellant led a combat patrol to conduct a deliberate ambush aimed at interdicting insurgent emplacement of improvised explosive devices (IEDs). The court-martial received testimony from several members of the squad that indicated the intended ambush mission morphed into a conspiracy to deliberately capture and kill a high value individual (HVI), believed to be a leader of the insurgency. The witnesses gave varying testimony as to the depth of their understanding of alternative targets, such as family members of the HVI or another random military-aged Iraqi male.

Considerable effort and preparation went into the execution of this conspiracy. Tasks were accomplished by various Marines and their corpsman, including the theft of a shovel and AK-47 from an Iraqi dwelling to be used as props to manufacture a scene where it appeared that an armed insurgent was digging to emplace an IED. Some squad members advanced to the ambush site while others captured an unknown Iraqi man, bound and gagged him, and brought him to the would-be IED emplacement.

The stage set, the squad informed higher headquarters by radio that they had come upon an insurgent planting an IED and received approval to engage. The squad opened fire, mortally wounding the man. The appellant approached the victim and fired multiple rifle rounds into the man's face at point blank range.

The scene was then manipulated to appear consistent with the insurgent/IED story. The squad removed the bindings from the victim's hands and feet and positioned the victim's body with the shovel and AK-47 rifle they had stolen from local Iraqis. To simulate that the victim fired on the squad, the Marines fired the AK-47 rifle into the air and collected the discharged casings. When questioned about the action, the appellant, like other members of the squad, made false official statements, describing the situation as a legitimate ambush and a "good shoot." The death was brought to the appellant's battalion commander's attention by a local sheikh and the ensuing investigation led to the case before us.

*Hutchins IV*, 72 M.J. at 296 (quoting *Hutchins III*, 2012 CCA LEXIS 93 at *4-6).

For ease of understanding the hierarchy within the appellant's squad, his squad members and co-conspirators will be identified by the ranks they held on 26 April 2006. They were Corporal (Cpl) Magincalda, Cpl Thomas, Lance Corporal (LCpl) Jackson, LCpl Pennington, LCpl Shumate, Private First Class (PFC) Jodka, and Navy corpsman, Hospitalman Third Class (HM3) Bacos. Other witnesses will also be identified by ranks they held in 2006.

We will incorporate additional facts as we address the AOEs.

## II. DISCUSSION

### A. Admissibility of evidence and issue preclusion

In his first AOE, the appellant avers that the military judge erred in admitting evidence of conduct of which the appellant had been acquitted at his first trial. Specifically, the evidence of acquitted misconduct included "evidence of 'housebreaking,' 'kidnapping,' the alternate plan to seize a random Iraqi, and the alleged seizure of a random Iraqi by the snatch team."[4]

We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion. *United States v. Harrell*, 75 M.J. 359, 362 (C.A.A.F. 2016). The military judge's findings of fact are reviewed for clear error; conclusions of law are reviewed *de novo. Id.* "If the military judge fails to place his findings and analysis on the record, less deference will be accorded." *United States v. Flesher*, 73 M.J. 303, 312 (C.A.A.F. 2014).

Intertwined with the appellant's AOE regarding the admission of evidence are two related issues—collateral estoppel (also known as issue preclusion) and the appellant's purported acquittal of conspiring to kill anyone other than high value individual and suspected insurgency leader, S.G.[5] We must address these two issues and their relationships to admissibility of evidence before reviewing the military judge's ruling. It is helpful to keep in mind that the case before us is a rehearing.

#### 1. *Collateral estoppel / issue preclusion*

When, as here, the government retries a criminal case, findings of not guilty from the first trial establish precedents limiting all future prosecutions of the same matter. Once acquitted of an offense, an accused need never "'run the gantlet'" again with regard to that specific offense. *Ashe v. Swenson*, 397 U.S. 436, 446 (1970) (quoting *Green v. United States*, 355 U.S. 184, 190 (1957)). The Double Jeopardy clause of the Fifth Amendment to the Constitution protects the accused from being "subject, for the same offence, to be twice put in jeopardy of life or limb[.]" U.S. CONST., amend. V. Courts have long recognized the civil litigation concept of collateral estoppel. *See Hoag v. New Jersey*, 356 U.S. 464, 470 (1958) ("'[W]here a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subsequent action on a different cause of action.'") (quoting RESTATEMENT, JUDGMENTS, § 68(1) (1942)). In *Ashe*, the Supreme Court held that criminal

---

[4] Appellant's Brief of 28 Jun 2016 at 30-31 (citation omitted).

[5] S.G. was a suspected Iraqi insurgency leader and an HVI in the Hamdaniyah area, believed to be responsible for a number of IED attacks on American forces. He was also the intended target of the conspiracy and killing at issue in this case.

collateral estoppel was embodied in the Fifth Amendment's guarantee against double jeopardy. 397 U.S. at 445. After the incorporation of criminal collateral estoppel into double jeopardy protection in *Ashe*, courts began to refer to it as issue preclusion. *See Schiro v. Farley*, 510 U.S. 222, 232 (1994).

The *Ashe* Court concluded that when a final and valid verdict resolved an issue of ultimate fact, the government could not litigate it again in a subsequent prosecution. *Ashe*, 397 U.S. at 446. An issue of fact is ultimate when it is critical to the verdict. "Issue preclusion bars successive litigation of 'an issue of fact or law' that 'is actually litigated and determined by a valid and final judgment, and . . . *is essential to the judgment.*'" *Bobby v. Bies*, 556 U.S. 825, 834 (2009) (citation omitted) (emphasis added).

The issue of ultimate fact in Ashe's case was whether he was among the band of robbers who broke into a poker game in a private home and stole money and a car from the six players around the table. *Id*. at 437. Ashe had been arrested in connection with the robbery and charged with robbing one of the players. *Id*. at 437-38. There was no question that the poker player had been robbed; the only issue in dispute was whether Ashe was one of the robbers. *Id*. at 438-39. Despite a jury's acquittal at this first trial, Ashe was later charged and convicted of robbing a different player at the same game. *Id*. at 439-440. On a petition for habeas corpus, the *Ashe* Court honed in on the "issue in dispute," finding:

> [T]he record is utterly devoid of any indication that the first jury could rationally have found that an armed robbery had not occurred, or that [the victim in the first trial] had not been a victim of that robbery. The single rationally conceivable *issue in dispute* before the jury was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not. The federal rule of law, therefore, would make a second prosecution for the robbery of [the victim in the second trial] wholly impermissible.

*Id*. at 445 (emphasis added). The issue in dispute, Ashe's presence at the robbery, was an issue of ultimate fact as it was essential to charges of robbery at his first and second trials. With reasonable doubt as to this essential ultimate fact, the government could not proceed with it at a second trial that also depended on it. *Id*. at 446. *See also Dowling v. United States*, 493 U.S. 342, 348 (1990) (rejecting the claim of collateral estoppel because "the prior acquittal did not determine an ultimate issue in the present case"); *see also id*. at 356 (Brennan, J., dissenting) ("Thus, in addition to being protected against retrial for the 'same offense,' the defendant is protected against prosecution for an offense that *requires* proof of a fact found in his favor in a prior proceeding." (emphasis added)).

6

The burden is on the accused to proffer that a previous set of not guilty findings resolved an issue of ultimate fact and move for dismissal of subsequent charges also dependent on that same issue. The accused must identify the issue in dispute, demonstrate that the verdict in the previous trial definitively resolved the proffered issue, and pray that it be foreclosed from further dispute in court. *Dowling*, 493 U.S. at 350. Once the accused proffers an issue of ultimate fact, the court must then test the accused's proffer. *Ashe*, 397 U.S. at 444. The *Ashe* Court charged trial courts testing for issue preclusion with delving back into prior findings:

> [T]he rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict on an issue other than that which the defendant seeks to foreclose from consideration."

*Id.* (citations omitted). *See also Bravo-Fernandez v. United States*, 580 U.S. __, 137 S. Ct. 352, 359 (2016) (noting that "[t]o identify what a jury in a previous trial necessarily decided . . . a court 'must examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter'" (quoting *Ashe*, 397 U.S. at 444)). *Cf Dowling*, 493 U.S. at 352 (finding "any number of possible explanations for the jury's acquittal verdict at Dowling's first trial[,]" the Court concluded that "the petitioner has failed to satisfy his burden of demonstrating" the proffered issue had been resolved in his favor). Having established that issue preclusion protects an issue of ultimate fact that is essential to both prior trial and trial at hand, we now consider issues of less than ultimate fact—relevant but not essential to pending charges.

### 2. *Extension of issue preclusion to evidence suppression*

When an issue of fact is not essential to *both* verdicts and thus not ultimate in *both* cases, preclusion is not automatic. The government need not prove the acquitted issue beyond a reasonable doubt to secure a new conviction, so it can proceed with the new prosecution. But can the government present evidence of that acquitted issue at a pending trial? With varying degrees of success, criminal defendants have invoked issue preclusion to suppress evidence from a prior acquittal in a subsequent trial. *See Dowling*, 493 U.S. at 348 (declining to extend *Ashe*'s bar on relitigation "to exclude in all circumstances . . . relevant and probative evidence that is

otherwise admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted"); *see also United States v. Hicks*, 24 M.J. 3, 8 (C.M.A. 1987) (noting "disagreement among the courts about the extent of the application of the doctrine of collateral estoppel to the evidentiary use of prior acts of which an accused has been acquitted.")

The appellant urges us to follow case precedent from the Second and Fifth Circuits and extend issue preclusion beyond issues of ultimate fact to evidence of prior bad acts subject to acquittal. *See United States v. Mespoulede*, 597 F.2d 329, 334 (2d Cir. 1979) (challenging the notion that collateral estoppel only applies to facts essential to conviction); *Wingate v. Wainwright*, 464 F.2d 209, 213 (5th Cir. 1972) (finding no "meaningful difference in the quality of 'jeopardy' to which a defendant is again subjected when the state attempts to prove his guilt by relitigating a settled fact issue which depends upon whether the relitigated issue is one of 'ultimate' fact or merely an 'evidentiary' fact in the second prosecution").

In *Hicks*, our superior court explicitly rejected what it characterized as the minority approach of allowing collateral estoppel "to determine admissibility of evidence which resulted in acquittal at a prior trial." 24 M.J. at 8.[6] Opting for the majority approach, the court declared that, "otherwise admissible evidence" was still admissible, "even though it was previously introduced on charges of which an accused has been acquitted." *Id.* (citations omitted). As the court succinctly stated in an opinion nearly thirty years later, "the admissibility of other acts evidence is governed by the Military Rules of Evidence . . . , and not by the members' verdict." *United States v. Washington*, 63 M.J. 418, 422 (C.A.A.F. 2006). *See also United States v. Miller*, 46 M.J. 63, 66 (C.A.A.F. 1997) (affirming a military judge's application of Military Rule of Evidence 404(b), SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) (MIL. R. EVID.) and the *Reynolds* test[7] in admitting evidence of prior misconduct for which the appellant was acquitted).

In *Hicks*, trial defense counsel (TDC) sought to suppress the testimony of four women who would describe Sergeant (Sgt) Hicks extorting them. 24 M.J. at 6-7. Sgt Hicks was charged with demanding sex from a woman in return for not reporting her boyfriend's misconduct. *Id.* at 5. The trial court found

---

[6] *Citing* E. Imwinkelried, *Uncharged Misconduct Evidence* §§ 10:03 through 10:07 (1984); Annot., 25 A.L.R. 4th 934 (1983); 2 *Weinstein's Evidence,* ¶ 404[10] at 404-58 (1982); 22 Wright and Graham, *Federal Practice and Procedure: Evidence* § 5249 at 535-56 (1978).

[7] *United States v. Reynolds*, 25 M.J. 105, 109 (C.M.A. 1989).

the evidence of uncharged misconduct "highly probative of a certain method or scheme employed by appellant to use his position of authority 'to orchestrate events' to obtain sexual or monetary favors from vulnerable females." *Id*. at 7 (citation omitted). Hicks argued that collateral estoppel should prevent two of the women from testifying because he had been acquitted of their allegations at courts-martial. *Id*. In rejecting Hicks' argument to apply collateral estoppel and suppress some of the evidence in his case, the Court of Military Appeals distinguished his case from *Ashe*. "In *Ashe v. Swenson*, . . . the fact underlying the issue of identity—that is, whether the accused was present at the robbery—was an ultimate fact and essential for conviction in both proceedings. On the other hand, the other-acts evidence here was totally separate from the instant offenses in time and place; was used for a limited evidentiary point; did not require proof beyond a reasonable doubt; and, although probative, was unnecessary to support a conviction of the instant charges." *Id*. at 8-9.

### 3. *Admissibility of evidence from an acquittal at court-martial*

Instead of issue preclusion, three Military Rules of Evidence govern the relevance and admissibility of evidence of conduct already litigated in a prior court-martial. *Miller*, 46 M.J. at 66; *Hicks*, 24 M.J. at 8. First, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." MIL. R. EVID. 401. "The military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." MIL. R. EVID. 403. "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." MIL. R. EVID. 404(b)(1). But "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" MIL. R. EVID. 404(b)(2).

In *United States v. Reynolds*, 29 M.J. 105 (C.M.A. 1989), the Court of Military Appeals articulated a three-part test for the admissibility of uncharged misconduct, including prior misconduct of which the accused was acquitted:

> 1. Does the evidence reasonably support a finding by the court members that appellant committed prior crimes, wrongs, or acts?
>
> 2. What "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence?

> 3. Is the "probative value . . . substantially outweighed by the danger of unfair prejudice"?

*Id.* at 109 (internal citations omitted, alterations in original).

Although the Military Rules of Evidence and the *Reynolds* test, not issue preclusion, govern the admissibility of uncharged misconduct, the fact of an acquittal is still a factor in the analysis. When an accused has been acquitted of conduct the government seeks to present as evidence in a subsequent case, that acquittal is a factor in the test for admissibility. "The fact of the prior acquittal may diminish the probative value of the evidence, however, and should be considered by the military judge when determining whether 'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *Hicks*, 24 M.J. at 9 (quoting MIL. R. EVID. 403). An accused also has the right to prove that he or she was previously acquitted of the acts admitted into evidence under MIL. R. EVID. 404(b). *United States v. Cuellar*, 27 M.J. 50, 56 (C.M.A. 1988). While issue preclusion is not a sword at the appellant's disposal in this case, does he nonetheless deserve the benefit of his purported acquittal of an issue of ultimate fact at his first court-martial? Our superior court has not prohibited us from querying whether we can extrapolate an acquittal from prior findings. To begin to answer whether that purported acquittal affects the admissibility of related evidence, we must consider the proffered acquittal.

### 4. *Proffered acquittal of conspiring to kill anyone other than S.G.*

As part of his motion in *limine* to suppress evidence of uncharged misconduct, the appellant asserted that the findings of his first court-martial indicated an acquittal of an issue of ultimate fact. Based on specific instructions to the members and their not guilty findings to housebreaking, kidnapping, and conspiring to commit them, the appellant asserted that the members must have concluded that (1) the appellant did not order his Marines to seize anyone other than suspected insurgency leader and HVI, S.G.; (2) the appellant believed that the individual seized was S.G.; and (3) the appellant was not responsible for his squad members going to a house and seizing an unknown Iraqi man (who was not S.G.).[8] TDC exhorted the military judge to examine the findings and exceptions made by the members at his first trial to confirm that they resolved this issue in the appellant's favor. Citing collateral estoppel, the appellant sought to exclude evidence that the appellant conspired to kill anyone other than S.G.

---

[8] AE XCVIII at 6-7.

a. Not an issue of ultimate fact in the case before us

Whom the appellant conspired to kill was central to the government's theme and theory at both trials but was not an issue of ultimate fact at his second court-martial. The conspiracy specification did not name the victim the appellant and his co-conspirators agreed to murder. Whether the man shot by the IED crater was the same man the appellant intended to kill was not critical to a finding of guilty for murder. As the military judge instructed the members, in cases of mistake or carelessness, "the intent to kill or inflict bodily harm is transferred in the intended victim of [the accused's] action to the actual victim."[9] And for the same reasons, the identity of the appellant's intended victim was not essential to the other charges referred to his second court-martial. With no pending charges dependent upon whom the appellant agreed to kidnap and kill, there is no issue of ultimate fact.

Without the required issue of ultimate fact at the pending court-martial,[10] we can find no abuse of discretion in the military judge's apparent decision not to explore the findings and record of the first court-martial for the purported acquittal. The military judge made no written findings of fact or conclusions of law in response to the appellant's request that he examine the first record of trial but said "[t]here is no requirement to speculate on the rationale on the last panel of members. In fact it's folly to try to do that."[11]

Though there appears to be no requirement to mine a prior record of trial for acquittal of an issue of less than ultimate fact, our superior court has not prohibited it. The analysis and conclusion of acquittal exemplified in *Ashe* is a preliminary step that may, but need not, result in issue preclusion. Even with issue preclusion off the table, the existence of an acquittal remains relevant to admission of evidence under the Military Rules of Evidence and *Reynolds*. For that reason, we believe the appellant's proffered acquittal deserves our consideration.

b. Findings of the appellant's first court-martial

The first panel of members returned mixed, and to some extent inconsistent,[12] findings. Those findings are summarized below:

Charge I: Conspiracy - Guilty of one specification of conspiracy to commit larceny, false official statements, murder, and obstruction of justice; but not

---

[9] Record at 2276.

[10] *See Ashe*, 397 U.S. at 443; *Dowling*, 493 U.S. at 348, discussed *supra*.

[11] Record at 778.

[12] As previously stated, the appellant's acquittal of premeditated murder and conviction of conspiracy to commit murder are irreconcilably inconsistent.

guilty of conspiracy to commit housebreaking and kidnapping and excepting four of 21 overt acts effecting the conspiracy.[13]

Charge II: False Official Statement - Guilty of one specification of false official statement for a written statement made on 28 April 2006; but not guilty of a second false official statement for the 8 May 2006 interview with the NCIS Special Agents.

Charge III: Premeditated Murder - Not guilty of premeditated murder, but guilty of the lesser included offense of unpremeditated murder of an unknown Iraqi man;

Charge IV: Larceny - Guilty of one specification of larceny;

Charges V, VI, and VII - Not guilty of assault consummated by battery, housebreaking, kidnapping, and obstruction of justice.[14]

The appellant contends, "[t]he removal of housebreaking and kidnapping as predicate offenses to the conspiracy charge indicate that the members found, as ultimate facts, that the conspiracy was only to kill [S.G.], and did not include any plans for alternate victims."[15]

c. Examination of the record of the prior proceeding

Our review of the record of the appellant's first court-martial aligns substantially with the appellant's account and conclusions regarding the meaning of the appellant's prior acquittal of housebreaking and kidnapping.

From their opening statements, trial counsel (TC) and TDC at the first court-martial presented conflicting theories of whom the appellant and his squad members conspired to kill on 25 and 26 April 2006. The government previewed their three-pronged conspiracy theory—"plan 'A', get [S.G.], plan 'B', get a brother, or plan 'C', get somebody[.]"[16] According to the government, the evidence would show that the appellant, Cpls Magincalda and Thomas,

---

[13] The four excepted overt acts were: (1) Cpl Magincalda, Cpl Thomas, LCpl Pennington, and HM3 Bacos walking from S.G.'s house to the home of an unknown Iraqi and Cpl Magincalda and Cpl Thomas entering the house; (2) Cpl Magincalda and Cpl Thomas taking an unknown Iraqi man from his house against his will; (3) the appellant's false statements to Staff Sergeant O.B. on 26 April 2006 regarding the facts and circumstances of the unknown Iraqi man's death; and (4) the appellant's false statements to Special Agents J.C. and S.L., Naval Criminal Investigative Service, on 8 May 2006 regarding the facts and circumstances of the unknown Iraqi man's death.

[14] First trial record, charge sheet and findings worksheet (AE CXXIV).

[15] Appellant's Brief at 27.

[16] First trial record at 1015.

and LCpl Pennington spent an hour and a half deliberating and developing a plan for four squad members to walk to the home of S.G., seize him, bring him about a kilometer to a crater formed by an IED, disturb the dirt with a stolen shovel so it appeared S.G. was trying to plant a new IED, stage a firefight with a stolen AK-47, and kill S.G. That was Plan A.

> Plan "B" is, Hey, if we can't get [S.G.], let's get one of his brothers, grab somebody from his house because we want to send a message. And as they talk about plan "B", then they say, What if we can't get into the house?
>
> Sergeant Hutchins tells them, Get someone else. Bring somebody back here tonight. We need to send a message. So they move from plan "B" to plan "C" to get somebody. Get somebody.[17]

In response to the government's opening statement, the appellant's TDC focused the members on command pressure to eliminate S.G., a "high value target,"[18] and challenged the existence of a three-prong conspiracy. TDC asserted that the appellant believed the man he shot at the IED crater was S.G.

Five members of the appellant's squad testified at his first court-martial. The refrain of a single plan repeated throughout their testimony—"To get [S.G.], bring him down to the IED hole, and shoot and kill him, sir."[19] According to LCpl Pennington and HM3 Bacos, the only two of the original planners to testify, they originally discussed storming S.G.'s house and killing him there, in what would look like a mujahedeen attack. Then they considered commandeering a car and using that to drive S.G. from his home to the IED crater. But they discarded these ideas in favor of a four-man "snatch team" seizing S.G. from his home and bringing him, on foot, to the IED crater.

Testimony about a substitute for S.G. was not consistent. When TC asked LCpl Jackson what would happen if the snatch team could not seize S.G., he responded, "[t]hey would get a relative of his or any other male in the house, sir."[20] TC did not pose the question to PFC Jodka, but in response to a question from a member, PFC Jodka specifically refuted any suggestion that the appellant planned to seize one of S.G.'s family members. PFC Jodka testified, "The plan was to get [S.G.] personally because he was the insurgent,

---

[17] *Id.* at 1014.

[18] *Id.* at 1031.

[19] *Id.* at 1127.

[20] *Id.* at 1125.

and that he was the one that we were going to put in this IED hole, that it wasn't just anybody, sir."[21] On cross-examination, TDC asked LCpl Shumate if the plan involved killing anyone other than S.G., and LCpl Shumate replied, "Not that I can think of, sir."[22]

LCpl Pennington and HM3 Bacos testified differently. According to LCpl Pennington, "[i]f we were compromised at the [S.G.] house and couldn't go inside without everyone knowing we were there, we would move on to another house where we would get another military age male."[23] LCpl Pennington conceded to TDC that "it would have been a significant departure . . . to grab somebody else" and "[i]t would have defeated the whole purpose not to grab [S.G.]."[24] HM3 Bacos also testified to Plans B and C:

> [W]e were tasked out to go retrieve an AK-47 and shovel from a nearby house, stash it somewhere, go patrol to [S.G.]'s house.
>
> If not—if we couldn't get [S.G.] because someone saw us in the family, we would go try getting someone else, anyone, and then walk that military-aged male—it was going to be a male—down to the IED hole with the AK-47 and shovel, disturb the dirt, make it look like he was digging and make it look like he is doing a terrorist act.[25]

HM3 Bacos remembered hearing the appellant say, "someone was going to die tonight[.]"[26]

The appellant did not testify on the merits at his first court-martial, but the statement he gave to Naval Criminal Investigative Service (NCIS) on 19 May 2006 went to the members as Prosecution Exhibit (PE) 1.[27] In his statement, the appellant acknowledged a back-up plan to seize and kill one of S.G.'s brothers if S.G. were not home. Amidst all the discussion, he remembered Cpl Thomas singing lyrics from a rap song "Somebody's gonna die tonight." According to the plan, the snatch team would bind S.G.'s hands with flexible handcuffs, gag him, and walk him to the IED crater. When Cpl

---

[21] *Id.* at 1203.

[22] *Id.* at 1265.

[23] *Id.* at 1337.

[24] *Id.* at 1379.

[25] *Id.* at 1406.

[26] *Id.* at 1410.

[27] The CAAF subsequently held that NCIS obtained this statement from the appellant in violation of his Fifth Amendment rights against self-incrimination and, accordingly, set aside his convictions. *Hutchins IV*, 72 M.J. at 299-300.

Thomas and Cpl Magincalda called the appellant on his personal radio receiver and told him they had "him," the appellant thought they were referring to S.G.[28] Not until after the shooting, when he approached the body, did the appellant realize they had killed another Iraqi man, not S.G. HM3 Bacos's testimony corroborated a radio exchange between the snatch team and the appellant as the snatch team approached the IED crater. "I remember Corporal Thomas saying that Sergeant Hutchins wanted to see the man, to bring the man to the tree. But Corporal Magincalda disagreed and said, 'No, we're not going to do that, let's just stick with the plan.'"[29] On cross-examination, TDC confirmed with HM3 Bacos that the appellant wanted to see the man with them, but Cpl Magincalda objected.[30]

In his closing argument, TC acknowledged the discrepancies in the testimony about plans A, B, and C but argued that the appellant planned to kidnap and kill not S.G., but somebody. "They couldn't get [S.G.] or one of his brothers, so they got somebody. They got somebody, because somebody was going to die tonight."[31] TDC closed by inviting the members' attention to what HM3 Bacos overheard on the radio between the appellant and the two corporals to dispute the government's assertion that he planned to kidnap and kill anyone other than S.G. Throughout the trial, the government and TDC advocated conflicting positions about whom the appellant conspired to kill by the IED crater on 26 April 2006.

As the appellant was not a member of the snatch team, the government relied on both principal and co-conspirator liability[32] to prosecute him for many of the offenses charged—larceny, housebreaking, kidnapping, and assault consummated by battery actually carried out by the snatch team members. TC ended his closing argument with a preview of the legal concept for members. The military judge instructed the members on principal liability of those who aid, abet, command, counsel, or procure an offense, and co-conspirator liability, when the offense is committed in furtherance of the conspiracy.

Prompted by evidence presented during the court-martial, the military judge also instructed the members about a possible mistake of fact defense with regard to the appellant's authority to detain S.G., a high value target.

---

[28] First trial record, PE 1 at 7.

[29] *Id.* at 1422.

[30] *Id.* at 1449.

[31] *Id.* at 1726.

[32] *See* MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.), Part IV, ¶¶ 77b(2)(b) and 81c(5).

"If the accused at the time of the offense was under the mistaken belief that he was authorized to detain [S.G.] at any time, then he cannot be found guilty of the offense of housebreaking."[33] "Now, the accused is not guilty of the offense of kidnapping if: First, he mistakenly believed he had the authority to detain [S.G.] at any time, and; Second, if such belief on his part was reasonable."[34]

In light of these instructions, the evidence, and counsel's arguments, the findings of not guilty of housebreaking, kidnapping, and conspiracy to commit them along with the exception of the overt acts of walking to an unknown Iraqi man's house, entering the house, and taking the man from his home against his will, support the appellant's proffered acquittal. We are not persuaded by the government's argument that the appellant could have reasonably expected an Iraqi to open his home to a knock in the middle of the night and voluntarily accompany American troops. But for the squad's legal authority to arrest and detain high value targets such as S.G., the plan required housebreaking and kidnapping.[35] The mistake of fact defense regarding the authority to detain applied only to S.G.; no one else was identified as a high value target. To borrow language from *Ashe*, "the record is utterly devoid of any indication that the first jury could rationally have found that" housebreaking and kidnapping of an unknown Iraqi man "had not occurred, or that" the unknown Iraqi man "had not been a victim of" housebreaking and kidnapping. 397 U.S. at 445.

With regard to the appellant's liability for committing housebreaking and kidnapping, "[t]he single rationally conceivable issue in dispute before the jury was whether" the appellant had conspired to enter the home of S.G. and seize him or to break into the home of someone else to kidnap someone other than S.G. *Id.* "And the jury by its verdict found" that the appellant had not conspired to break into the home of anyone other than S.G. or kidnap anyone other than S.G. *Id.* The members demonstrated they understood both

---

[33] First trial record at 1789.

[34] *Id.*

[35] The elements of housebreaking are: "(1) That the accused unlawfully entered a certain building or structure of a certain other person; and (2) That the unlawful entry was made with the intent to commit a criminal offense therein." MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.), Part IV, ¶ 56.b. The elements of kidnapping are: (1) That the accused seized, confined, inveigled, decoyed, or carried away a certain person; (2) That the accused then held such person against that person's will; (3) That the accused did so willfully and wrongfully; and (4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. *Id.*, Part IV, ¶ 92.b.

theories of liability by convicting the appellant of stealing an AK-47 and shovel he never touched. Their decision to acquit the appellant of housebreaking and kidnapping demonstrates that the members believed the mistake of fact defense applied, and the conspiracy was to get and kill S.G.

Again, we find no abuse of discretion in the military judge's failure to conclude that the appellant was acquitted of conspiring to kill anyone but S.G., but we will include this among the acquitted acts of misconduct as we proceed with analysis of the ruling on admission of evidence.

### 5. *Military judge's ruling on motion to suppress evidence*

In advance of his second trial, the appellant moved "to exclude evidence and testimony regarding conduct that was the subject of the members' 'not guilty' findings" at his first trial.[36] Specifically, the appellant sought to exclude evidence of premeditated murder, housebreaking, kidnapping, and a false official statement to NCIS agents regarding the placement of a shovel or AK-47 near the deceased.[37] The evidence to be suppressed was presented categorically and not delineated as physical exhibits, statements, or excerpts of statements. At the time of the motion, both parties anticipated that the appellant's former squad mates might testify to much of this evidence. Ultimately and unexpectedly, the government relied on transcripts of the prior court-martial testimony of four of the squad members, and the appellant objected to numerous excerpts of that prior testimony relating to acquitted offenses.

In a ruling from the bench, the military judge denied the appellant's motion to suppress evidence.

> The motion to suppress is denied. There is no requirement to speculate on the rationale of the last panel of members. In fact, it's folly to try to do that. The real risk of confusing them is if we try to parse the facts as proposed by the defense counsel. Misconduct can violate more than one article of the UCMJ and the conduct alleged in Paragraphs (a), (b), and (c) of the defense motion are not mutually exclusive to the charges of which the accused was acquitted.[38]

---

[36] AE XCVIII at 1.

[37] *Id.* at 5-7.

[38] Record at 778. Paragraphs (a), (b), and (c) referred, respectively, to "Evidence of 'Premeditation,'" "Evidence of Kidnapping and Housebreaking," and "Evidence of False Statements to NCIS About Underlying Facts." AE XCVIII at 5-7. As previously stated, the appellant's AOE focuses, almost exclusively, on the evidence in paragraph (b), housebreaking and kidnapping. We will confine our analysis to housebreaking

This statement of the military judge issued contemporaneously with his denial of the appellant's motion to suppress constitutes the sum total of the record reflective of the military judge's reasoning in support of his ruling. The record includes no explicit findings of fact or conclusions of law or any other explanation or justification in support of the military judge's ruling. In the context of the pleadings and argument during the surrounding Article 39(a), UCMJ, hearing, we can glean two findings of fact from the military judge's ruling and simultaneous comments.

First, the military judge apparently found that the evidence of which the appellant had been acquitted applied to other charges pending before the court. Early in the Article 39(a), UCMJ, session, the military judge posed to civilian defense counsel that conduct "can cut across more than one article of the UCMJ."[39] And "[w]hy can't the underlying conduct, if it applies to other charges, still come in?"[40] Neither the TC nor the military judge specified the pending charges to which the underlying misconduct applied. But in their response to the motion to suppress, the government "opine[d] that these acts demonstrate the accused's preparation, intent, lack of mistake or accident, and plan to execute the offense for which he is charged and escape culpability and suspicion for the charged offenses."[41]

In his second finding of fact, the military judge concluded that suppression of evidence of housebreaking, kidnapping, and the detour to the home of the unknown Iraqi man would leave the members confused. TC, in their response to the defense motion, asserted that, "[c]ourts should decline any invitation [to] create an artificial gap in the witness's narrative that will leave the fact-finder confused and uninformed."[42] The prospect of confused members resonated with the military judge, who then challenged the civilian defense counsel on censoring from witnesses' testimony how they transported the Iraqi man from his home to the IED crater and "how he got in—allegedly got into the IED hole."[43] TC then invoked the MIL. R. EVID. 403 balancing test and warned that "to simply omit those facts of the housebreaking and the kidnapping, to simply omit those facts, that is what would confuse the

---

and kidnapping and the underlying facts necessarily resolved by acquittal of those two charges.

[39] Record at 768.

[40] *Id.*

[41] AE XCIX at 10.

[42] *Id.* at 8.

[43] Record at 770.

members."[44] From the argument on the record, we can conclude that the military judge found that excising uncharged misconduct of which the appellant had been acquitted from testimony would confuse the members, and admitting it was necessary to prevent that confusion.

We presume the military judge knows the law and correctly applies it, unless the record in this case suggests otherwise. *See United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (holding that "[m]ilitary judges are presumed to know the law and to follow it absent clear evidence to the contrary"). However, if the military judge analyzed the evidence of prior misconduct in accordance with MIL. R. EVID. 401, 403, or 404(b) or the three-part *Reynolds* test,[45] he did not so articulate on the record. Aside from the necessity for a coherent narrative, TC did not volunteer and the military judge did not solicit the probative value of the evidence. The military judge did not acknowledge how the appellant's prior acquittal impacted its probative value, and he was silent as to any potential prejudice.

In his instructions to the members, the military judge provided the standard MIL. R. EVID. 404(b) instruction regarding acquitted offenses and added:

> I remind you again that the accused was acquitted at a prior proceeding of the offenses of kidnapping, housebreaking, assault, obstruction of justice, premeditated murder, and false official statement on or about 8 May, as well as conspiracy to commit kidnapping and housebreaking. You may therefore consider evidence that the accused may have been involved in plans or acts involving entering the alleged victim's home, moving him to another location, involvement in a shooting, and providing a statement to NCIS on or about 8 May for the limited purpose of its tendency, if any, to prove a plan or design of the accused to commit the charged acts.[46]

Given the absence of any substantive findings or analysis by the military judge, we will conduct our own *Reynolds* analysis.

### 6. Application of the Reynolds test

The appellant moved to suppress evidence of the offenses of which he had been acquitted: conspiracy to commit housebreaking and kidnapping, false official statement for the 8 May 2006 interview with NCIS, premeditated

---

[44] *Id.* at 776.

[45] 29 M.J. at 109.

[46] Record at 2285-86.

murder, obstruction of justice, assault consummated by battery, housebreaking, and kidnapping. In addition, we analyze the admissibility of evidence to conspire to kill anyone other than S.G.

### a. Support of prior crimes, wrongs, or acts

Evidence in the form of direct testimony from multiple former squad mates reasonably supports findings that the appellant instigated, advised, counseled, encouraged, and conspired to commit the offenses of which he was acquitted, including, as a contingency, conspiring to kill someone other than S.G. *See Reynolds*, 29 M.J. at 109. In particular, through their testimony at the first court-martial, snatch team members LCpl Pennington and HM3 Bacos recounted the carefully considered and crafted plan to enter a home, seize S.G. or a substitute, transport him to the IED crater, kill him, and stage the incident to look like a legitimate firefight. They both testified to the contingency plan to seize one of S.G.'s relatives or any Iraqi man if they could not get S.G. LCpl Pennington and HM3 Bacos then provided consistent, step-by-step accounts of the execution of that plan, including the actual housebreaking, kidnapping, and assault consummated by battery. The other junior squad members corroborated the plan to obstruct justice with details of the carefully staged scene. All of this testimony contradicted the appellant's initial accounts of discovering and engaging an insurgent digging a hole in which to bury an IED and suggests deceit and false official statement. This first factor inures to the admission of the evidence.

### b. Probability of facts of consequence

Evidence that the appellant instigated, advised, encouraged, and conspired to commit the acquitted offenses and that they were committed in furtherance of that conspiracy makes it more probable that the death of an unknown Iraqi man in Hamdaniyah on 26 April 2006 was the result of a conspiracy the appellant hatched and led. *Id*. The granularity of detail evident in the testimony about conspiring to enter the home of S.G. and seize him—or someone else, to kill S.G., and to cover it up made it more probable that the larceny and murder were also products of the same deliberate and comprehensive planning process. Evidence of all the actions taken to carry out the plan made it more probable that the squad members and the appellant had committed to the plan's goal of a killing in an IED crater. Finally, evidence that the appellant and the snatch team members considered a contingency such as S.G.'s absence from his home and the identification of a substitute victim made it more probable that the fatal shooting was both intentional and wrongful.

c. Does the danger of unfair prejudice substantially outweigh the probative value?

First, we consider the probative value of evidence of the acquitted offenses. *Id.* As the government argued, the primary probative value was narrative cohesion. A cohesive narrative revealed a well-thought out plan indicating preparation, intent, and lack of mistake or accident.

As for unfair prejudice that might substantially outweigh probative value, the appellant submits very little. Relying on suppression by issue preclusion, TDC did not address the *Reynolds* factors or Military Rules of Evidence in their motion. The parties discussed the MIL. R. EVID. 403 balancing test only with regard to evidence of housebreaking and kidnapping and the confusion of extracting part of the narrative. To complete our analysis, we consider the potential prejudice of evidence of acquitted misconduct.

Prejudice from evidence of premeditated murder, obstruction of justice, and the 8 May 2006 false official statement was minimal. The appellant had been acquitted of committing those offenses but convicted of conspiring to commit them. Evidence of the completed offenses was essentially indistinguishable from evidence of conspiracy to commit them and thus presented little, if any, danger of unfair prejudice.

As for evidence of housebreaking, kidnapping, and the conspiracy to commit them, their absence would have likely been conspicuous to members. Some members may have independently understood the authority to seize and detain high value targets, but there might not have been an instruction explaining the legal distinction. Faced with a logical gap in the narrative, the members may have assumed details similar to, or more aggravating than, what the evidence revealed. Suppressing the evidence may have done little to reduce prejudice.

More important, the evidence of housebreaking and kidnapping was embedded in the larger narrative. The consistent eyewitness testimony of one co-conspirator after another compounded the evidence of both conspiracy to commit murder and murder itself. There was little danger of conviction based on character evidence stemming from the housebreaking and kidnapping that preceded the murder. Inclusion of evidence explaining how the unknown Iraqi civilian arrived at the IED crater was therefore not unduly prejudicial.

With regard to the appellant's agreement to kill anyone other than S.G., the appellant fell short of articulating unfair prejudice that might have outweighed probative value. Evidence of Plans B and C, conspiracy to commit someone other than S.G., is undeniably probative of a conspiracy to commit murder and the ultimate murder of an unknown Iraqi man. The appellant's

acquittal of these two plans does diminish their probative value but likely not in an appreciable way.

Nevertheless, the *potential* prejudice loomed large. The counsel prosecuting the appellant's second court-martial resurrected and recycled the conspiracy to kill a random Iraqi as the government's "theory of prosecution."[47] Sounding remarkably like his predecessor seven years earlier, TC in the appellant's second trial began his opening statement with: "Sergeant Hutchins had a perfect plan, a perfect plan to commit a murder and send a message. Sergeant Hutchins was the mastermind of the plan, and his squad executed."[48] The prosecutor quickly referred to "a plan to drag someone out of their bed in the middle of the night and kill them."[49] Then he laid out "Plan A, get [S.G.]. Plan B, get [S.G.'s] brothers . . . Plan C, you get any Iraqi male . . . you get any Iraqi male because this town is going to get the message."[50] TC then repeated Plan A, Plan B, Plan C. As he wrapped up his opening statement, the TC again referred to the appellant's "perfect plan to send a message."[51] The three-prong conspiracy theory debunked at the first trial reappeared as a central theory of the second trial, and the intent to kill someone and send a message was its theme. Although the charge sheet was silent as to a victim of the conspiracy, the members might have been forgiven for assuming the appellant was charged with conspiring to kill a random Iraqi man.

Unlike in *Hicks*, where "the other-acts evidence was totally separate from the instant offenses in time and place; was used for a limited evidentiary point; did not require proof beyond a reasonable doubt; and, although probative, was unnecessary to support a conviction of the instant charges[,]" here, although the other-acts evidence did not require proof beyond a reasonable doubt and was unnecessary to conviction, it was part and parcel of the instant offenses and prominently presented as the theme and theory of the case. 24 M.J. at 9.

The government's depiction of the appellant as someone who conspired to kill an innocent Iraqi civilian at random was at least arguably aggravating, but it did not ultimately amount to unfair prejudice in this case. "[T]he term 'unfair prejudice' in the context of [MIL. R. EVID.] 403 'speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring

---

[47] Appellant's Brief at 17, 24.

[48] Record at 1255.

[49] *Id.*

[50] *Id.* at 1259.

[51] *Id.* at 1265.

guilty on a ground different from proof specific to the offense charged.'" *United States v. Collier*, 67 M.J. 347, 354 (C.A.A.F. 2009) (quoting *Old Chief v. United States*, 519 U.S. 172 (1997)). In light of the substantial and less controverted evidence that the appellant conspired to kill S.G., the members would not have needed to rely on evidence of a conspiracy to kill anyone else to prove the charge itself. Although Plans B and C were a contingency on which the snatch team needed to rely, evidence of Plans B and C was a contingency of proof the government did not need.

Finally, had the appellant exercised his right to prove his acquittal of conspiracy to murder anyone other than S.G.,[52] the diversion necessary for doing so might have tipped the scales of the MIL. R. EVID. 403 balancing test. MIL. R. EVID. 403 (providing for the exclusion of evidence "if its probative value is substantially outweighed by the danger of . . . confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.") But this prejudice is purely speculative. The appellant did not attempt to prove his acquittal to the members of the second court-martial, and thus this potential prejudice never became an issue.

Despite the potential for unfair prejudice in the admission of evidence of a conspiracy to kill anyone other than S.G., that prejudice was not before the military judge at the time he admitted the evidence. The actual prejudice did not substantially outweigh the evidence's probative value.

Having progressed through the three factors of the *Reynolds* test and finding them all in favor of admission, we can find no abuse of discretion in the military judge's decision to admit the evidence of acquitted misconduct, including evidence of a conspiracy to kill anyone other than S.G. The evidence offered proof of motive, intent, preparation, plan, and an absence of mistake or accident with regard to the charges against the appellant, particularly conspiracy to commit murder and murder. MIL. R. EVID. 404. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice or other unjustified distraction from the court-martial. MIL. R. EVID. 403.

### 7. *Prejudice*

Even if we had found abuse of discretion on the military judge's part in admitting evidence of a conspiracy to commit Plans B and C, there was no actual prejudice to the appellant. "We evaluate prejudice from an erroneous evidentiary ruling by weighing (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in

---

[52] *See Cuellar*, 27 M.J. at 56, discussed *supra*.

question, and (4) the quality of the evidence in question." *United States v. Barnett*, 63 M.J. 388, 397 (C.A.A.F. 2006) (citations and internal quotation marks omitted).

Even though the appellant's second trial defense team did not concede his plan to kill S.G., the evidence of a conspiracy to kill him was overwhelming. The appellant's primary defense was that the account of the night's events was fabricated and forced upon his squad during coercive interrogations. The vivid, granular details the co-conspirators recounted with calm, confident certainty ring with credibility. Evidence of a conspiracy to kill anyone other than S.G. was material to the government's case but of inferior quality to the evidence of an agreement to kill S.G. Despite the prominence the government gave the evidence of Plans B and C and the murderous callousness the government presumably sought to depict in the appellant, the evidence of Plan A was sufficient to assuage any concerns that members needed to fall back on evidence of Plans B and C. With those concerns assuaged, there is no prejudice.

## B. Former testimony of co-conspirators

The appellant challenges the military judge's ruling that certain government witnesses were unavailable and their prior testimony was admissible.

"So long as the military judge understood and applied the correct law, and the factual findings are not clearly erroneous, neither the military judge's decision to admit evidence, nor his unavailability ruling, should be overturned." *United States v. Cabrera-Frattini*, 65 M.J. 241, 245 (C.A.A.F. 2007).

An accused's Sixth Amendment right to confront witnesses against him normally prevents the government from admitting a witness's former testimony—testimonial evidence—without producing the witness for cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 51 (2004). But if the witness is unavailable, and has previously been subject to the accused's cross-examination, such testimonial evidence may be admissible. *Id.* at 59 (concluding that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine"); *see also Cabrera-Frattini*, 65 M.J. at 245.

### 1. Unavailability of witnesses

"The test for unavailability focuses on 'whether the witness is not present in court in spite of good-faith efforts by the Government to locate and present the witness.'" *Cabrera-Frattini*, 65 M.J. at 245 (quoting *United States v. Cokeley*, 22 M.J. 225, 228 (C.M.A. 1986)). We review a military judge's

determinations of witness unavailability—and the government's good faith efforts to produce the witness—for an abuse of discretion. *Id.*

Among the reasons for witness unavailability enumerated in MIL. R. EVID. 804(a) are "(1) exempt[ion] from testifying about the subject matter of the declarant's statement because the military judge rules that a privilege applies;" and "(2) refus[al] to testify about the subject matter despite the military judge's order to do so[.]" A witness may refuse to testify by invoking his privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and, where applicable, Article 31, UCMJ. U.S. CONST. amend V. To overcome a witness's privilege against self-incrimination and compel his testimony, the government must confer testimonial immunity, as described in MIL. R. EVID. 301(d)(1):

> The minimum grant of immunity adequate to overcome the privilege is that which under either R.C.M. 704[53] or other proper authority provides that neither the testimony of the witness nor any evidence obtained from that testimony may be used against the witness at any subsequent trial *other than in a prosecution for perjury, false swearing, the making of a false official statement*, or failure to comply with an order to testify after the military judge has ruled that the privilege may not be asserted by reason of immunity.

(emphasis added). Testimonial immunity does not protect against prosecution for perjury, *United States v. Swan*, 45 M.J. 672, 679 (N-M. Ct. Crim. App. 1996); that protection requires transactional immunity.[54] But "[t]he government is not required to seek transactional immunity to demonstrate a good faith effort." *United States v. Trank*, No. 20130742, 2013 CCA LEXIS 985, at *16 (A. Ct. Crim. App. 2013) (citing *Kastigar v. United States*, 406 U.S. 441, 453 (1972)).

In *Trank*, the alleged victim—a civilian—testified under oath at an Article 32, UCMJ, preliminary hearing about sexual abuse and was subject to cross-examination. *Id.* at *5-*6. Later, she indicated through counsel that she intended to recant her allegation and would invoke her Fifth Amendment right against self-incrimination rather than testify at court-martial. *Id.* at *6. The government obtained a grant of testimonial immunity for the alleged victim from an Assistant United States Attorney and unsuccessfully sought

---

[53] RULE FOR COURTS-MARTIAL (R.C.M.) 704, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) provides for grants of immunity to witnesses subject to the UCMJ.

[54] *See* R.C.M. 704(a)(1). "A person may be granted transactional immunity from trial by court-martial for one or more offenses under the [UCMJ]."

transactional immunity from the state government, but prosecutors declined to return to the United States Attorney for a grant of transactional immunity. *Id.* at *7. The military judge found the alleged victim to be unavailable, and the Army Court of Criminal Appeals agreed that a grant of transactional immunity was not required before finding a witness unavailable. *Id.* at *16.

In *Swan*, a witness testified at an Article 39(a), UCMJ, session that his statement to NCIS implicating Swan was a fabrication. 45 M.J. at 679. The government offered the witness testimonial immunity, but not transactional immunity, and instead pursued perjury charges against him for his Article 39(a), UCMJ, testimony. *Id.* The military judge questioned the witness about his refusal to testify, determined that he had invoked his Article 31(b), UCMJ, rights, and declared him unavailable. *Id.* at 679-80. This court affirmed the military judge's ruling of unavailability, finding that he "made sufficient inquiries to establish that [the witness] would exercise his privilege against compelled self-incrimination despite the purported grant of immunity." *Id.* at 680.

In the case before us, the government subpoenaed the appellant's former squad mates, all civilians by the time of trial, to testify for the prosecution. HM3 Bacos, PFC Jodka, LCpl Pennington, and LCpl Shumate took the stand in Article 39(a), UCMJ, sessions. Despite receiving grants of testimonial immunity,[55] they each invoked their Fifth Amendment privilege against self-incrimination, cited a fear of prosecution for perjury, and declined to comply with the military judge's order to testify. Based on this Article 39(a), UCMJ, testimony, the military judge found HM3 Bacos, PFC Jodka, and LCpl Pennington unavailable. LCpl Shumate's Article 39(a), UCMJ, session followed the military judge's verbal ruling that the three preceding witnesses were unavailable, and he neglected to explicitly declare LCpl Shumate unavailable. This oversight elicited no objection from the appellant, and the military judge simply dismissed LCpl Shumate after his Article 39, UCMJ, testimony and proceeded with the admission of his prior testimony based on his refusal to testify.

The military judge made no specific findings of fact, but he elicited from each of the four witnesses testimony that met the MIL. R. EVID. 804(b)(1) criteria for unavailability—their intent to invoke their privilege against self-

---

[55] AE CXXX, CXXXII-CXXXIV. HM3 Bacos, PFC Jodka, LCpl Pennington, and LCpl Shumate each received a "Grant of Testimonial Immunity and Order to Testify" from the CA under authority from the Justice Department. In return for testifying truthfully, each had "immunity from the use of [his] testimony or other information given by [him] . . . except a prosecution for perjury, giving a false statement, or otherwise failing to comply with an order to testify in these matters."

incrimination to avoid testifying that they had committed perjury at the first court-martial and their refusal to testify despite being ordered to do so. Although the military judge did not elaborate on the good faith efforts of the government to produce the witnesses, all witnesses were present and took the stand to confirm the circumstances that made them unavailable. The government had procured the required grants of testimonial immunity. Despite the appellant's argument that good faith required TC's application for transactional immunity, our military case law precedent is clear that only testimonial immunity is necessary. The military judge's rulings were in accordance with MIL. R. EVID. 804(b)(1) and *Swan*, which he cited as authority, as well as *Trank*. We find no abuse of discretion with regard to the unavailability of HM3 Bacos, PFC Jodka, LCpl Pennington, and LCpl Shumate.

Having found the four witnesses unavailable, the military judge invited the government to seek admission of their testimony from the prior court-martial. To determine if admission of that prior testimony were an abuse of discretion, we next look at the appellant's opportunity to cross-examine the witnesses.

*2. Opportunity and similar motive for cross-examination*

If a witness is unavailable, MIL. R. EVID. 804(b)(1) provides an exception to the rules against hearsay allowing admission of the unavailable witness's former testimony. The exception applies to testimony that "(A) was given by a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and (B) is now offered against a party who had an opportunity and similar motive to develop it by direct, cross-, or redirect examination." MIL. R. EVID. 804(b)(1).

The appellant argues he did not have a similar motive to cross-examine the four unavailable co-conspirators at his first trial.

Whether there was a similar motive to cross-examine a witness at a prior proceeding is a question of law we review *de novo*. *Trank*, 2013 CCA LEXIS 985, at *15. The party seeking to admit prior testimony as evidence must demonstrate similarity of motive. *United States v. Salerno*, 505 U.S. 317, 322 (1992) (finding no exception to MIL. R. EVID. 804(b)(1)'s "similar motive" requirement for admitting prior testimony). The appellant steers us to *United States v. DiNapoli*, 8 F.3d 909 (2nd Cir. 1993), for the meaning of similar motive to develop testimony. In *DiNapoli*, the Second Circuit composed a test for what constitutes a similar motive at two proceedings: "whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue." 8 F.3d at 914-15. The "relevant though not conclusive" factors for comparing relative intensity of

interest are "[t]he nature of the two proceedings—both what is at stake and the applicable burden of proof—and, to a lesser extent, the cross-examination at the prior proceeding—both what was undertaken and what was available but forgone . . . ." *Id.* at 915.

The context of this analysis in *DiNapoli* is revealing. The party resisting admission of the offered testimony was the government. *Id.* at 911. The two proceedings were a grand jury and a trial. *Id.* A prosecutor declined to cross-examine a witness at a grand jury "in order not to reveal the identity of then undisclosed cooperating witnesses or the existence of then undisclosed wiretapped conversations that refuted [the witness's] denials . . . ." *Id.* It is logical to conclude that the lower stakes and burden of proof at the grand jury prompted the prosecutor to forego that line of cross-examination. On the other hand, when the nature of the two proceedings is the same—for example, testimony on findings at a court-martial—the prospect of conviction or acquittal is the same, and the government's burden of proof is the same. A shift in cross-examination strategy does little to change the intensity of the accused's interest in avoiding conviction. In fact, the *DiNapoli* court noted that "[w]here both proceedings are trials and the same matter is seriously disputed at both trials, it will normally be the case that the side opposing the version of a witness at the first trial had a motive to develop that witness's testimony similar to the motive at the second trial." *Id.* at 912.

In this case, the military judge found "that the exception [MIL. R. EVID.] 804(b)1 [sic] regarding former testimony would apply, making the former testimony in this prior trial, not the other cases we've heard about, would become [sic] admissible if so desired by the government to introduce them."[56] This ruling immediately followed the military judge's declaration that three of the appellant's squad members were unavailable as witnesses. TC did not file a written motion in limine to admit the prior testimony, nor did they proffer the appellant's similar motives to develop the testimony at the first and second courts-martial on the record. As the appellant points out, the military judge made no findings of fact or conclusions of law regarding similarity of motive, from the bench or in writing.

But again, we presume the military judge knows and follows the law unless there is evidence to the contrary. *See Erickson*, 65 M.J. at 225 (holding that "[m]ilitary judges are presumed to know the law and to follow it absent clear evidence to the contrary"). And here we find no evidence to the contrary, particularly in light of our *de novo* review of the similarity of motives. The government sought to introduce the prior testimony of witnesses to prove the same charges against the same accused in the same forum—a contested

---

[56] Record at 1528.

general court-martial. Even the *DiNapoli* court would agree that the motive to develop that testimony would normally be the same. 8 F.3d at 912. The appellant fails to rebut that expectation of similarity.

On the record, TDC argued that the defense team at the first trial was ineffective. TDC further contended that "different charges pending, different theories of the government and defense, and different motivations and strategic decisions made by both counsel" negated the appellant's prior confrontation of the witnesses.[57] In his brief, the appellant alleged that his first trial defense counsel team "explicitly conceded nearly all of the charged offenses."[58] But all of the charges referred to the appellant's second court-martial were also referred to his first court-martial. Housebreaking and kidnapping fell off the charge sheet, and premeditated murder became unpremeditated murder, but the appellant was still accused of murder and conspiracy to commit murder. The appellant pleaded not guilty to all charges on both occasions. TDC offered no evidence that the intensity of the appellant's interest in fighting for his life against murder charges differed from one trial to the next. "A shift in the theory of the case does not defeat admissibility when the underlying liability remains the same, thereby guaranteeing cross-examination with the same purpose . . . ." 5-804 Weinstein's Federal Evidence § 804.04 (2017); *see also United States v. Avants*, 367 F.3d 433, 444 (5th Cir. 2004) (finding that, in a case where the appellant's "motive was to discredit a witness . . . whose testimony could, if believed, convict him," a change in trial strategy did not create dissimilarity in motive).

Much of the appellant's strategy for attacking his squad mates' testimony rests on their freshly sworn affidavits renouncing their previous statements to NCIS and earlier testimony as coerced and false. Nevertheless, the discovery of new evidence useful to cross-examining a witness does not inject dissimilarity into the comparison of motives. "The 'similar motive' requirement is satisfied if counsel had the opportunity to cross-examine the witness without restriction on the scope of the examination even if counsel subsequently discovers information which was not available at the [previous] hearing." *Trank*, 2013 CCA LEXIS 985, *13-14 (citation omitted); *see also United States v. Hubbard*, 28 M.J. 27, 32 (C.M.A. 1989) (reiterating that "admissibility of former testimony is not precluded because, after the giving of that testimony, material information is obtained as to which the defense had no opportunity to cross-examine the absent witness"). Nothing prevented the appellant's first trial defense counsel team from exploring the

---

[57] *Id.* at 1642.

[58] Appellant's Brief at 46.

circumstances under which the squad members made their statements to NCIS then negotiated immunity and favorable pretrial agreements in return for testifying at other courts-martial, including the appellant's.

Comparing his two trial defense teams in hyperbolic terms, the appellant tries to elevate difference in strategy to a difference in motive. The difference in strategy manifested in the zeal with which the trial defense teams sought to discredit the squad members' testimony. But the purported unreliability of testimonial evidence alone will not prevent its admission, even under MIL. R. EVID. 804(b)(1). Our superior court has declined to suppress testimonial evidence based on credibility concerns alone because "factual reliability does not have to be established as a prerequisite for admitting hearsay evidence pursuant to a well-recognized hearsay exceptions." *See Hubbard*, 28 M.J. at 33.

While we have no findings of fact from the military judge, the appellant does not dispute that his first defense counsel team had the opportunity to cross-examine all four witnesses later declared unavailable. The charges the appellant faced at his first court-martial and his not guilty pleas are not subject to debate. The appellant has not introduced evidence sufficient to overcome those undisputed facts. The military judge also cited the correct rule, MIL. R. EVID. 804(b)(1), in admitting the testimonial evidence, and his ruling does not run afoul of the appellant's preferred legal standard in *DiNapoli*: "whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue." 8 F.3d at 914-15. Finding interests of substantially similar intensity at both courts-martial to dispute a substantially similar set of testimony and disprove a substantially similar set of charges, we find no abuse of discretion in the military judge's admission of the four unavailable squad members' former testimony.

## C. UCI

The appellant alleges that public statements made by then-Secretary of the Navy (SECNAV) Ray Mabus constituted UCI on the appellant's clemency proceedings, appellate review, and second court-martial.

We review allegations of UCI *de novo. United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013).

Article 37(a), UCMJ, prohibits unlawful influence on the military justice process by someone in a position of authority:

> No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military

judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercises of its or his functions in the conduct of the proceedings. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

10 U.S.C. § 837(a) (2012).

Interpreting Article 37, UCMJ, in light of case law explored *infra*, we can distill something of a formula for facts constituting UCI: (1) a government actor (2) takes action which influences or appears to influence (3) a decision-maker in the court-martial process. The affected decision-maker might be a potential court-martial member, CA, or military judge. In his analysis of alleged UCI in this very case, former Chief Judge Baker of the CAAF set out the following factors in the context of a government actor making a public statement: the comments' intended audience, the intended and larger audience's perception of the comments, existence of an intent to influence a proceeding's outcome, the implicit or explicit threat of repercussions for dissent, and regardless of any intent, an effect of influencing outcome or actors. *Hutchins IV*, 72 M.J. at 313 (Baker, C.J., dissenting). These factors, while admittedly not binding, are instructive. The potential influence is unauthorized or unlawful because through "censure, reprimand, or admonish[ment]"[59] or something similar, a government actor manipulates, interferes with, or improperly strips the actors in the court-martial process of their independence.

To show prejudice or compromise of the military justice process, a complaining party must tie these facts constituting UCI to some effect. "In cases involving [UCI], the key to our analysis is effect—not knowledge or intent" of the government actor. *United States v. Boyce*, 76 M.J. 242, 251 (C.A.A.F. 2017). The effect may be actual prejudice to the complainant or the appearance of it. The prejudice may be unforeseen, accidental collateral damage, but it nevertheless results from—or in the case of apparent UCI, appears to result from—governmental interference in the military justice process. *See United States v. Stombaugh*, 40 M.J. 208, 211 (C.A.A.F. 1994) (focusing on "interference with the substantial rights of the accused" in analyzing allegations of UCI).

---

[59] Art. 37(a), UCMJ.

### 1. Actual UCI

"[A]ctual [UCI] has commonly been recognized as occurring when there is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *Boyce*, 76 M.J. at 247 (citations omitted). An appellant has the initial burden of raising UCI by showing: (1) "facts which, if true, constitute [UCI];" (2) "that the proceedings were unfair;" and (3) "that UCI was the cause of the unfairness." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999). The evidentiary standard for raising the issue of UCI is "some evidence." *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002); *United States v. Ayala*, 43 M.J. 296, 300 (C.A.A.F. 1995). The appellant's burden of proof is low, but it must be more than mere allegations or speculation. *Stoneman*, 57 M.J. at 41. The appearance of evil is not enough to justify action by an appellate court in a particular case or, said another way, "[p]roof of command influence in the air" will not suffice. *Stombaugh*, 40 M.J. at 213 (internal quotation marks omitted) (alteration in original).

If the appellant raises some evidence of UCI the burden shifts to the government to rebut the allegation by persuading the court, beyond a reasonable doubt, that: (1) the predicate facts do not exist; (2) the facts do not constitute UCI; (3) the UCI did not affect the findings or sentence; or (4) if on appeal, by persuading the appellate court that the UCI had no prejudicial impact on the court-martial. *Salyer*, 72 M.J. at 423; *Biagase*, 50 M.J. at 151.

### 2. Apparent UCI

"Even if there [is] no actual [UCI], there may be a question whether the influence of command placed an 'intolerable strain on public perception of the military justice system.'" *Stoneman*, 57 M.J. at 42-43 (quoting *United States v. Wiesen*, 56 M.J. 172, 175 (C.A.A.F. 2001)). Unlike actual UCI, which requires prejudice to the accused, "no such showing is required for a meritorious claim of an appearance of [UCI]. Rather, the prejudice involved . . . is the damage to the public's perception of the fairness of the military justice system as a whole[.]" *Boyce*, 76 M.J. at 248. An appellant raises a claim of apparent UCI by demonstrating (1) "facts, which if true, constitute [UCI];" and (2) that "this [UCI] placed an 'intolerable strain' on the public's perception of the military justice system because 'an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding.'" *Id.* at 249 (quoting *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006)). As with actual UCI, the appellant must show "some evidence" greater than "mere allegation or speculation." *Biagase*, 50 M.J. at 150. Some evidence of UCI will again shift the burden to the government to disprove one prong or the other beyond a reasonable doubt. *Boyce*, 76 M.J. at 249-250.

With this framework for analyzing UCI in mind, we turn to the facts of the case before us.

### 3. SECNAV's statements to the media

The appellant identifies SECNAV as the singular source of the UCI allegedly impacting him. It appears SECNAV became personally involved in the appellant's case two years after his first court-martial. The appellant approached some of his congressional representatives and requested they solicit clemency from SECNAV on his behalf.[60] As later reported in the media, SECNAV reviewed the records of the Hamdaniyah courts-martial, denied the appellant's request for clemency, and ordered that his four most junior squad members be administratively separated from the Marine Corps and Navy and that the squad lieutenant be ordered to show cause why he should remain in the Marine Corps.

These were acts outside the court-martial process and within SECNAV's authority. Administrative separation is not an authorized court-martial punishment.[61] SECNAV was and is the highest separation authority in the Marine Corps and the Navy.[62] We will discuss SECNAV's role and authority in granting clemency *below*. But it is SECNAV's public announcement of these administrative actions and his reasons for them that form the basis of the appellant's UCI claims.

In November 2009, SECNAV gave interviews about his recent administrative actions regarding the appellant and other members of his squad implicated in the killing at Hamdaniyah. The appellant attached two of the resulting news articles to his Motion to Dismiss for UCI: one printed in The Marine Corps Times and one printed in The North County Times, a San Diego regional newspaper.[63] From the newspaper articles, we can conclude that SECNAV's audience was Marines, the Marine Corps community, and specifically, the community surrounding Camp Pendleton, California.

One article quoted SECNAV on his reasons for denying the appellant's clemency request: "'I thought that it was a sentence commensurate with the

---

[60] AE LXXXVIII at 78.

[61] R.C.M. 1003(b)(8).

[62] *See* Marine Corps Separation and Retirement Manual at ¶¶ 1002.51, 6002.17, 6214.1 (Ch-2, 6 Jun 2007); Naval Military Personnel Manual, Art. 1910-704 (22 Aug 2002).

[63] AE LXXXVIII at 74-78 (Gidget Fuentes, *SecNav: No Clemency in Iraqi murder plot*, THE MARINE CORPS TIMES, Nov. 17, 2009; Mark Walker, *Navy Secretary boots 4 Pendleton troops involved in Iraqi's killing*, THE NORTH COUNTY TIMES, Nov. 17, 2009).

crime,'" and "a senior Marine Corps commander's" reduction of the appellant sentence from 15 years to 11 years "'shows greatly substantial clemency already.'"[64] The reporter later identified that senior Marine Corps commander as then-Lieutenant General James Mattis, the CA. The article went on to share SECNAV's impression of the case:

> Mabus said he was surprised to learn that the killing was "so completely premeditated, that it was not in the heat of battle that not only was the action planned but the cover-up was planned, and that they picked somebody at random, just because he happened to be in a house that was convenient. He was murdered."

> "It wasn't somebody coming apart under pressure. It wasn't in the middle of action, in the middle of battle," the [SECNAV] said. "It was completely planned and completely executed. . . . That was disconcerting."[65]

The remainder of the article addressed SECNAV's concurrent decision to order the administrative separations of LCpl Jackson, LCpl Shumate, PFC Jodka, and HM3 Bacos, and his order that the squad lieutenant show cause why he should remain in the Marine Corps.

The second article led with SECNAV's orders that the four junior squad members be administratively separated and that the lieutenant show cause.[66] While the second article reported SECNAV's decision to deny clemency to the appellant, it contained no comments from SECNAV about the appellant's clemency request. The reporter quoted SECNAV about the squad members more generally:

> "None of their actions lived up to the core values of the Marine Corps and the Navy . . . . This was not a 'fog of war' case occurring in the heat of battle. This was carefully planned and executed, as was the cover-up. The plan was carried out exactly as it had been conceived."[67]

---

[64] *Id.* at 74 (Fuentes, *SecNav: No Clemency in Iraqi murder plot*).

[65] *Id.* at 75 (Fuentes, *SecNav: No Clemency in Iraqi murder plot*).

[66] *Id.* at 77 (Walker, *Navy Secretary boots 4 Pendleton troops involved in Iraqi's killing*).

[67] *Id.* at 77 (Walker, *Navy Secretary boots 4 Pendleton troops involved in Iraqi's killing*).

The second reporter then quoted military law experts and two of the junior squad members' defense counsel on their reaction to the ordered administrative separations.

SECNAV, a government actor capable of UCI,[68] informed the Marine Corps community and the general public of administrative actions he had taken toward Marines and a Sailor implicated in the killing at Hamdaniyah, all but one of whom had previously been convicted at court-martial. The question before this court, then, is whether SECNAV's public pronouncements amount to "censure, reprimand, admonish[ment]" of, or an attempt to threaten, coerce, or influence, another player in the court-martial process.[69] As this is not the first case in which a senior official has spoken out about a high visibility issue, we look at two earlier cases resulting in similar allegations of UCI.

In 1998, a Marine Corps aircraft struck cables supporting an alpine gondola near Aviano, Italy; all 20 people in the gondola died. *See United States v. Ashby*, 68 M.J. 108, 112 (C.A.A.F. 2009). While a Marine Corps Command Investigation Board (CIB) conducted a preliminary investigation, "there was intense international media coverage of the gondola incident and unsettled political relations between the United States and Italy." *Id.* at 126. Upon completion of the preliminary investigation, the general officer who led the CIB held a press conference announcing their findings. *Id.* at 127. The general officer who ordered the investigation and would later refer charges against Ashby issued a press release announcing his agreement with the CIB's conclusions. *Id.* One day after the Article 32, UCMJ, hearing in the case, the Commandant of the Marine Corps (CMC) told one of Ashby's peers that the "mishap crew would be disciplined if they did anything wrong and that 'if someone is guilty, they need to be punished.'" *Id.* Behind the scenes, the CMC, CA, the CIB, and other senior officials exchanged multiple phone calls about the status of the investigation and its findings. *Id.* at 126.

Citing pressure on the CIB and multiple public statements about his case from senior Marine Corps officials, Ashby raised a claim of UCI. Finding no actual UCI, the CAAF focused on Ashby's speculation vice presentation of actual evidence:

> His claims regarding the CIB are predicated on communications between the members of the CIB and various

---

[68] SECNAV is neither a CA nor a commanding officer, and is not subject to the UCMJ, thus Article 37, UCMJ, does not appear to apply to him. The CAAF's opinion in *Boyce*, however, clearly holds that a service secretary can be the source of UCI. 76 M.J. at 252.

[69] Art. 37, UCMJ.

senior military officers. However, he has failed to show facts which, if true, would demonstrate that the CIB members were wrongfully influenced.

. . . .

With regard to Ashby's claim of [UCI] arising from the other actions by senior military officials, including the Commandant, Ashby has not pointed to any . . . specific facts that the court-martial process was tainted by unlawful command influence. Because of the highly publicized international nature of the incident, it is understandable that many senior military officials became publicly involved in the aftermath and investigation of the accident. However, there is no direct evidence that the actions of any of those officials improperly influenced Ashby's court-martial.

*Id.* at 128-29. Nor did the CAAF find some evidence of apparent UCI in the public statements. *Id.* at 129.

While not necessarily an international incident, the issue of sexual assault was one of the highest visibility issues in the military in 2012. The CMC embarked on a four-month tour of Marine Corps installations, delivering what was coined the "Heritage Brief" to as many Marine officers and staff noncommissioned officers as he could reach. *United States v. Howell*, 2014 CCA LEXIS 321, at *3 (N-M. Ct. Crim. App. 22 May 2014). In the brief, the CMC stressed the legitimacy of 80% of sexual assault claims and the underreporting of sexual assaults. *Id.* at *6-*7. He expressed his deep disappointment in Marine Corps court-martial members, among others, for becoming soft and retaining Marines who commit misconduct instead of holding them accountable and getting rid of them. *Id.* at *7-*8. Howell's court-martial for sexual assault was pending at Parris Island, South Carolina, when the CMC delivered the Heritage Brief there, *id.* at *3-*4, and the Heritage Brief was the subject of national media coverage the week before the members reported for the trial. *Id.* at *11.

On appeal, this court found some evidence of UCI in the CMC's remarks about sexual assault in the Marine Corps and the need to hold those who commit sexual assault accountable. *Id.* at *28. *Voir dire* of the members revealed that:

eight of the eleven members attended the Heritage Brief; many had also either read White Letter 2-12[70] or the media coverage;

---

[70] In conjunction with the Heritage Brief tour, the CMC issued White Letter 2-12, addressed to all Marines, announcing a Marine Corps-wide campaign to address

> virtually all acknowledged a high degree of deference to the CMC, particularly when he holds a strong opinion on a topic; they recalled the Heritage Brief primarily focusing on two things – sexual assault and accountability; almost all remembered and accepted as true the CMC's statement that 80% of sexual assault allegations are legitimate; and, most would characterize the CMC as unhappy, frustrated, or disappointed in his officers and senior enlisted for their failure to hold Marines accountable.

*Id.* at *14. This court concluded that the three military judges presiding over the case had failed to cure the appearance of UCI by not excusing more of the members or rehabilitating them through curative instruction. *Id.* at 35-37. A more carefully vetted panel of members, instructed on their independence as fact finders, could have tried the case with an objective outsider's confidence in the integrity of the process. But this court did not believe the Heritage Brief in and of itself was fatal and necessitated dismissal of the charges with prejudice. *Id.* at *37-38; *see also id.* at *39 (Ward, S.J. concurring) (agreeing with the majority that the Heritage Brief does not create an appearance of UCI *per se*).

Returning to the case at bar, we look for evidence of actual influence or some effect that suggests influence on military justice proceedings. In this case, SECNAV publicized administrative actions he had already taken or ordered while the appellant's court-martial was still pending appeal before this court in November 2009. But SECNAV made no mention of a pending appeal. He cited the findings of the courts-martial as justification for the administrative actions he had already taken.

The appellant accuses SECNAV of deliberately misrepresenting the facts and findings of his case in the articles. SECNAV described the killing as premeditated, contrary to the appellant's acquittal of premeditated murder. But in light of the appellant's concurrent conviction for conspiracy to commit murder, we cannot impugn intentional misrepresentation to his use of the word "premeditated." SECNAV also appeared not to have interpreted the appellant's acquittal of housebreaking and kidnapping as an acquittal of a conspiracy to murder a random Iraqi man. In light of our analysis of that issue above, we also decline to find SECNAV's lack of precision intentionally deceptive.

---

sexual assault and his expectation that leadership be engaged in addressing it. *Howell*, 2014 CCA LEXIS 321, at *9.

SECNAV's words of "censure, reprimand, or admonish[ment]"[71] were reserved for the appellant, his squad members, and the squad lieutenant. To the extent SECNAV rebuked earlier decisions to retain the three junior Marines and the Sailor, he indirectly criticized administrative separation decisions separate and distinct from the court-martial process. But there were no expressions of disappointment or frustration with CAs, members, or anyone else referring or adjudicating charges at courts-martial.

Although SECNAV's comments, excerpted from the November 2009 articles, have been repeatedly reproduced in numerous publicly available print and online articles, the record reveals no new comments or actions from SECNAV regarding the appellant since the interviews in November 2009. Other than a vague reference to requests for information about the status of the appellant's second court-martial from "the Secretariat" in a staff judge advocate's routine email correspondence,[72] there is no evidence of SECNAV, or anyone acting on his behalf, directly contacting anyone, in or out of the Department of the Navy, about the appellant or this case. In fact, the appellant alleges that SECNAV's subordinates were influenced by nothing more than their awareness of their superior's opinions from these articles. In his brief, the appellant repeatedly alleges that subordinates bowed to SECNAV's influence because they "*were aware of Secretary Mabus' comments*."[73]

### 4. *Decision-makers allegedly influenced*

We turn now to government actors and entities who subsequently made a recommendation, a decision, a ruling, or took some action related to the appellant's first or second court-martial. Assuming without deciding that the appellant has alleged facts constituting UCI in SECNAV's words alone, we proceed with the *Biagase* and *Boyce* tests. To find actual UCI, we must find "that the proceedings were unfair" and "that [UCI] was the cause of the unfairness." *Biagase*, 50 M.J. at 150. To find apparent UCI, we must find that "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Boyce*, 76 M.J. at 249 (citation and internal quotation marks omitted).

---

[71] Art. 37, UCMJ.

[72] AE LXXXIII.

[73] Appellant's Brief at 63.

a.  Naval Clemency and Parole Board (NC&PB)

The appellant cites "denied clemency/parole in Jan 2010" as the first of the "unfair actions" resulting from SECNAV's comments.[74]

Clemency is available to service members primarily through three statutory avenues: Article 60, UCMJ; Article 74, UCMJ; and 10 U.S.C. § 953. Article 60, UCMJ, requires a CA to consider matters an accused submits in clemency before taking action on the findings and sentence of a court-martial. At the time of the appellant's first court-martial, the CA had unfettered authority under Article 60, UCMJ, to "disapprove, commute, or suspend the sentence in whole or in part."[75] Under Article 74(a), UCMJ: "The Secretary concerned and, when designated by him, any Under Secretary, Assistant Secretary, Judge Advocate General, or commanding officer may remit or suspend any part or amount of the unexecuted part of any sentence, including all uncollected forfeitures other than a sentence approved by the President." Pursuant to 10 U.S.C. § 953, SECNAV maintains the NC&PB as his system for granting clemency.[76]

With a few inapplicable exceptions, SECNAV has delegated his authority to act in matters of clemency and parole to the Assistant SECNAV for Manpower and Reserve Affairs (ASN(M&RA)).[77] The NC&PB is composed of a civilian director and four senior officers representing communities in the Marine Corps and Navy.[78] The board's mission is to "act for or provide recommendations or advice to SECNAV in the issuance of decisions regarding clemency or parole matters[.]"[79] Among the board's functions is to "submit to SECNAV, with recommendation for final action . . .

(a)      Cases in which SECNAV or a designee has indicated in writing an official interest. . . .

(d)      Any individual whose clemency may be the subject of controversy or substantial congressional or press interest as determined by SECNAV or a designee . . .

---

[74] *Id.* at 61.

[75] Art. 60(c)(2), UCMJ. The appellant's CA reduced his sentence to confinement from 15 years to 11 years pursuant to his Article 60, UCMJ, authority.

[76] Secretary of the Navy Instruction (SECNAVINST) 5815.3J (12 Jun 2003).

[77] *Id.* at ¶ 205 (emphasis omitted).

[78] *Id.* at ¶ 307.

[79] *Id.* at ¶ 306.

> (e)      Cases in which the NC&PB recommends clemency for any offender whose approved unsuspended, [sic] sentence to confinement is in excess of 10 years . . . ."[80]

Clemency and parole are not rights but decisions within the NC&PB's and SECNAV's discretion.[81] While consideration of clemency is part of the post-trial process, it is considered an executive, not a judicial function. *See United States v. Healy*, 26 M.J. 394, 395-96 (C.M.A. 1988).

Given SECNAV's statutory authority to grant or deny clemency, we are skeptical that his influence over the process, assuming he had any, was inappropriate, much less unlawful. As Chief Judge Baker wrote in his dissent in *Hutchins IV*, "[SECNAV] would be hard pressed to exercise unlawful command influence over the NC&PB clemency decision over which he retains sole discretion with the sort of public comments attributed to him in this case." 72 M.J. at 317 (Baker, C.J., dissenting). Judge Ryan, in her concurring opinion in *Hutchins IV*, acknowledged that "SECNAVINST 5815.3J limits the NC&PB's role in Appellant's clemency process to one that merely advises the Secretary on a matter committed, by statute, to his discretion." *Id.* at 303 (Ryan, J. concurring in the result). The appellant accuses SECNAV of interfering in his own process by revealing his opinion to his own advisers. If SECNAV's public comments are the source of UCI, the revelation of the opinion, not the manner in which SECNAV reached it, is the issue. Assuming without deciding that SECNAV could inappropriately influence his own advisers by communicating a decision to them, we evaluate the evidence in light of the tests in *Biagase* and *Boyce*.

The appellant offers no evidence as to why a decision to deny him clemency or parole was unfair. He simply includes it in a list of unfavorable actions and decisions made since November 2009 that he characterizes as "unfair."[82]

Moving to the third *Biagase* factor, causation, the appellant alleges that the NC&PB reversed course and recommended no clemency—when they had previously recommended a six-year reduction in confinement—because they were "aware" of SECNAV's opinion.[83] First, that argument rests on the unsupported assumption that board membership was constant from 2009 to 2010. But more important, the government presented evidence undermining the purported effect of SECNAV's statement. TC presented the acting

---

[80] *Id.* at ¶ 308.a.(6) (emphasis omitted).

[81] *Id.* at ¶ 308.a and b.

[82] Appellant's Brief at 61.

[83] *Id.* at 63.

ASN(M&RA)'s 10 March 2009 memorandum notifying the President of the NC&PB of his disagreement with the board's recommendation and denial of *any* clemency for the appellant.[84]

In his Motion to Dismiss for UCI, the appellant detailed his further requests for clemency and the results. In June 2010, the appellant was released from confinement following this court's decision to set aside his conviction. After being ordered back into confinement in February 2011, the appellant filed a special request for clemency with the NC&PB. The board recommended reducing the appellant's sentence by 251 days, and the acting ASN(M&RA) approved.[85] The NC&PB subsequently recommended parole in June 2011, but the new ASN(M&RA) disapproved. A year later, the NC&PB recommended *against* clemency and parole, but then in 2013, the board recommended granting parole. ASN(M&RA) rejected the recommendation.[86] This fluctuation further undermines any reasonable expectation of consistency in recommendations from year to year.

Looking at the facts presented by both the appellant and the government, we do not see "some evidence" that the appellant's proceedings for requesting clemency were unfair or that the appellant was denied additional clemency because of SECNAV's public statements. ASN(M&RA) rejected NC&PB's recommendation for clemency in March 2009 and communicated his decision directly to the President of the NC&PB. The appellant has failed to demonstrate how SECNAV subsequently interfered with the process or inappropriately influenced the NC&PB by reaching the identical decision eight months later and indirectly communicating it to the NC&PB via the media.

Turning to apparent UCI of the NC&PB, we note that a member of the CAAF previously concluded that "[n]o member of the public, aware of the remarks made and the change in clemency recommendation that occurred, could fail to harbor grave concerns that the change in the NC&PB's clemency recommendation was directly related to the Secretary's intemperate remarks about Appellant[.]" *Hutchins IV*, 72 M.J. at 302-03 (Ryan, J. concurring in the result). However, it appears Judge Ryan reached her conclusion without the benefit of ASN(M&RA)'s March 2009 memorandum, which the government subsequently submitted during the appellant's second court-martial. In light of that evidence, we are convinced, beyond a reasonable doubt, that the government has dispelled any notion that "[UCI] placed an intolerable strain on the public's perception of the military justice system because an objective,

---

[84] AE LXXXIX at 23.

[85] AE LXXXVIII at 8.

[86] *Id*. at 8-9.

disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Boyce*, 76 M.J. at 249.

When the appellant raised the effect of UCI on the NC&PB before his second court-martial, the government presented ASN(M&RA)'s 10 March 2009 memorandum to the President of NC&PB. In it, he declined to approve the board's recommendation to reduce the appellant's confinement by six years and denied any clemency for the appellant. In the routine correspondence documenting his decision, ASN(M&RA) went on to respond to the NC&PB's recommendation with the following:

> Having thoroughly reviewed Private Hutchins' case, specifically including the evidence presented on his behalf, I found the adjudged sentence to be appropriate for the murder of an innocent Iraqi national and the subsequent attempts to fraudulently cast the incident as an attack upon United States forces. These acts represented a significant departure from the conduct expected of a Marine, no matter how dire the situation or circumstances.[87]

The decision and the comments supporting it predated SECNAV's comments by eight months, and there is no evidence that SECNAV was aware of the exchange or in any way influenced ASN(M&RA). In fact, the record suggests that SECNAV only became involved in the appellant's case when congressional members approached him personally on the appellant's behalf. Any consultation between SECNAV and ASN(M&RA) in advance of ASN(M&RA)'s decision to deny the clemency recommendation would have defeated the purpose of SECNAV's delegation of authority.

Although apparent UCI does not require evidence of causation, it is the appearance that SECNAV abruptly derailed the appellant's prospects for clemency with his comments that constitutes the evidence of apparent UCI in this case. ASN(M&RA)'s unequivocal denial of the appellant's clemency in remarkably similar terms, addressed directly to the board eight months earlier, negates that appearance. No observer aware of that March 2009 denial can believe that, but for SECNAV's comments, the appellant would have received the NC&PB's recommended clemency. To the extent subsequent NC&PB board members felt chilled against recommending clemency for the appellant, a reasonable observer would be hard pressed to attribute that chilling effect to SECNAV instead of the senior official who had already disapproved the recommendation as a matter of due course.

---

[87] AE LXXXIX at 23.

This evidence undermining the appearance that NC&PB reversed course in response to SECNAV's comments also addresses the first of three points Judge Ryan found bolstered her concerns about the fairness of the clemency process:

> (1) the NC&PB's dramatic change following the Secretary's comments that Appellant receive no clemency or parole; (2) the subordinate status of all NC&PB members to the Secretary, and (3) the fact that any NC&PB clemency or parole recommendation would have to be approved by the [ASN(M&RA)], who was presumably aware of the Secretary's position on this matter.

*Hutchins IV*, 72 M.J. at 302 (Ryan, J. concurring in the result) (internal citations omitted). We respectfully submit that awareness of ASN(M&RA)'s March 2009 memorandum significantly weakens any apparent causal link between SECNAV's comments and NC&PB's change in recommendation. Second, members of NC&PB are also subordinate to ASN(M&RA), and they understand their role is to submit cases like the appellant's with recommendations for final action by ASN(M&RA) or SECNAV. Third, the memorandum reveals that ASN(M&RA) communicated a disinclination to award the appellant clemency eight months before he presumably learned of SECNAV's position on the matter. Thus, for NC&PB, SECNAV's comments were less of an influence than an echo.

Finally, someone aware that NC&PB membership and recommendations are not consistent from year to year would not expect consistency in the board's recommendations. We are convinced beyond a reasonable doubt that a reasonable observer, cognizant of all of the facts and circumstances, would find SECNAV's comments far less consequential to subsequent NC&PB recommendations, if consequential at all. We find that, at the appellant's second court-martial, the government successfully rebutted the appearance of UCI infecting the NC&PB's consideration of the appellant's clemency requests.

b.  The Judge Advocate General

Next, the appellant claims that, following this court's decision in *Hutchins I*, the Judge Advocate General (JAG) of the Navy succumbed to UCI and felt compelled to certify the case to the CAAF for further review.

Pursuant to Article 67, UCMJ, and RULE FOR COURTS-MARTIAL (R.C.M.) 1203, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), the JAG may "forward the decision of the Court of Criminal Appeals to the Court of Appeals for the Armed Forces for review with respect to any matter of law." R.C.M. 1203(c)(1).

On 22 April 2010, this court set aside the findings and sentence of the appellant's first court-martial, citing an improper severance of the appellant's attorney-client relationship with one of his detailed defense counsel. *Hutchins I*, 68 M.J. at 631. The record was returned to the JAG for remand to an appropriate CA with authority to order a rehearing. *Id.* Instead, the JAG exercised his authority to certify issues related to the severance of counsel to the CAAF. *Hutchins II*, 69 M.J. at 283-84. The CAAF found that severance of the appellant's relationship with one of his detailed defense counsel did not materially prejudice his rights and remanded the case to this court for a new review under Article 66, UCMJ. *Id.* at 293.

Citing the JAG's occupation of his billet in November 2009—a billet in which he was SECNAV's direct subordinate—the appellant assumes the JAG was aware of SECNAV's comments. The appellant also offers media reports that the JAG's advisors recommended against certification of the case, presumably to suggest that the JAG acted in accordance with something other than sound legal judgment.[88] He alleges that "certification of *Hutchins I* to CAAF ultimately led to the reinstatement of Sgt Hutchins' convictions, and led to Sgt Hutchins serving an additional 29 months of confinement."[89]

Assuming, *arguendo*, that the JAG was familiar with the newspaper articles, the appellant fails to demonstrate that the decision to certify his case was prejudicial, much less unfair. Had the JAG not certified the appellant's case to CAAF, he would have remanded it to a CA with the authority to order a rehearing. Ultimately, that happened, after the CAAF's decision to set aside the findings and sentence in *Hutchins IV*. Attributing an additional 29 months of confinement to that delay is baseless, as there is no way to know how the appellant's rehearing and subsequent appeals might have unfolded without the certification. Instead, the JAG acted within his authority, and the appellant cannot show some evidence of an unfair proceeding or prejudice resulting from the JAG's decision, much less from UCI.

We agree with Chief Judge Baker's observation that "subordination, a divergence in staff advice, and a certification do not alone amount to some evidence of [UCI]. Rather they reflect the ordinary process of review and appeal." *Hutchins IV*, 72 M.J. at 315 (Baker, C.J., dissenting). There is no cause for an "objective, disinterested observer, fully informed of all the facts and circumstances," to "harbor a significant doubt about the fairness of the proceeding." *Boyce*, 76 M.J. at 249.

---

[88] Regardless of what advice the JAG might have received, his judgment was sound. The CAAF overturned this court's decision based on one of the issues the JAG certified. *Hutchins II*, 69 M.J. at 292-93.

[89] Appellant's Brief at 65.

Accordingly, we find that the appellant has failed to satisfy his initial burden of providing some evidence of UCI of the JAG.

c. Navy-Marine Corps Court of Criminal Appeals (NMCCA)

The appellant speculates that three former judges of this court "desire[d] to validate the Secretary of the Navy" when they "failed to diligently review the record and the pleadings, and were predisposed to affirm the conviction and find that Secretary Mabus did not engage in [UCI]" in *Hutchins III*, 2012 CCA LEXIS 93.[90]

When the newspaper articles appeared in November 2009, the appellant's case was still pending its first review before this court. Although not appearing to address the appellate court, SECNAV publicly shared that, after reading the record of the appellant's court-martial, he was convinced the appellant led his squad in planning, executing, and covering up the premeditated murder of an Iraqi civilian. According to SECNAV, the appellant had received the sentence he deserved. Five months later, this court set aside the findings and sentence from the appellant's court-martial and remanded the case for rehearing. The CAAF, comprised entirely of judges outside the Department of the Navy, reversed and remanded to this court for a new review. Two of the three appellate judges on the panel deciding *Hutchins III* had concurred in the *en banc* decision to set aside in *Hutchins I*. *Hutchins III*, 2012 CCA LEXIS 93, at *1 (opinion by Perlak, S.J. with Carberry, S.J. and Modzelewski, J. concurring); *Hutchins I*, 68 M.J. at 631 (Carberry, S.J. and Perlak, J., concurring in the majority opinion). In *Hutchins III*, this court affirmed the findings and sentence, finding no merit in an allegation of UCI or other AOEs. 2012 CCA LEXIS 93, at *11, *32.

In addition to presenting some evidence of UCI, the appellant must also overcome the presumption that appellate judges "know the law and apply it correctly." *United States v. Clark*, 75 M.J. 298, 300 (C.A.A.F. 2016) (citations omitted). "Without such evidence, courts will not conclude that a military judge was affected by unlawful command influence." *Hutchins IV*, 72 M.J. at 314 (Baker, C.J., dissenting) (citing *United States v. Rivers*, 49 M.J. 434, 443 (C.A.A.F. 1998)).

To rebut "the presumption of regularity that applies to the acts of the appellate military judges"[91] and demonstrate some unfairness in the appellate review of his case, the appellant focuses on the content of the opinion. According to the appellant, the opinion's author failed to recite the charges, specifications, or language of which the appellant was acquitted, he

---

[90] *Id.* at 69.

[91] *Clark*, 75 M.J. at 300.

summarized, instead of quoted, SECNAV's statements as published in the articles, and he "falsely claimed to have granted all the defense motions to attach UCI-related documents to the record."[92] From this third, readily provable oversight, the appellant concludes the panel either failed to read the record of trial or the pleadings, or knowingly made a false statement.[93] Reading the *Hutchins III* opinion, and particularly the UCI analysis, we find no merit in the appellant's allegations of impropriety, or unfairness, at the appellate court level.

The appellant also falls short of demonstrating some evidence of causation. To tie *Hutchins III* to SECNAV's UCI, the appellant characterizes the opinion as "a complete validation of Secretary Mabus' actions and an adoption of his view of the case"[94] instead of the full or partial dismissal the appellant requested.[95] Striving to explain how Senior Judges Perlak and Carberry suddenly abdicated their judicial responsibility under pressure from SECNAV in *Hutchins III*, when they had been comfortable reversing the convictions in *Hutchins I*, the appellant speculates that in April 2010 this court was not yet aware of SECNAV's comments. The appellant's tangled explanation of whom the UCI affected and when is nothing more than "mere allegation or speculation." *Stoneman*, 57 M.J. at 41; *see also Hutchins*, 72 M.J. at 314 (Baker, C.J., dissenting) (concluding that the "Appellant has not moved beyond mere allegation or speculation in demonstrating 'some evidence' that the CCA proceedings were unfair or affected by unlawful command influence.").

Finally, the CAAF's subsequent decision setting aside the appellant's findings and sentence and authorizing a new trial in *Hutchins IV* nullifies this court's holdings in *Hutchins III* and any negative effect the appellant might have suffered therefrom. He received a new trial. The appellant disputes mootness by insisting this court shirked its Article 66, UCMJ, duty to dismiss the charges with prejudice for factual insufficiency. But the evidence against the appellant simply did not support a finding of factual insufficiency. Despite the harmless misstatement regarding motions to attach in *Hutchins III*, the appellant has failed to demonstrate some evidence that his appeal was unfair or that the appellant judges ceded their judicial independence in an effort to please SECNAV. For the same reasons, the appellant has also failed to demonstrate some evidence that an objective,

---

[92] Appellant's Brief at 68 (citation omitted).

[93] *Id*. at 69.

[94] Appellant's Reply of 6 Mar 2017 at 44.

[95] Appellant's Brief at 70.

disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding.

### d. CAs and their staff judge advocates

The appellant avers that the two CAs who referred charges to his second general court-martial and rejected his requests for administrative separation in lieu of trial (SILT) and offers to plead guilty were compromised by UCI. He asserts that UCI affected the staff judge advocates (SJAs) who advised them as well.

To demonstrate the impact of UCI on his CAs in this case, the appellant proffers evidence that the CAs were aware of SECNAV's published statement as they made decisions propelling the appellant toward court-martial.

The first of the two CAs, Lieutenant General (LtGen) Robert Neller, USMC, referred the charges to the appellant's second court-martial. In his role as CA, he also received and ultimately denied appellant's requests for release from pretrial confinement, assignment to desired duties, SILT, and acceptance of a proposed pretrial agreement.

In an affidavit signed 14 August 2014, LtGen Neller wrote:

> I was generally aware of [sic] the Secretary of the Navy made some comment to the press and others in 2009 about the case, but do not know any of the specifics. This had no influence on my referral decision. I did not receive any direct or indirect influences from any senior officer or official regarding the handling of this case.[96]

At an Article 39(a), UCMJ, session on 5 March 2015, LtGen Neller testified that SECNAV's comments "had no bearing on anything that [he] did in relation to this case."[97] According to his testimony and his electronic correspondence, he consulted only with his legal counsel about this case. LtGen Neller referred charges based on his personal knowledge of the charged events, having been in Iraq at the time, and his review of statements.[98] Excerpts of LtGen Neller's electronic correspondence contain no evidence that SECNAV or anyone else in LtGen Neller's chain of command communicated with him regarding his decisions.

The appellant alleges that UCI tainted advice the SJA, Colonel (Col) G, gave LtGen Neller. SJAs, like military judges, enjoy the presumption of knowledge of and compliance with the law and their independent duties,

---

[96] AE LIV.

[97] Record at 698.

[98] *Id.* at 701.

absent evidence to the contrary. *See Ashby*, 68 M.J. at 130 (C.A.A.F. 2009) (presuming that "legal officers properly performed their professional duties which included independent review of the evidence and preparation of only those charges for which they determined probable cause existed."). Relying on support from Col G's electronic correspondence, the appellant proffers that Col G was cognizant of SECNAV's comments, the motion to dismiss for UCI, requests for information "originating from the 'Secretariat,'" and LtGen Neller's desire for input from the SJA to the CMC following the reversal of convictions.

The appellant also alleges that the SJA's office and the prosecution "were on the same 'team'" because Col G addressed his deputy and the trial counsel as "Team" in an email asking that defense counsel route their requests for the CA through trial counsel.[99] This does not amount to evidence that Col G assumed a prosecutorial role. Nor did the email require Col G to disqualify himself as the SJA. *See United States v. Chessani*, 2009 CCA LEXIS 84, *5-6, *21 (N-M. Ct. Crim. App. 17 Mar 2009) (affirming apparent UCI based on the presence of a disqualified SJA—who had interviewed Chessani, elicited incriminating statements from him, and was "intimately involved in drafting findings and conclusions" about him—when subordinate SJAs briefed the CA about the case). The appellant has not presented sufficient evidence to overcome the presumption of Col G's compliance with the law or to demonstrate that Col G or any of the other SJAs acted as an investigator, military judge, or counsel in this case and thus should be disqualified.

The appellant also alludes to a memorandum to the Justice Department requesting testimonial immunity for one of the appellant's squad members. It was likely drafted by TC, reviewed by Col G, and bore LtGen Neller's signature. Citing concerns about the armed forces' image abroad and difficulties in renewing the Status of Forces Agreement with Iraq, the memorandum sought assistance "to reinstate Sergeant Hutchins' convictions."[100] LtGen Neller testified that the wrong words were used in that statement and clarified his intent was to seek retrial, not reinstatement of convictions.[101] Regardless of the propriety of references to political concerns or Status of Forces Agreements, the memorandum provides no evidence of SECNAV's influence.

LtGen Neller was relieved by LtGen Kenneth McKenzie, USMC, who then became the appellant's CA. As evidence of the impact of UCI on LtGen McKenzie, the appellant cites his denial of a SILT request. The appellant's

---

[99] Appellant's Brief at 72.

[100] AE LXXXVIII at 151.

[101] Record at 704.

SILT request "specifically highlighted Secretary Mabus' comments in detail, along with referencing Air Force cases of political retaliation against convening authorities, as justification for the SILT, in order to restore public confidence in the independence of convening authorities."[102] LtGen McKenzie also refused to meet with the appellant's civilian defense counsel or to negotiate a pretrial agreement with him.

In an affidavit, LtGen McKenzie wrote, "I do not recall any prior specific comments made about this case by any particular individual, including the Secretary of the Navy, the Honorable Ray Mabus, General Hagee and General Conway."[103] Based on his "independent review of this matter post-referral," LtGen McKenzie concurred with the SJA's Article 34, UCMJ, advice.[104] LtGen McKenzie declared his independence as a CA, denied any attempts to influence him, and affirmed his presumption of the appellant's innocence and right to a fair trial.[105]

At the Article 39(a), UCMJ, hearing, LtGen McKenzie testified to having no recollection of SECNAV's comments at the time of their publication and to learning about them only through the appellant's motion to dismiss for UCI. When asked for his "immediate reaction" to SECNAV's comments, LtGen McKenzie testified, "I'm dealing in, you know, 2014, 2015 and they don't seem to have any bearing on what I'm going to do and what actions I'm going [to] take as the [CA] in the case. So, no, they did not particularly concern me."[106] LtGen McKenzie confirmed that he had conducted his own independent review of the appellant's case upon assuming command from LtGen Neller and concurred with the decision to refer charges.[107]

With regard to LtGen Neller, Col G, and LtGen McKenzie, the appellant submits that their unwillingness to grant his requests for a more favorable disposition, coupled with their full knowledge of SECNAV's opinions in 2009, constitutes at least some evidence of UCI. Their electronic correspondence reveals no evidence of influence from SECNAV or a lack of independence in pursuing the case.[108] But for the briefings and publicity surrounding the appellant's motion to dismiss for UCI, it is unclear whether the CAs would have even known what SECNAV said. Neither LtGen Neller nor LtGen

---

[102] Appellant's Brief at 81 (citation omitted).

[103] AE LVIII at 3.

[104] *Id.* at 4.

[105] *Id.*

[106] Record at 785.

[107] *Id.* at 790-91.

[108] AE LXXXIII.

McKenzie could have testified more emphatically about the irrelevance of SECNAV's comments to their deliberative process or their independence of judgment. The appellant has again fallen short of presenting some evidence of either unfairness or causation.

Finally, there is not some evidence of apparent UCI. This case has none of the hallmarks of apparent UCI identified in *Boyce*. In *Boyce*, the CA had drawn considerable public criticism from Congress and the media for setting aside sexual assault convictions in the court-martial of a lieutenant colonel and direct but quiet criticism from the JAG of the Air Force for declining to refer charges of sexual assault against an airman. 76 M.J. at 244-45. The newly confirmed Secretary of the Air Force directed the Air Force Chief of Staff to call the CA and present him with two choices—"voluntarily retire from the Air Force at the lower grade of major general, or wait for the Secretary to remove him from his command in the immediate future." *Id.* at 251-52. Within three hours of the call, the CA decided to retire early. *Id.* at 252. In formally requesting retirement, the CA wrote, "[m]y decisions as a General Court Martial [sic] [CA] . . . have come under great public scrutiny, and media attention . . . will likely occur on subsequent sexual assault cases I deal with." *Id.* at 245-46 (internal quotation marks omitted). The effect on Boyce came ten days later when the CA referred charges of sexual assault against him. *Id.* The CAAF found the appearance of UCI in the facts preceding the CA's decision. *Id.* at 251. They "conclude[d] that members of the public would understandably question whether the conduct of the Secretary of the Air Force and/or the Chief of Staff of the Air Force improperly inhibited [the CA] from exercising his court-martial convening authority in a truly independent and impartial manner as is required to ensure the integrity of the referral process." *Id.* at 252-253; *see also United States v. Gerlich*, 45 M.J. 309, 314 (C.A.A.F. 1996) (setting aside findings and sentence because a general court-martial CA wrote a letter to his subordinate special court-martial CA questioning his resolution of a sexual assault allegation with nonjudicial punishment and "request[ing]" that the special court-martial CA consider further investigation).

In contrast, there is no evidence of implicit or explicit threats of retaliation, congressional chastisement, or even a phone call to any of the CAs in this case at the behest of SECNAV or anyone else. SECNAV's disapproval of decisions to retain some of the appellant's most junior squad mates, expressed five years earlier, does not amount to the kind of "censure, reprimand, or admonish[ment]"[109] that creates an appearance of UCI. Unlike the CA in *Boyce*, who was forced to retire for his actions, both LtGen Neller and LtGen McKenzie affirmed their unhindered independence and the

---

[109] Art. 37, UCMJ.

absence of SECNAV's influence from their decisions. Again, the appellant has offered nothing more than speculation and allegation. Unfavorable decisions made with awareness of a five-year-old SECNAV article and nothing more do not create an appearance of UCI.

e. Military judge

Finally, the appellant alleges that the military judge, with full awareness of SECNAV's statements, made legally unsupported rulings on motions related to UCI to protect SECNAV and his own post-retirement employment in the Department of Defense.

Absent evidence to the contrary, military judges enjoy a presumption of resistance to UCI in their decisions. *Rivers*, 49 M.J. at 443; *see also Stombaugh*, 40 M.J. at 213 (holding that the court would "not presume that a military judge has been influenced simply by the proximity of events which give the appearance of command influence in the absence of a connection to the result of a particular trial." (citations omitted)).

It is worth examining a case of unlawful influence of a military judge for perspective. In *Salyer*, prosecutors and a supervisory circuit judge took action toward the military judge presiding over Salyer's court-martial. "Perplexed" by one of the military judge's rulings on a pretrial motion, trial counsel accessed the military judge's personnel record looking for evidence of a potential personal bias. *Salyer*, 72 M.J. at 420. Trial counsel then questioned the military judge about personal information from his file in *voir dire* and challenged him for actual and implied bias. *Id.* Eager to warn the military judge's supervisory judge about this unusual turn of events, one of the senior prosecutors shared the discovered personal information and plans for *voir dire* with the supervisory judge as a courtesy. *Id.* In a subsequent conversation between the two judges, the supervisory judge mentioned the phone call from the prosecutor, the perplexing ruling, the reaction to it, and the government's intent to seek the military judge's recusal. *Id.* at 421. Recusing himself from the case, the military judge cited "an inappropriate method for addressing a disagreement with [his] ruling" as cause for a reasonable person to question his impartiality on future decisions in the case. *Id.* at 421-422. The CAAF agreed with the military judge, finding that "[a]n objective, disinterested observer, fully informed of these facts and circumstances, might well be left with the impression that the prosecution in a military trial has the power to manipulate which military judge presides in a given case . . . ." *Id.* at 427; *see also Lewis*, 63 M.J. at 414, 416 (finding actual UCI in the command's "unlawful effort to unseat an otherwise properly detailed and qualified military judge" and ordering dismissal with prejudice because the government could not render its error harmless). In Salyer's case, the government successfully replaced the military judge.

The appellant offers no evidence of prosecutorial skullduggery, government efforts to embarrass, manipulate, or replace the military judge in this case, or criticism or questions from anyone in the military judge's chain of command. Instead, the appellant attempts to demonstrate unlawful influence with the military judge's subordinate position to SECNAV, his knowledge of SECNAV's statements five years earlier, and the rulings he made. Once again, the appellant's differing interpretation of the law and the facts is not evidence of an unfair proceeding. SECNAV's position at the top of the military judge's chain of command and the theoretical prospect of downward pressure alone are not evidence of causation. The appellant implies that the military judge's post-retirement employment aspirations with the Department of Defense and possibly the Department of the Navy are evidence of UCI. Without evidence that SECNAV retaliated against—or rewarded—anyone for their actions resolving the Hamdaniyah cases, such an implication is bare allegation and speculation.

While this court does not condone senior officials making public comments about courts-martial pending appeal, the appellant has, with one exception, failed to present some evidence of actual or apparent UCI on his court-martial proceedings. In the case of apparent UCI affecting the NC&PB, the government rebutted the appearance of UCI, and we are convinced, beyond a reasonable doubt, that an objective observer, cognizant of all the facts and circumstances, would not harbor a significant doubt about the fairness of the clemency process.

## D. Apparent UCI from the search of defense counsel's office

The appellant argues that apparent UCI arising from a government search of one of his detailed defense counsel's office necessitates setting aside his findings and sentence and ordering the government to pay reasonable attorney fees for his civilian defense counsel.

"'Where the issue of unlawful command influence is litigated on the record, the military judge's findings of fact are reviewed under a clearly-erroneous standard, but the question of command influence flowing from those facts is a question of law that this Court reviews *de novo.*'" *United States v. Reed*, 65 M.J. 487, 488 (C.A.A.F 2008) (quoting *United States v. Wallace,* 39 M.J. 284, 286 (C.M.A. 1994)).

The command authorized search at issue arose and was litigated in a separate case this court has reviewed and affirmed. *United States v. Betancourt*, No. 201500400, 2017 CCA LEXIS 386, unpublished op. (N-M. Ct. Crim. App. 6 Jun 2017), *rev. denied*, __ M.J. __, 2017 CAAF LEXIS 1118 (C.A.A.F. Dec. 4, 2017). On 2 May 2014, Criminal Investigative Division (CID) agents executed a command search authorization and searched multiple defense counsel offices within Legal Support Services Section (LSSS)

–West spaces aboard Marine Corps Base Camp Pendleton, California. Agents suspected a cell phone belonging to Sgt Betancourt was in the office of one of his defense attorneys. *Id.* at *9-*10. With the cooperation of the senior trial counsel, three CID agents searched defense counsel offices, and a fourth agent recorded video of the search. *Id.* at *11. "The agents were professional but extremely thorough, searching through desk drawers, file cabinets, lockers, garbage cans, and ceiling tiles. The agents opened case files, but quickly flipped through the files without pausing to read documents within the files." *Id.* at *12.

This court found some evidence of apparent UCI in *Betancourt* but was "convinced beyond reasonable doubt that an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt as to the fairness of [Betancourt's] court-martial[.]" *Id.* at *27. "[T]he government took significant corrective action after the search to limit disclosure of any information obtained by CID agents during the search. This included removing the [senior trial counsel], the trial counsel, and the investigators from further involvement with the investigation or court-martial. . . . The video recording of the search was secured by order until a special investigating officer was appointed to review it for potential leakage of privileged information. Subsequently, the recording was sealed by the military judge who reviewed it *in camera*." *Id.* at *27-*28.

Unbeknownst to prosecutors, the command search authorization was not limited to Sgt Betancourt's counsels' offices, and the search extended to the offices of five other defense counsel not associated with Sgt Betancourt's case. *Id.* at *11-*12. One of the offices searched belonged to Captain (Capt) S.L., one of the detailed defense counsel in the case before us. The appellant's TDC filed a motion to disqualify members of LSSS-West and any CID personnel involved in the 2 May 2014 search, and the parties litigated the impact of the search on the appellant's case.

In his written ruling on the motion, the military judge reached findings of fact supported by the record that are not clearly erroneous. Returning to his office after it was searched, Capt S.L. "noticed 'many books and binders out of place on the bookshelf' where his kept his *Hutchins* case file, [but] he could not say whether documents therein were searched."[110] The four CID agents who participated in the search testified to only flipping through file folders in search of the cell phone and not reading the files' contents. Review of the video recording of the search of Capt S.L.'s office[111] by the military judge and this court corroborates the agents' testimony. The video indicates that the

---

[110] AE LIX at 2 (quoting AE XXXI at 33)

[111] AE LVII.

search of Capt S.L.'s office lasted about five minutes. The agents also testified that they knew nothing about the appellant's case.

TC who prosecuted the appellant at his second court-martial were also not involved in the search authorization or the search. As documented in an affidavit, Capt P.M. "played no role in the planning or execution of the Betancourt Command Authorization for Search and Seizure."[112] Almost six weeks after the search, he was assigned to the trial team in the Betancourt case because the original trial counsel were disqualified. Despite litigating issues related to the search in multiple courts-martial, Capt P.M. never viewed video of the search or discussed it with the senior trial counsel who facilitated the search, any of the investigators, or the judge advocate who conducted the taint review.[113] Capt P.M. stated in his affidavit, "I have not heard, reviewed, seen, learned, read, or gleaned anything related to Sgt Hutchins as a result of the search."[114] The other trial counsel, Major (Maj) A.W., also swore in an affidavit, "I have not heard, reviewed, seen, learned, read, or gleaned anything related to Sgt Hutchins as a result of the search."[115] Maj A.W. was stationed in Austin, Texas, on the day of the search.

The military judge concluded that the circumstances of the search of defense counsel offices raised some evidence of apparent UCI in this case. We do not dispute that finding, particularly in light of our similar conclusion in *Betancourt*. While the military judge found the government could not disprove the "predicate facts on which the allegation of UCI is based[,]" he determined the government had proven beyond a reasonable doubt that a reasonable person with knowledge of the relevant facts would not perceive that the deck is unfairly stacked against the accused.[116]

Reviewing the military judge's legal conclusion *de novo*, we also find the government has rebutted, beyond a reasonable doubt, any notion that "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding" against the appellant. *Boyce*, 76 M.J. at 249 (citation and internal quotation marks omitted). Despite the government's troubling

---

[112] AE LIX at 15.

[113] *Id*. at 15-17. Capt P.M. acknowledged receiving a call from one of the CID agents after the agent received a call from the appellant's civilian defense counsel. The agent did not disclose any information about the search with Capt P.M. during that call.

[114] *Id*. at 15.

[115] *Id*. at 18.

[116] *Id*. at 13-14; *see United States v. Morrison*, 66 M.J. 508, 510-11 (N-M. Ct. Crim. App. 2008).

intrusion into defense counsel spaces, the testimony and the video recording of the search of Capt S.L.'s office provide overwhelming evidence that any exposure to privileged information about the appellant's case, if it occurred, was momentary, at most. The CID agents who executed the search were wholly uninvolved with the appellant's investigation and therefore would not have recognized the significance of any information they might have glimpsed. The agents were subject to a gag order, prohibiting them from discussing what they might have seen with anyone. There is no evidence to suggest any agent violated that gag order or that any privileged information about the appellant's defense reached the prosecution in his case. The government has also dispelled, beyond a reasonable doubt, any suspicion that prosecutors directed, knew, or even anticipated that CID agents would gain access to privileged files about the appellant.

Corrective measures we deemed adequate to prevent apparent UCI in *Betancourt* are more than adequate to protect against apparent UCI in this case, where the appellant was subject to substantially less exposure. We find no apparent UCI in this case stemming from the brief search of Capt S.L.'s office.

**E. Recusal of the military judge**

The appellant avers that the military judge erred in refusing to recuse himself based upon actual and/or apparent bias stemming from (1) UCI, (2) a conflict of interest with supervisory judges in his chain of command, and (3) his independent investigation and *ex parte* communications.

We review a military judge's decision not to recuse himself for an abuse of discretion. *United States v. McIlwain*, 66 M.J. 312, 314 (C.A.A.F. 2008) (citing *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001)).

R.C.M. 902 details the grounds for disqualification of a military judge:

(a) *In general.* Except as provided in subsection (e) of this rule, a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned.

(b) *Specific grounds.* A military judge shall also disqualify himself or herself in the following circumstances:

(1) Where the military judge has a personal bias or prejudice concerning a party . . . .

. . . .

(5) Where the military judge . . . :

> (B) Is known by the military judge to have an interest, financial or otherwise, that could be substantially affected by the outcome of the proceeding . . . .

As with UCI, maintaining public confidence in the independence and impartiality of military judges requires us to consider both actual bias and the appearance of bias as possible bases for disqualification. *See United States v. Quintanilla*, 56 M.J. 37, 44-45 (C.A.A.F. 2001). "The first step asks whether disqualification is required under the specific circumstances listed in [R.C.M.] 902(b). If the answer to that question is no, the second step asks whether the circumstances nonetheless warrant disqualification based upon a reasonable appearance of bias." *Id*. at 45.

"There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle, particularly when the alleged bias involves actions taken in conjunction with judicial proceedings." *Quintanilla*, 56 M.J. at 44 (citation omitted). But "'[a]ny conduct that would lead a reasonable man knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification.'" *Id*. at 78 (quoting *United States v. Kincheloe*, 14 M.J. 40, 50 (CMA 1982) (additional citation and internal quotation marks omitted); *see also* R.C.M. 902(a).

The appellant filed a pretrial motion seeking recusal of the military judge and the entire Navy-Marine Corps Trial Judiciary.[117] The military judge denied the motion for recusal without making a written ruling. In the absence of detailed findings of fact and conclusions of law on the record, we must accord his ruling less deference. *See Flesher*, 73 M.J. at 312. With the exception of one subsequently mooted basis for judicial recusal, the appellant has raised the same purported sources of judicial bias on appeal. We now parse those allegations for reasonable questions about the military judge's impartiality.

*1. UCI*

The appellant argues that SECNAV's UCI and evidence of its effect on members of this court create and confirm an actual, or at least apparent, bias against the appellant in the military judge.

Our superior court has recognized that we test for apparent bias in violation of R.C.M. 902(a) in essentially the same way we test for apparent UCI. *See Lewis*, 63 M.J. at 415. "We focus upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public." *Id*. Accordingly, the appellant reiterates his

---

[117] AE C.

arguments for finding actual and apparent UCI—SECNAV's 2009 comments poisoned the military justice system adjudicating the appellant, whether that adulteration manifested as UCI or apparent bias. Only the requested remedies are different. Instead of arguing for dismissal of the charges, the appellant challenges the military judge's decision not to recuse himself.

In section C of this opinion, we exhaustively analyzed the appellant's allegations of actual and apparent UCI. Having found no actual or apparent UCI impacting the appellate court or the military judge, we necessarily conclude that neither the military judge, nor the former appellate court judges who participated in *Hutchins I* or *Hutchins III*, labored under an actual or apparent bias born of SECNAV's 2009 comments about this case.

### 2. *Conflict of interest with the judicial chain of command*

The appellant also asserts that the military judge suffered from a conflict of interest with supervisory judges in his chain of command.

R.C.M. 902(b)(5) targets a military judge's conflicts of interest by demanding disqualification when he or she "has a personal interest, financial or otherwise, that could be substantially affected by the outcome of the proceeding." In this context, a personal interest is "extra-judicial" as opposed to judicial. *Quintanilla*, 56 M.J. at 43 (citing *Liteky v. United States*, 510 U.S. 540, 549 (1994); *In re Corrugated Container Antitrust Litigation*, 614 F.2d 958, 964 (5th Cir. 1980); *In re Boston's Children First*, 244 F.3d 164, 168 (1st Cir. 2001)). The UCMJ acknowledges and mitigates the personal interest that "results from the well-recognized effect of fitness-report evaluations on a military lawyer's service advancement and security." *United States v. Mabe*, 33 M.J. 200, 205 (C.M.A. 1991) (citations omitted). Article 26(c), UCMJ, prohibits a CA or any member of a CA's staff from "prepar[ing] or review[ing] any report concerning the effectiveness, fitness, or efficiency of the military judge so detailed, which relates to his performance of duty as a military judge." The Navy Performance Evaluation System Manual specifically addresses evaluation of the performance of military justice duties: "[Fitness reports] on military judges and appellate judges may properly evaluate their professional and military performance, but may not include marks, comments, or recommendations based on their judicial opinions or rulings, or the results thereof."[118]

With safeguards such as these in place, our superior court has held that the administration of military justice by judges subject to a military chain of command does not present an inherent conflict of interest. *See United States v. Mitchell*, 39 M.J. 131, 142 (C.M.A. 1994) (rejecting Mitchell's argument

---

[118] Bureau of Personnel Instruction 1610.10D, Encl (2) at I-3 (1 May 2015).

that the naval officer fitness report system creates "a reasonable possibility of a perceived pecuniary interest of his judges in deciding his case unfairly" as "simply too speculative and remote to violate the Constitutional norm" against an appearance of unfairness). *See also United States v. Graf*, 35 M.J. 450, 466 (C.M.A. 1992) (affirming the effectiveness of the UCMJ and Court of Military Appeals in protecting military judges from conflicts with their own "security of tenure" and "financial security" in the context of the military chain of command and performance evaluation system). Nor does the military justice system, *per se*, foster an apparent conflict of interest in violation of R.C.M. 902(a). *See United States v. Norfleet*, 53 M.J. 262, 269 (C.A.A.F. 2000) (holding "that preparation of fitness reports for appellate military judges by senior judge advocates does not create a circumstance in which the impartiality of a judge might reasonably be questioned under [R.C.M.] 902(a)" (citation omitted)).

An actual or apparent conflict of interest between a military judge's rulings and his or her personal interest in protecting career prospects arises only in extraordinary circumstances. An example is when a supervisory judge deviates from the UCMJ, regulations, and case precedent and affirmatively questions a subordinate judge's ruling. *See Mabe*, 33 M.J. at 205-06 (referring to a memorandum from a Chief of the Trial Judiciary to a military judge about the subordinate judge's sentences as a "military justice taboo" and concurring that removal of the offending chief trial judge from the military judge's chain of command restored the appellant's right to a fair trial and the integrity of the military justice system). The appellant offers no evidence of supervisory intrusion on subordinate discretion in this case.

a. Conflict regarding SECNAV's alleged UCI and former appellate judges in the chain of command

In support of their motion to recuse the military judge, the appellant conducted *voir dire*. First, TDC asked the military judge to detail his chain of command within the trial judiciary. The military judge identified Col M.R., the Circuit Judge of the Western Judicial District, as his immediate superior and confirmed Col M.R. would sign his next fitness report. Col M.R. reported directly to the Chief Trial Judge, who in turn reported to the Chief Judge of the Department of the Navy. All of the military judges, as members of the Department of the Navy, were subordinate to SECNAV.

In response to the basis for the challenge—SECNAV's 2009 comments about this case—the military judge disavowed any memory of them prior to reading the appellant's pleadings regarding UCI. Then he stated:

> I profoundly and deeply don't care what the Secretary of the Navy thinks as far as this case goes. . . .

> As how it effects [sic] my career, a post-command senior O-6 who is retiring next summer, don't care. Deeply, profoundly don't care. Deeply, profoundly don't care what [the Chief Trial Judge] or [the Chief Judge of the Department of the Navy] would think about it as well.

> They are professional colleagues and I think they would be profoundly disappointed in me . . . if I took any action, whatsoever, of speculating about what they might think. That would be abdicating my role as a military judge, as an officer of the Navy, and a member of the Judge Advocate General [sic] Corps, and certainly of the California Bar.

> . . . I just want to make it clear on the record that, something that Secretary Mabus may have said in 2009 has beyond no bearing on anything that I might do or might not do in this case.[119]

To overcome the presumption against a conflict of interest in the military justice system and the military judge's emphatic denial of any personal interest susceptible to his rulings in this case, the appellant asserts that the military judge had a personal interest in not embarrassing his supervisory judges with adverse findings about them. According to the appellant, the prospective damage to these senior judges' reputations necessitated the military judge's recusal. *See Norfleet*, 53 M.J. at 271 (acknowledging "[t]here may be cases in which the ruling by a military judge on an issue would have such a significant and lasting adverse direct impact on the professional reputation of a superior for competence and integrity that recusal should be considered.").

Motions filed on behalf of the appellant solicited the military judge to make findings about his chain of command. The Chief Trial Judge and the Chief Judge of the Department of the Navy were both former members of this court and concurred in the majority opinions in *Hutchins III* and *Hutchins I*, respectively. In his motion to dismiss for UCI, the appellant asked the military judge "to make potentially adverse findings against the [Chief Judge of the Department of the Navy] and [the Chief Trial Judge] [.]"[120] Specifically, the military judge might have to determine that they "were unlawfully influenced by Secretary Mabus, and/or had made/adopted materially false statements."[121] As previously discussed *infra* in section C, we do not impute

---

[119] Record at 96.

[120] Appellant's Brief at 120.

[121] *Id*.

mendacity to the Chief Judge of the Department of the Navy and the Chief Trial Judge from immaterial discrepancies in prior appellate opinions. Nor do we fault the military judge for failing to do so.

b. Conflicts involving the military judge's immediate supervisor

Col M.R., the military judge's immediate supervisor, was the original military judge in this case before recusing himself during pretrial motions. He had a personal relationship with another senior Marine judge advocate likely to testify as a witness in litigation of a motion. Nonetheless, the appellant argued that Col M.R. remained a witness to contested facts in this case.[122] First, in his position as the circuit judge, Col M.R. possessed investigative materials and notes relevant to the CID search of defense counsel spaces in *Betancourt*, discussed, *supra*, in section D. Second, the appellant alleged that Col M.R., after learning of the appellant's continued instructor role at the Marksmanship Training Unit (MTU) aboard Camp Pendleton, notified the senior Marine judge advocate with whom he had a personal relationship. Shortly thereafter, that senior Marine judge advocate advised his commander to remove the appellant from the MTU—a transfer the appellant asserts violated Article 13, UCMJ.

According to the appellant's motion for recusal, these allegations necessitate the military judge's recusal because (1) a trial judge's interference in the duty assignment of an accused appearing before him "would cause significant damage to the public perception of the integrity of the military justice system"[123] and must be fully vetted "through witness testimony at open hearing."[124] But (2) that trial judge, Col M.R., could not testify if he must appear before his subordinate military judge. So the subordinate military judge must recuse himself. Like the military judge, we decline the appellant's invitation to resolve these allegations. Once Col M.R. recused himself from this court-martial, his own possible bias against the appellant became irrelevant. The court could and did adjudicate the CID search of defense counsel spaces and the appellant's Article 13, UCMJ, motion without further inquiring into Col M.R.'s possible involvement. Our review of these two issues, submitted to us as AOEs, confirms they were susceptible to resolution without the need to call Col M.R. to the stand.

A subordinate military judge should disqualify him or herself from ruling on a credible allegation of impropriety by a supervisory judge. The desire to spare a superior such an ordeal does create an apparent, if not an actual,

---

[122] AE C at 16.

[123] *Id.* at 17.

[124] *Id.*

conflict of interest. But a party cannot incite a conflict by raising unsupported and/or irrelevant allegations of judicial misconduct.

In this case, the appellant has not presented evidence of a credible extrajudicial threat to the military judge that overcomes the presumption that his supervisors will follow the law. The prospect of a conflict of interest in presiding over this case remains far too speculative and remote to constitute an actual or apparent conflict of interest necessitating recusal.

*3. Independent investigation / ex parte communications*

The appellant accuses the military judge of violating the judicial canon prohibiting *ex parte* communications and submits this violation as evidence of bias against the appellant necessitating his recusal.

In pursuit of the military judge's recusal, the appellant levies a serious charge against the military judge and at least three other current and former Navy judge advocates. Pursuant to instruction,[125] the military judge's conduct was governed by the American Bar Association (ABA) Model Code of Judicial Conduct. Canon 2.9 of the ABA Model Code governs *ex parte* communications:

> (A) A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter, except as follows:
>
> > (1) When circumstances require it, ex parte communication for scheduling, administrative, or emergency purposes, which does not address substantive matters, is permitted, provided:
> >
> > > (a) the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication; and
> > >
> > > (b) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication, and gives the parties an opportunity to respond.

ABA, Model Code of Judicial Conduct, Canon 2.9: Ex Parte Communications (2011 ed.) (internal asterisks omitted). While the facts of the military judge's alleged breach of this canon are necessary to our analysis of this AOE, we need not determine whether he actually breached it. "[A]ctivity inconsistent with standards of judicial conduct does not mandate recusal unless it rises to the level of a violation of applicable disqualification standards." *Butcher*, 56

---

[125] Judge Advocate General's Instruction 5803.1D at ¶ 7 (1 May 2012).

M.J. at 92 (citing R.C.M. 902). Thus we need only focus on whether the military judge's *ex parte* communications required his disqualification and recusal.

When an allegation of *ex parte* communication forms part of a motion for recusal,

> [a] decision on disqualification will "depend on [1] the nature of the communication; [2] the circumstances under which it was made; [3] what the judge did as a result of the ex parte communication; [4] whether it adversely affected a party who has standing to complain; [5] whether the complaining party may have consented to the communication being made ex parte, and, if so, [6] whether the judge solicited such consent; [7] whether the party who claims to have been adversely affected by the ex parte communication objected in a timely manner; and [8] whether the party seeking disqualification properly preserved its objection."

*Quintanilla*, 56 M.J. at 44 (quoting RICHARD E. FLAMM, JUDICIAL DISQUALIFICATION § 14.3.1 at 411-12 (1996) (footnotes omitted)). Our analysis will focus primarily on the first four of the eight factors above, as the last four all inure to the appellant. For clarity, we will begin with factor 2, the circumstances under which the communication was made, and then proceed to the nature of the communication, factor 1.

a. Circumstances under which communications were made

On 24 September 2014, the appellant's trial defense counsel requested the CA approve and provide logistical support for a site visit to Iraq.[126] Upon denial of this request, the appellant filed a motion to compel a site visit.[127] Both the appellant and the government acknowledged that the appellant's previous trial defense team traveled to Iraq and briefly visited the alleged crime scene in January 2007. In his written ruling denying the motion to compel a site visit, the military judge noted that "the current Defense team has access to the files from the former team which visited the situs—and may consult with former counsel Lt.Col. [J.S.] who has been made available by his supervisor."[128]

Lieutenant Colonel (LtCol) J.S. was one of the appellant's detailed defense counsel at his first court-martial, and he traveled to Iraq with the

---

[126] AE LXIX at 4, 12.

[127] AE LXIX.

[128] AE CXXV at 6.

appellant's original civilian defense counsel in January 2007. By the time of the second court-martial and the motion to compel, LtCol J.S. had transitioned from active duty to the Marine Corps Reserve. He was an Assistant U.S. Attorney in his civilian capacity and a Reserve appellate military judge on this court. LtCol J.S. was the subject of the *ex parte* communication.

The appellant's current civilian defense counsel asked the military judge about LtCol J.S.'s availability in a telephonic R.C.M. 802 conference on 25 November 2014.[129] The military judge explained that he contacted the Chief Trial Judge to inquire of this court whether LtCol J.S. could be made available "to assist the defense based on his prior representation of Sgt Hutchins."[130] He went on to confirm that he and the Chief Trial Judge "agreed to make sure LtCol [J.S.] is available to assist the defense."[131]

b. Nature of the communications

Proceeding to the nature of the communication, it was a single telephone call from the military judge to the Chief Trial Judge. On the record, the military judge explained that he "contacted [the Chief Trial Judge] to ensure [the NMCCA] would be sure to wall [LtCol J.S.] off from any Hutchins matters should the defense desire to consult with him on their own, (a); and (b), should the case reach that venue again."[132] LtCol J.S. later testified at an Article 39, UCMJ, session about his knowledge of the *ex parte* communications. The then-Chief Judge of this appellate court called him "and indicated that there would be an order coming out on this case and that the trial counsel had reached out to the Chief Judge of the [Department of the] Navy . . . to confirm that [LtCol J.S.] could—the level of [LtCol J.S.'s] participation, and they had some sort of conversation."[133] LtCol J.S. understood that he was authorized to "provide information from [his] previous representation" of the appellant.[134] He summarized the scope of this authority as follows: "So basically I can sort of dump every single bit of information that I have regarding the site visit . . . it's a one-way flow of

---

[129] AE C at 40. Details of that R.C.M. 802 conference come from an affidavit by one of the appellant's detailed defense counsel, who was also on the conference call. The appellant submitted the affidavit in support of his motion for the military judge's recusal.

[130] *Id.*

[131] *Id.* at 41.

[132] Record at 655.

[133] *Id.* at 728.

[134] *Id.*

communication." LtCol J.S. understood that the Chief Judge of the Department of the Navy was the source of this authority, and the then-Chief Judge of this appellate court conveyed it to LtCol J.S.

c.  What the judge did as a result of the ex parte communication

Next we consider what the military judge did as a result of this *ex parte* communication. From his written ruling on the appellant's motion to compel a site visit, it appears the military judge communicated to the appellant's counsel that they could consult with LtCol J.S. regarding his 2007 site visit. In his Findings of Fact, the military judge concluded that the appellant's "previous Defense counsel were afforded a site visit to [Hamdaniyah] to survey the scene, conduct interviews, and investigate the circumstances surrounding the event."[135] In a footnote to this finding, the military judge noted that the appellant's former civilian defense counsel was

> unavailable for consultation due to the filing of an ineffective assistance of counsel (IAC) claim after the first trial. However, Lt.Col. [J.S.], a reserve judge at N.M.C.C.A., has been advised by his supervisors that he may discuss the case with the Defense and assist them in interpreting any of the information in the file.[136]

The military judge also allowed LtCol J.S. to testify for the defense in support of their efforts to compel a subsequent site visit.

In his motion for recusal of the military judge and again on appeal, the appellant averred that the military judge's *ex parte* communication resulted in him reaching three "opinions":

> (1) the ineffective assistance of counsel claim against LtCol [J.S.] and the other members of the original trial defense team does not give rise to a conflict of interest;

> (2) the site visit conducted by LtCol [J.S.] was sufficient for the defense to recover any desired evidence or witness testimony; and

> (3) LtCol [J.S.] was concurrently an appellate judge and, without need to consult Sgt Hutchins, a participant in the defense team; [sic] LtCol [J.S.] could actively assist the defense interpretation of evidence and strategy discussions under the protection of attorney-client privilege.[137]

---

[135] AE CXXV at 3 (footnote omitted).

[136] *Id.*, n.5.

[137] Appellant's Brief at 123. *See also* AE C at 18.

We address these alleged opinions in turn. First, the appellant alleges that the military judge relied on the *ex parte* communication to resolve a conflict of interest that arguably prevented LtCol J.S. from assisting with the appellant's defense team. During an Article 39(a), UCMJ, session to litigate the appellant's motion to compel a site visit, the appellant identified two conflicts of interest affecting LtCol J.S.: his position as a Reserve judge on this court and the ineffective assistance of counsel claim that extinguished his attorney-client relationship with the appellant.[138] When asked about that ineffective assistance claim, LtCol [J.S.] disputed suffering a conflict of interest that prevented him from assisting the appellant's new defense counsel. He was able to "provide the information in a narrative sense" because the appellate issues for which attorney-client relationship was waived were irrelevant to the site visit.[139] The military judge did not explicitly address LtCol J.S.'s purported conflict of interest on the record, so we do not know the extent to which he considered the issue, if at all. We find no merit in the appellant's claim that LtCol J.S. suffered from a conflict of interest and thus find nothing to resolve. When our superior court set aside the findings of the appellant's first court-martial, his detailed defense counsel's effectiveness or lack thereof became moot. As LtCol J.S. commented in his testimony, his waiver of his attorney-client privilege in the course of litigation about his effectiveness did not conflict with his ability to relay his site visit experience to counsel. The military judge's *ex parte* communications could not impact a claim with no merit on its face.

Secondly, the appellant alleges that the military judge's *ex parte* procurement of LtCol J.S.'s assistance allowed him to conclude that the 2007 site visit was "sufficient for the defense to recover any desired evidence or witness testimony[.]"[140] As will be discussed below, in section H, the security situation on the ground in and around Hamdaniyah made a site visit essentially impossible for any counsel in 2014 and 2015. Instead the military judge faced a more academic question about counsels' equality of opportunity to obtain witnesses and other evidence in compliance with Article 46, UCMJ. LtCol J.S.'s availability to the appellant's defense team was a factor in evaluating the appellant's opportunity and access to evidence. But the appellant was never entitled to "recover[y of] any desired evidence or witness testimony," nor did the military judge ever reach that conclusion.

Third and finally, the appellant alleges that he was excluded from the decision to include LtCol J.S. in his defense team's "interpretation of evidence

---

[138] Record at 498.

[139] *Id*. at 742.

[140] Appellant's Brief at 123.

and strategy discussions under the protection of attorney-client privilege."[141] Such a characterization overstates LtCol J.S.'s authorized role in the appellant's second defense. Once the appellant's first court-martial was forwarded for appellate review, LtCol J.S.'s attorney-client relationship with the appellant ended.[142] LtCol J.S. testified to clear guidance from the then-Chief Judge of this court that he "cannot get involved in tactical decisions, strategic decisions, in giving [the appellant's defense team] theories of defense . . . ."[143] His disclosures to the new defense team were a "one-way street" in which both he and the new counsel were obligated to protect attorney-work product from their respective representations of the appellant.[144]

Thus we decline to find that the military judge's *ex parte* communications spawned any of these "opinions."

> d. Whether the communications adversely affected a party who has standing to complain

Turning to the fourth *Quintanilla* factor, we consider any adverse effect of the *ex parte* communication on the appellant. Beyond the three purported opinions, the appellant alleges that the "'availability' of LtCol [J.S.] was a key basis for the military judge's denial of the defense request for a site visit."[145] Allegedly, this amounted to apparent bias against the appellant in that "as a matter of public perception, the appearance is that the military judge's independent investigation and ex parte communications were made for the express purpose of gathering evidence to support a denial of the defense motion."[146]

But the facts again rebut the appellant's characterization. "[A] reasonable man knowing all the circumstances" would not reasonably question the judge's impartiality. *Quintanilla*, 56 M.J. at 78. As will be explained in greater detail below in section H., the security situation in and around Hamdaniyah, not LtCol J.S.'s availability, precluded a site visit. Even if the military judge had ordered a site visit, witness testimony cast significant doubt on its enforceability. The military judge's *ex parte* communication served no other purpose than to facilitate the trial defense team's access to a

---

[141] *Id.*

[142] Record at 742.

[143] *Id.*

[144] *Id.* at 729-30, 742.

[145] Appellant's Brief at 124 (citation omitted).

[146] *Id.*

Marine judge advocate who traveled to Hamdaniyah on the appellant's behalf in 2007 and was still within the court's jurisdiction. But by procuring LtCol J.S.'s assistance, the military judge helped restore the balance required by Article 46, UCMJ, and thus mitigated concerns raised by the appellant's subsequent Motion to Dismiss for Denial of Site Visit, or Alternatively, to Abate Proceedings Until Such Time As a Site Visit Can be Conducted, which depended on a violation of Article 46, UCMJ.[147]

Analyzing the eight *Quintanilla* factors— (1) the nature of the military judge's ex parte communication, (2) the circumstances surrounding it, (3) its consequences, (4) the adverse effect on the appellant, and (5-8) the appellant's timely objection and preservation of the issue at trial—we detect not a bias against the appellant but an effort to remove obstacles to his access to evidence.

A reasonable person aware of the military judge's *ex parte* communications, their effect, the appellant's rationale for challenging those communications, and the subsequent production of LtCol J.S. would find no cause to question the military judge's impartiality. Thus there is no need for disqualification.

Even in light of the military judge's brief and entirely verbal bases for his decisions not to recuse himself from this case, and the resulting diminution of our deference to his judgment, we still find no abuse of discretion.

### F. Abatement for severance of attorney-client relationship

The appellant claims the military judge erred when he refused to abate the proceedings until the appellant's attorney-client relationship with his appellate defense attorney, Maj S.B.K., was restored. The military judge also declined to order Maj S.B.K's appointment as the appellant's individual military counsel (IMC).

"A military judge's failure to abate proceedings is reviewed for an abuse of discretion." *United States v. Simmermacher*, 74 M.J. 196, 199 (C.A.A.F. 2015) (citing *United States v. Ivey*, 55 M.J. 251, 256 (C.A.A.F. 2001)).

An accused's right to IMC is not absolute but subject to the discretion of the CA and a determination of the availability of the requested counsel. *See United States v. Eason*, 45 C.M.R. 109, 111 (C.M.A. 1972). "The ruling of a military judge on an IMC request, including the question whether such a ruling severed an attorney-client relationship, is a mixed question of fact and law. Legal conclusions are subject to *de novo* review, and findings of fact are reviewed under a clearly erroneous standard." *United States v. Spriggs*, 52 M.J. 235, 244 (C.A.A.F. 2000) (citing *United States v. White*, 48 M.J. 251, 257

---

[147] AE XCVI.

(C.A.A.F. 1998); S. CHILDRESS & M. DAVIS, 2 FEDERAL STANDARDS OF REVIEW § 7.05 at 7-26 to 36 (2d ed. 1992)).

### 1. IMC

Pursuant to Article 38(b), UCMJ, an accused has the right to be represented at court-martial "by military counsel of his own selection if that counsel is reasonably available[.]" Art. 38(b)(3)(B), UCMJ. If reasonably available, that military counsel may be appointed to the accused's trial defense team as an IMC. Reasonable availability is defined by the service secretary but excludes persons serving, *inter alia*, as trial counsel or appellate defense counsel. Art. 38(b)(7), UCMJ; R.C.M. 506(b)(1)(C)-(D). The Manual of the Judge Advocate General of the Navy, or JAGMAN, implements Article 38(b)(3)(B), UCMJ, and R.C.M. 506 with regard to counsel in the Navy and Marine Corps.[148] First, counsel must be on active duty to be reasonably available.[149] Then a list of disqualifying criteria significantly limits the pool of available counsel.[150] Those disqualifying criteria include, *inter alia*, performance of duties as trial counsel or appellate defense counsel and permanent assignment to a command outside the Trial Judicial Circuit where the court-martial will be held or beyond 500 miles from the site of the court-martial.[151]

The military judge found—and the record supports—that Maj S.B.K. was detailed as the appellant's appellate defense counsel, pursuant to Article 70, UCMJ, in May 2008.[152] In preparation for his second court-martial, the appellant filed his IMC request for Maj S.B.K. on 8 August 2014.[153] By then, Maj S.B.K. was assigned to a trial counsel billet more than 500 miles from Camp Pendleton, the site of the appellant's court-martial. For these reasons, Maj S.B.K.'s chain of command denied the request on 11 September 2014. The appellant appealed, but his appeal was denied on 24 September 2014. Maj S.B.K. had left active duty the previous day and transferred to the Individual Ready Reserve.

Citing R.C.M. 506(b) and the list of assignments that disqualify counsel from serving as IMC *per se*, the military judge concluded that Maj S.B.K. was

---

[148] Judge Advocate General Instruction 5800.7F (JAGMAN) § 0131 (26 Jun 2012).

[149] *Id*. at § 0131b.(4).

[150] *Id*.

[151] *Id*. at § 0131b.(4)(b), (d)(1).

[152] Appellee's Response to Court's Order to Produce of 16 Nov 2017, Ruling on Defense Motion re: IMC Request for Maj S.B.K. of 5 May 2015 at 2; AE CXI at 2.

[153] AE CXI at 8.

"*per se* not reasonably available while serving as a trial counsel and then again when he left active duty shortly thereafter."[154]

### 2. *Existing attorney-client relationship*

Despite Maj S.B.K.'s nonavailability, the appellant asserted his attorney-client relationship with Maj S.B.K. and argued denial of the IMC request would sever that preexisting relationship. R.C.M. 506 provides for exceptions to availability requirements "when merited by the existence of an attorney-client relationship regarding matters relating to a charge in question." R.C.M. 506(b)(1). But the exceptions do not apply "if the attorney-client relationship arose solely because the counsel represented the accused on review under Article 70[.]" R.C.M. 506(b)(1).

Article 70, UCMJ, governs the detail of appellate counsel. Specifically, the JAG shall appoint "[a]ppellate defense counsel [who] shall represent the accused before the Court of Criminal Appeals, the Court of Appeals for the Armed Forces, or the Supreme Court[.]" Art. 70(c), UCMJ. The authority governing detail of appellate counsel is separate and distinct from Article 27, UCMJ,[155] which mandates the detail of trial counsel and defense counsel "for each general and special court-martial." Art. 27(a)(1), UCMJ.

The distinction between representation at courts-martial arising under Article 27, UCMJ, and representation on appeal arising under Article 70, UCMJ, appears in the JAGMAN's relevant definition of an attorney-client relationship. "For purposes of this section [0131 Standards for Determining Availability of Requested Individual Military Counsel], an attorney-client relationship exists between the accused and requested counsel when counsel and the accused have had a privileged conversation relating to a charge pending before the proceeding, and counsel has engaged in *active pretrial preparation and strategy with regard to that charge*."[156] Among the "[a]ctions

---

[154] Appellee's Response to Court's Order to Produce of 16 Nov 2017, Ruling on Defense Motion re: IMC Request for Maj S.B.K. of 5 May 2015 at 8.

[155] Article 70, UCMJ, does require that appellate counsel be qualified under Article 27(b)(1), UCMJ. Qualifications detailed at Article 27(b)(1), UCMJ, include being a judge advocate, graduation from an accredited law school, membership in a federal or state bar, and certification as competent to perform duties as trial or defense counsel by the Judge Advocate General.

[156] JAGMAN § 0131b(3) (emphasis added). The JAGMAN definition of attorney-client relationship continues:

> Actions by counsel deemed to constitute active pretrial preparation and strategy which materially limit the range of options available to the accused include but are not limited to: advising the accused to waive or assert a legal right . . .; representing the accused at a pretrial investigation under Article 32, UCMJ . . . ; submitting

that, in and of themselves, will *not* be deemed to constitute 'active pretrial preparation and strategy'" is "representing the accused in appellate review proceedings under Article 70, UCMJ[.]"[157] Finally, the JAGMAN references the JAGINST 5803.1 series[158] "prohibiting a counsel from establishing an attorney-client relationship until properly detailed, assigned, or otherwise authorized." *Id.* at § 0131b.(3).

The military judge concluded that the appellant "provided no evidence to suggest that Maj. [S.B.K.] engaged in active pretrial preparation and strategy with regard to the charges now before the trial court—or that he was authorized to do so under JAGINST 5803.1E."[159] In detailed Findings of Fact, the military judge described Maj S.B.K.'s representation of the appellant:

> zealous advocacy through the overturn of the accused's conviction by CAAF on 26 June 2013 including representation at NMCCA, CAAF, a 2009 *Dubay* [sic] hearing, a 2010 IRO hearing, and at the Naval Clemency and Parole Board, among other actions. [Maj S.B.K.] continued to provide appellate advocacy for Sgt Hutchins subsequent to the re-referral of charges on 6 January 2014, co-signing a Writ of Mandamus on behalf of Sgt. Hutchins in May 2014.[160]

While the record does not explicitly corroborate each of these acts on behalf of the appellant, there is also no indication they are clearly erroneous. It is also unclear the circumstances under which Maj S.B.K. represented the appellant at the 2009 *DuBay* hearing or the 2010 Initial Review Officer (IRO) hearing and whether he was formally detailed to do so. TDC, not appellate counsel, typically provide representation at those types of hearings. But those hearings are not typically associated with active pretrial preparation and strategy. Finally, Article 70, UCMJ, was the authority for Maj S.B.K.'s representation of the appellant, and the scope of that representation was

---

> evidence for testing or analysis; . . . offering a pretrial agreement on behalf of the accused; submitting a request for an administrative discharge in lieu of trial on behalf of the accused; or interviewing witnesses relative to any charge pending before the proceeding.

*Id.* at § 0131b.(3)(a).

[157] *Id.* at § 0131b.(3)(b) (emphasis added).

[158] JAGINST 5803.1 series governs "Professional Conduct of Attorneys Practicing Under the Cognizance and Supervision of the Judge Advocate General" including Marine Corps judge advocates, active duty and Reserve.

[159] Appellee's Response to Court's Order to Produce of 16 Nov 2017, Ruling on Defense Motion re: IMC Request for Maj S.B.K. of 5 May 2015 at 8.

[160] *Id.* at 2.

appellate review and other post-trial matters arising after the release of the appellant's original trial defense counsel.

The military judge relied on the distinctions between trial and appellate advocacy in ruling that the appellant had not demonstrated the kind of attorney-client relationship with Maj S.B.K. that required restoration at the trial level. The military judge cited *United States v. Kelker*, 4 M.J. 323, 325 (C.M.A. 1978), in support of the "separability of the trial and appellate functions." As in the case before us, Private Kelker requested assignment of his appellate defense counsel to his trial defense team for his second court-martial. *Id.* at 323-24. Our superior court held that attorney-client relationships formed pursuant to Article 70, UCMJ, for appellate representation do not extend to the trial level, even for a rehearing of the same case. *Id.* at 325.

Citing *Spriggs*, *supra*, extensively, the military judge focused on what triggers the kind of attorney-client relationship that cannot be severed and thus compels appointment as an IMC. Establishing such a relationship requires demonstrating "'both a bilateral understanding as to the nature of future representation and active engagement by the attorney in the preparation and pretrial strategy of the case.'"[161] Although absent from the military judge's ruling, the JAGMAN explicitly precludes IMC approval authorities from considering appellate representation as pretrial preparation and strategy.[162]

The appellant cites *United States v. Morgan*, 62 M.J. 631, 635 (N-M. Ct. Crim. App. 2006), for the proposition that the attorney-client relationship with appellate defense counsel continues "through remands and retrials, unless properly excused by the client or other competent authority."[163] For that reason, we disagree with the military judge's implication that Maj S.B.K's representation of the appellant was complete. In fact, Maj S.B.K. continues to represent the appellant before this court. But that relationship, formed under the authority of Article 70, UCMJ, is still limited to representation before appellate authorities. Despite Maj S.B.K.'s representation of the appellant at a *DuBay* hearing and an IRO hearing—representation normally provided by trial defense counsel—there is no evidence the statutory authority for the representation changed. Nor did the

---

[161] *Id.* at 6 (quoting *Spriggs*, 52 M.J.at 241).

[162] JAGMAN at § 0131b.(3)(b).

[163] Appellant's Brief at 130 (citing *Morgan*, 62 M.J. at 635 (noting that "appellate counsel . . . join the appellant's growing defense team. Each attorney remains on that team until such time as he or she is released by the appellant or a court having jurisdiction, or is excused by competent authority for good cause shown.")

military judge clearly err in finding no evidence that Maj. S.B.K. was engaged in active pretrial preparation and strategy.

Finding no clearly erroneous findings of fact and no error in the military judge's legal conclusion that the appellant and Maj S.B.K. did not share the kind of attorney-client relationship that demands assignment as an IMC, we affirm the military judge's decision not to order Maj S.B.K.'s assignment to the trial defense team. We also find no abuse of discretion in the military judge's denial of the appellant's request to abate the proceedings.

## G. Pretrial punishment in violation of Article 13, UCMJ

The appellant contends that the government violated the Article 13, UCMJ, prohibition against unlawful pretrial punishment when it subjected him to unduly harsh pretrial confinement in Iraq and at Camp Pendleton, reassigned him from a MTU to an administrative billet, and withheld a Navy-Marine Corps Achievement Medal (NAM) from him.

"The burden is on appellant to establish entitlement to additional sentence credit because of a violation of Article 13[, UCMJ]." *United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002) (citing R.C.M. 905(c)(2)). Whether an appellant is entitled to relief for a violation of Article 13, UCMJ, is a mixed question of law and fact. *Id.* (citing *United States v. Smith*, 53 M.J. 168, 170 (C.A.A.F. 2000); *United States v. McCarthy*, 47 M.J. 162, 165 (C.A.A.F. 1997)). "We will not overturn a military judge's findings of fact, including a finding of no intent to punish, unless they are clearly erroneous. We will review *de novo* the ultimate question whether an appellant is entitled to credit for a violation of Article 13." *Id.* (citing *Smith*, 53 M.J. at 170).

Article 13, UCMJ, states that "[n]o person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances required to insure his presence[.]" In *United States v. Fischer*, the CAAF interpreted Article 13, UCMJ, to prohibit "(1) the intentional imposition of punishment on an accused prior to trial, i.e., illegal pretrial punishment; and (2) pretrial confinement conditions that are more rigorous than necessary to ensure the accused's presence at trial[.]" 61 M.J. 415, 418 (C.A.A.F. 2005) (citing *United States v. Inong*, 58 M.J. 460, 463 (C.A.A.F. 2003); *McCarthy*, 47 M.J. at 165). Illegal pretrial punishment "'entails a purpose or intent to punish an accused before guilt or innocence has been adjudicated.'" *Id.* (quoting *McCarthy*, 47 M.J. at 165). "We apply this standard by examining the intent of detention officials or by examining whether the purposes served by the restriction or condition are 'reasonably related to a legitimate governmental objective.'" *Id.* (quoting *United States v. King*, 61 M.J. 225, 227 (C.A.A.F. 2005)) (citations omitted). Similarly, we consider whether a condition or term of pretrial

confinement "'is imposed for . . . punishment or whether it is but an incident of some other legitimate governmental purpose.'" *United States v. James*, 28 M.J. 214, 216 (C.M.A. 1989) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)).

In this case, the appellant filed a motion for "appropriate legal and injunctive relief for unlawful pretrial punishment"[164] which the military judge denied.[165] We will examine the military judge's findings with regard to the four types of alleged punishment the appellant has challenged again on appeal. The military judge correctly placed the burden of demonstrating violation of Article 13, UCMJ, on the appellant. R.C.M. 905(c)(2); *see also Mosby*, 56 M.J. at 310.

### 1. *Pretrial restriction in Iraq*

From 11 to 23 May 2006, the appellant was "placed in pretrial restriction and housed in a climate-controlled Containerized Housing Unit (CHU) with an escort" in Iraq.[166] There has been no dispute that this restriction was tantamount to confinement, and the appellant received day-for-day confinement credit for this restriction.[167] The Results of Trial from the first court-martial did not indicate clearly how pretrial confinement credit was calculated, but the record reflects that the appellant received at least one day of pretrial confinement credit for each day spent restricted to the CHU in Iraq.[168]

This period was also the focus of the CAAF's opinion in *Hutchins, IV*, 72 M.J. 294. The government's failure to facilitate the appellant's access to an attorney, despite his request for counsel upon his initial Article 31(b) rights notification, contributed significantly to the CAAF's suppression of his statements to NCIS, reversal of his initial convictions, and his new trial. *Id.* at 296-300.

---

[164] AE LXV at 1.

[165] AE LXXXVII.

[166] *Id*. at 2.

[167] *Id*. at 6. The military judge attributed the credit to *United States v. Allen*, 17 M.J. 126 (C.M.A. 1984). *Allen* entitles an accused to day-to-day sentence credit for pretrial *confinement*, but, with one exception, the military judge referred to the period for which the appellant received the credit as "pre-trial restraint" and "restriction." *Id.*

[168] AE LXVI at 120; Record at 629.

At his second court-martial, the appellant moved for additional remedies for the command's failure to comply with R.C.M. 305 and his "unduly harsh pre-trial confinement conditions"[169] in Iraq.

R.C.M. 305 prescribes requirements and rules to ensure pretrial confinement is not unduly rigorous or otherwise in breach of Article 13, UCMJ.[170] R.C.M. 305(j)(2) directs military judges to order administrative credit under R.C.M. 305(k) "for any pretrial confinement served as a result of an abuse of discretion or failure to comply with" the provisions affording members command documentation of probable cause for confinement, independent review of probable cause, and access to military counsel. R.C.M. 305(k) credit ordered for noncompliance "is to be applied in addition to any other credit the accused may be entitled as a result of pretrial confinement served." R.C.M. 305(k). But the military judge declined to award R.C.M. 305(k) or Article 13, UCMJ, credit for the appellant's restriction in Iraq because "the law does not twice rebuke the Government for an after-the-fact reclassification of restraint absent evidence of other unusually harsh circumstances not present here."[171]

Our superior court has held that "R.C.M. 305 applies to restriction tantamount to confinement only when the conditions and constraints of that restriction constitute physical restraint, the essential characteristics of confinement." *United States v. Rendon*, 58 M.J. 221, 224 (C.A.A.F. 2003). While restriction tantamount to confinement may entitle an accused to day-for-day confinement credit under *Allen, supra*, or *United States v. Mason*, 19 M.J. 274 (C.M.A. 1985), the accused is not entitled to double that confinement credit under R.C.M. 305(k). *Rendon,* 58 M.J. at 224. We see no evidence in the record leading us to disturb the military judge's implicit finding that the appellant's period of restriction did not include physical restraint and thus did not amount to confinement. Despite the isolated

---

[169] AE LXV at 1.

[170] Pretrial confinement requires probable cause, meaning "a reasonable belief that: (1) [a]n offense triable by court-martial has been committed; (2)[t]he person confined committed it; and (3) [c]onfinement is required by the circumstances." R.C.M. 305(d). Continued confinement requires a documented probable cause determination made by the commander not more than 72 hours after learning a member is in confinement. R.C.M. 305(h)(2)(A). A neutral and detached officer shall review the probable cause determination within seven days of the imposition of confinement and memorialize his or her factual findings and conclusions. R.C.M. 305(i)(2). At the request of the prisoner, military counsel shall be provided before the 72-hour probable cause determination or the seven-day review, whichever occurs first. R.C.M. 305(f).

[171] AE LXXXVII at 7.

nature of the appellant's restriction, the unique circumstances of restriction in a war zone, and our superior court's characterizations of the period in *Hutchins, IV*, 72 M.J. at 296-97, the appellant has inexplicably offered no evidence of *physical* restraint. Therefore, we affirm the military judge's decision not to apply R.C.M. 305(k) credit.

Regarding the punitive nature of the restraint and violation of Article 13, UCMJ, the military judge found that the appellant had not provided the necessary evidence to demonstrate that "this confinement was either illegal or punitive in nature."[172] R.C.M. 304(f) prohibits punitive pretrial restraint such as "punitive duty hours or training, . . . punitive labor, or . . . special uniforms prescribed only for post-trial prisoners." The appellant alleged none of these but argued only that his solitary confinement in Iraq deprived him of "the ability to communicate with anyone else, including his family or friends."[173] The government countered by asserting there was contemporaneous probable cause to believe that the appellant and his squad members conspired to commit murder—and committed it—and thus it was necessary to segregate them to prevent further obstruction of justice.[174]

The military judge concluded that "[g]iven the nature of the charged offenses and the proximity of the command in the midst of a war zone in a foreign country, solitary restriction to a CHU was not beyond the pale."[175] Our review of the record does not contradict this finding as to the nature of the restriction. The military judge correctly cited *Mosby* in support of his legal conclusions. 56 M.J. at 310 (denying additional sentence credit for an Article 13, UCMJ, violation when "[o]ther than introducing evidence that appellant was placed in solitary confinement based on the charge alone, appellant has not introduced any evidence of an intent to punish.") Based on this record, we conclude that the military judge's findings are not clearly erroneous and that the circumstances of the restriction were not punitive. We affirm the military judge's decision not to award additional credit or other remedies pursuant to Article 13, UCMJ.

### 2. *Pretrial confinement at Camp Pendleton*

The appellant was redeployed from Iraq to Camp Pendleton and began a period of pretrial confinement from 24 May 2006 to 3 August 2007. As in Iraq, he argues his "*extreme confinement* conditions" were punitive.[176]

---

[172] *Id.*

[173] AE LXV at 5.

[174] AE LXVI at 1.

[175] AE LXXXVII at 7.

[176] AE LXV at 7.

Specifically, the appellant alleges he was held in "a sound-proof, solitary-confinement cell for ten out of the fifteen months" of pretrial confinement and "was shackled every time he left his cell."[177] He argues the conditions of his pretrial confinement were not necessary and were intended "to exact punishment, harassment, and abuse[.]"[178]

The military judge made the following findings of fact regarding the appellant's pretrial confinement at Camp Pendleton. The appellant's custody classification on 24 May 2006 was "'maximum'" based on "the nature of the allegations against him and an assessment of other factors."[179] The command complied with R.C.M. 305 by providing the appellant a pretrial confinement advice letter on 25 May 2006 and conducting a status review with an IRO on 26 May 2006. The IRO's "comments clearly indicate his view that continued pretrial confinement was appropriate."[180] About three weeks later, brig officials cited the appellant's "'entirely appropriate'" behavior in downgrading his custody classification and increasing his privileges.[181] The military judge noted that the appellant's claim that he was placed in Maximum-[Potentially Violent and Dangerous] status for 150 days was "expressly contradicted by evidence of brig records revealing a downgrade from MAX (maximum) to MDI (medium) after 23 days."[182] Because of "the nature of his charges and concerns about problems in the brig general population" and ease of access to frequent family and legal visitors, the appellant remained in Special Quarters housing.[183] The military judge noted that on or about 5 October 2006, the appellant complained to the brig officer about problems he had encountered with other inmates on the general population mess decks. Extensive documentation from the Camp Pendleton Base Brig corroborates the military judge's findings.

Detailing administrative and safety reasons for the conditions of the appellant's custody, the military judge concluded that the "Defense has not met its burden to show that the conditions of pretrial confinement at the Camp Pendleton Base Brig were more rigorous than necessary to ensure the accused's presence at trial."[184] The military judge found that the high profile

---

[177] Appellant's Brief at 136 (citation omitted).

[178] *Id*. at 137.

[179] AE LXXXVII at 2.

[180] *Id*.

[181] *Id*.

[182] *Id*. at 8, n.14.

[183] *Id*. at 2-3.

[184] *Id*. at 7.

of the appellant's case, the number of alleged co-conspirators, and concerns about the appellant's presence in the general population were safety concerns that amounted to legitimate administrative purposes for continued confinement in Special Quarters housing. He cited *Smith*, 53 M.J. at 173, in which the CAAF affirmed a military judge's determination that (1) "the Government had not restricted the appellant with an intent to punish prior to trial" and (2) "that there were legitimate nonpunitive governmental objectives served by the restrictions placed on appellant and that, therefore, Article 13 was not violated[.]" *Id.* at 169.

Although the *Smith* court analyzed pretrial restriction, not confinement, *id.* at 170, our superior court has repeatedly applied the same test to pretrial confinement. In *United States v. Crawford*, 62 M.J. 411 (C.A.A.F. 2006), the CAAF pledged deference to prison officials who adopt and execute "'policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* at 416 (quoting *Bell*, 441 U.S. at 547). In light of confinement officials' responsibility to ensure a detainee's presence for trial and the security of the facility, the burden was on Crawford to demonstrate that the conditions of his confinement were "unreasonable or arbitrary[.]" *Id.* at 414. *See also McCarthy*, 47 M.J. at 167 (holding, in the context of maximum custody confinement, that "[i]f the conditions of pretrial restraint are 'reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment.'") (quoting *James*, 28 M.J. at 216) (additional citations omitted).

The military judge implied that solitary confinement and shackles were "'discomforting' administrative measures reasonably related to the effective management of the confinement facility" and "'*de minimus*' impositions" and therefore not punitive.[185] However, *United States v. Corteguera*, 56 M.J. 330 (C.A.A.F. 2002), the source of that language, addressed a confinement facility orientation process requiring pretrial detainees to briefly sing and shout. We do not equate solitary confinement and shackles with embarrassment. However, we concur with the military judge that the appellant has failed to provide evidence his confinement was unduly rigorous. Unlike in *King*, 61 M.J. at 225, the appellant has not demonstrated that any conditions of his confinement were "an arbitrary response to the physical limitations" of the facility. *Id.* at 228. Instead, the record—especially regular reports from his brig counselor—reveals considered justifications for his custody classifications and his segregation from his squad mates and the general population.

---

[185] *Id.* at 8 (quoting *United States v. Corteguera*, 56 M.J. 330, 334 (C.A.A.F. 2002)).

Finding no clear error in the military judge's conclusions that the appellant's confinement conditions stemmed from legitimate purposes, and, impliedly, not punitive intent, we concur there was no Article 13, UCMJ, violation during his pretrial confinement.

### 3. *Transfer from the MTU*

The appellant alleges that his reassignment from a marksmanship instructor position to an administrative billet was arbitrary and the result of punitive intent.

While his first court-martial progressed through appellate review, the appellant was in and out of post-trial confinement. After this court set aside his convictions in *Hutchins I*, 68 M.J. at 631, the appellant was released from confinement and returned to duty at Camp Pendleton in June 2010. He was assigned as an instructor at the Battalion Headquarters MTU. In January 2011, the CAAF reversed *Hutchins I* and remanded the case for review. *Hutchins II*, 69 M.J. at 293. The next month, the appellant was returned to confinement. In June 2013, the CAAF set aside the appellant's convictions, *Hutchins IV*, 72 M.J. at 300. He was released from confinement again and returned to Camp Pendleton the next month. He served again as an MTU instructor.

At some point after the appellant's return to Camp Pendleton in July 2013, his assignment as an MTU instructor came to the attention of Col M., the Officer in Charge of the Camp Pendleton LSSS. Col M. contacted the appellant's commanding officer, Col Co., and "relayed his concern about the 'optics' of a Marine working on a rifle range who stood accused of killing a civilian with a rifle."[186] Sometime thereafter, Col Co. transferred the appellant from the MTU to the S4 Logistics Division, which had repeatedly failed inspections. "Col [Co.] testified that Col [M.]'s call affected the timing of this move, but given the [appellant's] outstanding performance and the perpetual failings of S4, he 'probably' would have moved Sgt. Hutchins there at some point to shore up the division."[187] He did not consider the reassignment to be punitive and believed the S4 billet was rated one or two paygrades above the appellant's paygrade of E-5.

When Col Co. retired in July 2014, Col Cr. relieved him as the appellant's commanding officer. A month later, the appellant was reassigned to the MTU. Conflicting evidence was presented as to Col Cr.'s awareness of the change, and the military judge refrained from making findings of fact on the matter. Col M. contacted Col Cr. to express his continuing concerns about the

---

[186] *Id*. at 4.

[187] *Id*. at 4, n.9.

"'optics'" of the assignment, and the appellant was returned to S4.[188] "Col [Cr.] disavowed an ulterior motive for the transfer and praised Sgt. Hutchins' work."[189] He rated the pay grade of the S4 billet as higher than E-5 and possibly as high as a junior officer.

Substantial testimony from the colonels and members of their staff supports these findings of fact from the military judge.

Again, the military judge found that the appellant had not met his burden to show that his reassignment from MTU to S4 was punitive. He applied the two-part *Smith* test again. 53 M.J. at 169, 72-73. The military judge found no evidence that assignment to S4 was considered punitive, and he held that assignment outside of one's military occupational specialty was not, "*ipso facto*," punitive.[190] He questioned the propriety of the LSSS Officer in Charge intervening in the appellant's duties but detected "no evidence of either improper motive or an improper result."[191]

We find no reason to question the military judge's findings and ultimate conclusion as to the appellant's reassignment from MTU to S4. The appellant urges us to infer punitive intent from the "chief prosecutor's" intervention, inconclusive evidence as to why the appellant was briefly returned to the MTU, and his assertion that there was no legitimate reason for him to leave the MTU. This is not evidence of punitive intent, nor does it successfully rebut the nonpunitive reasons the colonels cited for their advice and decisions.

### 4. Withdrawal of nomination for a NAM

Finally, the appellant avers that a prosecutor, acting with punitive intent, dissuaded the appellant's commanding officer from awarding him a proposed impact award and thus punished him.

The military judge found that the appellant made an immediate, positive impact at both MTU and S4 and that praise for his performance was both universal and effusive. Col Co. remembered reviewing a recommendation that the appellant receive a NAM as an impact award for his tenure at MTU. But Col Co. demurred in favor of a letter of continuity because the appellant had been on board less than a year. Col Co. also advocated for the appellant to receive a Combat Action Ribbon.

---

[188] *Id*. at 5.

[189] *Id*.

[190] *Id*. at 9.

[191] *Id*.

The appellant asserts that Col Co. withheld his NAM because a prosecutor, Maj S., warned it "would not 'look good' given that he was charged with murder."[192] As support, the appellant cited a deposition of the Battalion Operations Officer, Maj B., who nominated the appellant for the award. Maj B did not testify before the military judge, but a transcript of his deposition was attached to the appellant's motion. According to the deposition transcript, Maj B. remembered being present for a telephone call between Col Co. and Maj S. during which Maj S. balked at awarding a NAM to someone charged with murder because it wouldn't look good. Col Co. then decided to leave the appellant's proposed NAM citation in the awards system and "'wait until everything clears up.'"[193] He expected similar recognition for the appellant from S4 and, according to Maj B., said, "'[j]ust hold off to all his recognitions. He's not denied but he's not approved.'"[194] Col Co. testified that he frequently consulted with Maj S. on other cases but did not remember discussing the appellant with him.

While there is some disagreement between Col Co. and Maj B., it does not prompt us to disregard the military judge's findings of fact as *clearly erroneous*. Maj S.'s concerns about the appearance of awarding a murder suspect a NAM are consistent with Col M.'s concerns about the optics of assigning a murder suspect to train Marines in marksmanship. Col Co. testified, "I think you should write [the appellant] up for a letter of continuity because we can't have a Marine getting three awards to reach a senior's ears, just because we moved him around."[195] This does not directly contradict Maj B.'s memory of Col Co. deciding to hold the appellant's recognitions from MTU, S4, and others until his court-martial.

The military judge again found that the defense had not met its burden to show that Col Co.'s decision not to approve the appellant's NAM was punitive. He cited Col Co.'s testimony that a NAM for less than a year of performance was premature. While he did not explicitly cite the *Smith* test in the context of this alleged punishment, he concluded there was no evidence of punishment to overcome the evidence that a legitimate, alternative purpose motivated the decision not to award the NAM to the appellant.

None of the military judge's findings as to the lack of punitive intent and the existence of legitimate, nonpunitive reasons regarding the appellant's restriction in Iraq, pretrial confinement at Camp Pendleton, reassignment

---

[192] Appellant's Brief at 143.

[193] AE LXV at 90.

[194] *Id.*

[195] Record at 612.

from MTU to S4, or impact award is clearly erroneous. Thus we affirm his conclusions that the appellant was not subject to pretrial punishment in violation of Article 13, UCMJ.

## H. Denial of trial defense counsel's site visit to Iraq

The appellant alleges that the military judge erred in denying his TDC's request for a site visit to Iraq, depriving him of equal access to evidence, due process, and effective representation.

We review a military judge's discovery rulings for an abuse of discretion. *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015).

### 1. Equal access under Article 46, UCMJ

Article 46, UCMJ, affords trial counsel, trial defense counsel, and the court-martial "equal opportunity to obtain witnesses and other evidence[.]" It is implemented in R.C.M. 701 and R.C.M. 703. R.C.M. 701 ensures "[e]ach party shall have adequate opportunity to prepare its case and equal opportunity to interview witnesses and inspect evidence. . . . No party may unreasonably impede the access of another party to a witness or evidence." R.C.M. 701(e). The government must make evidence in the "possession, custody, or control of military authorities" available if it is "material to the preparation of the defense[.]" R.C.M. 701(a)(2). The standard for production of evidence not in a military authority's possession, custody, or control is higher. Parties to a court-martial are "entitled to production of evidence that is relevant and necessary." R.C.M. 703(f)(1).

When moving "for discovery under R.C.M. 701 or for production of witnesses or evidence[,]" the burden is on the moving party to prove, by a preponderance of the evidence, "any factual issue the resolution of which is necessary to decide a motion[.]" R.C.M. 905(b)(4), (c).

### a. Motion to compel

The appellant filed a motion to compel after the CA denied his TDC's request for a site visit to Hamdaniyah, Iraq.[196] He sought government-funded and facilitated travel and access to Hamdaniyah so his trial defense counsel could inspect the site of the alleged offenses and locate and interview prospective witnesses.

At an Article 39(a), UCMJ, session, the deputy intelligence officer at Marine Forces Central testified about conditions on the ground near Hamdaniyah. Beginning in June 2014, 80-90% of surrounding Al Anbar Province had fallen under the control of the Islamic State of Iraq and the Levant, and nearby Abu Ghraib was "one of the more contested violent areas

---

[196] AE LXIX.

in Al Anbar[.]"[197] The intelligence officer opined that it would be "very, very difficult, if not impossible" to send a team of investigators or attorneys to the general area.[198] Testimony about the current condition of the homes of SG and the Iraqi man killed on 26 April 2006 was inconclusive. Finally, the intelligence officer understood that the Department of State, not the Department of Defense, had the final authority for such travel to Iraq, and he was doubtful of their approval given the danger and lack of Iraqi governmental control of Hamdaniyah.[199]

During argument at the Article 39(a), UCMJ, session, TDC proposed, as an alternative, a limitation on the government's admission of evidence obtained in Iraq. In rebuttal, TC asserted that his team had given the appellant's trial defense team "everything [they had] . . . that was collected or produced in Iraq[.]"[200] TDC did not dispute the availability of the government's evidence but questioned the adequacy of the NCIS investigation and the evidence it yielded. Challenging the objectivity of the NCIS investigation, TDC speculated that the cache of evidence and exhibits "may have been very different had defense counsel been on the ground[.]"[201] When the military judge queried TDC about what evidence he hoped to find on-site after eight years, TDC responded, "[i]nterviews."[202] Posed with the inability to compel production of any Iraqi witnesses, the TDC replied, "we ask questions and then we open up doors, and we go down this path or that path, and that's what—sometimes you run into some dead ends and sometimes you run into leads."[203]

In his initial written ruling denying the site visit, the military judge made findings of fact, all supported by the record and not clearly erroneous. Conducting a *de novo* review of his application of the law, we concur with his application and conclusions. The military judge held the appellant to the burden of proving, by a preponderance of the evidence, that evidence and witnesses beyond government control in Iraq were relevant and necessary at trial. He concluded that the appellant offered nothing more than speculation as to the value of personally inspecting the site or the ability to locate witnesses to the events. In a footnote to his written ruling, the military judge

---

[197] Record at 489-90.

[198] *Id*. at 490.

[199] *Id*. at 491-494.

[200] *Id*. at 501.

[201] *Id*. at 502.

[202] *Id*. at 496.

[203] *Id*. at 497.

noted that the appellant had failed to distinguish his request for a site visit from a "*pro forma*" request, offering nothing to demonstrate "the necessity of a site visit in *this case*."[204] The appellant failed to prove by a preponderance of the evidence that a visit to Hamdaniyah, eight and a half war-torn years after the incident, would yield evidence relevant and necessary to his defense.

Article 46, UCMJ, does not obviate an accused's requirement to demonstrate the *necessity* of evidence or assistance beyond what is already at hand. *See* R.C.M. 703(f)(1) (production of evidence); R.C.M. 703(d) (employment of expert witnesses). Military courts have rejected the notion that the mere prospect of finding relevant and necessary evidence satisfies the requirement for showing relevance and necessity. *See United States v. Washington*, 46 M.J. 477, 479 (C.A.A.F. 1997) (finding that the appellant had failed to demonstrate the necessity of investigative assistance when, *inter alia*, "the defense appears to be on a 'fishing expedition' as to defense witnesses who 'may exist who can refute the charges' or 'may be helpful.'"); *United States v. Kinsler*, 24 M.J. 855, 856 (A.C.M.R. 1987) (noting that "[a] court need not provide for investigative services for a mere 'fishing expedition'") (citing *United States v. Shultz*, 431 F.2d 907, 911 (8th Cir. 1970)).

The military judge also addressed trial defense counsel's alternative remedy of suppressing government evidence collected in Iraq. He found that "[b]oth sides have equal access to the evidence available at trial and the Government is not calling any Iraqi witnesses on the merits."[205] The military judge initiated arrangements for the appellant's former detailed defense counsel, LtCol J.S., then a Reserve appellate judge on this court, to be made available for privileged consultation with the appellant's current defense team. LtCol J.S. had made a brief visit to Hamdaniyah in January 2007 and had seen the IED crater and interviewed one Iraqi witness. With the appellant's access to all of the evidence and to detailed military counsel from the first trial, the military judge concluded there was no violation of Article 46, UCMJ, in this case, in 2007 or at the time of the motion.

We find no abuse of discretion in the military judge's initial two rulings.

b.  Motion to dismiss

In a subsequent Motion to Dismiss for Denial of Site Visit or, Alternatively, to Abate Proceedings Until Such Time as a Site Visit Can Be Conducted, the appellant argued that without a new site visit, he would receive neither due process nor effective representation. The motion raised

---

[204] AE CXXV at 6, n.7.

[205] *Id.* at 6.

the inadequacy of the appellant's first trial defense counsel's site visit to Iraq in 2007. The military judge issued a second written ruling, again denying a site visit as well as the motion to dismiss or abate proceedings.[206]

We again find no clear error in the military judge's findings of fact. The military judge adopted his statement of law from his previous ruling and ruled that the appellant had still failed to meet his burden of demonstrating that a new site visit would "recover relevant and/or admissible evidence regarding the offenses allegedly committed there nine years ago."[207] Regarding the appellant's arguments about the insufficiency of his former trial defense counsel's site visit in 2007, the military judge found "the Defense must be considered at least somewhat complicit given the short notice they provided in the face of the operational and security constraints in the region."[208]

The military judge did not abuse his discretion in finding no Article 46, UCMJ, violation in original trial defense counsel's 2007 site visit. The right of access to evidence—or sources of evidence—is not unlimited. There is usually no obligation to arrange interviews between trial defense counsel and witnesses, but the government may not hinder them. *United States v. Killebrew*, 9 M.J. 154, 160 (C.M.A. 1980). The government may not "unreasonably impede the access of another party to a witness or evidence." R.C.M. 701(3). "'[A]bsent special circumstances, the right to a pretrial interview—guaranteed to [the defense] under the Manual [for Courts-Martial] and the Code—encompasses the right to an interview free from insistence by the Government upon the presence of its representative.'" *Killebrew*, 9 M.J. at 159 (quoting *United States v. Enloe*, 35 C.M.R. 228, 232 (C.M.A. 1965)) (alterations in original). A witness cannot be compelled to speak to TDC, as long as the government did not bring about the refusal. *Id.* The court may issue subpoenas to compel the attendance of civilian witnesses at trial, but "[f]oreign nationals in a foreign country are not subject to subpoena." R.C.M. 703(e)(2) and Discussion. Subpoenas are available to produce evidence not in government custody, but "a party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process." R.C.M. 703(f)(2). *See also* R.C.M. 703(f)(4)(B).

We agree the appellant did not demonstrate, by a preponderance of the evidence, that the government's handling of the original TDC's 2007 site visit to Iraq amounted to a deprivation of equal access in violation of Article 46. The evidence suggests that multiple factors conspired to limit the scope and

---

[206] AE CXXVIII at 4.

[207] *Id.* at 3.

[208] *Id.* at 3-4.

effectiveness of that site visit—from legitimate security concerns to TDC's own tactics. We decline to find that impediments arising from safety and security measures taken in 2007 were unreasonable and thus in violation of R.C.M. 701(e).

We find no abuse of discretion in this second pair of rulings.

Our superior court has interpreted Article 46, UCMJ, to be a statement of congressional intent to prevent the government from marshaling its resources to gain an unfair advantage over an accused and thus to ensure "a more even playing field." *United States v. Warner*, 62 M.J. 114, 120 (C.A.A.F. 2005). But the parity contemplated in Article 46, UCMJ, does not entitle an accused to a blank check. *Id.* at 118 (citing *United States v. Calhoun*, 49 M.J. 485, 487-88 (C.A.A.F. 1998) (noting that an accused is not entitled to the particular expert consultant or witness requested).

Assuming, *arguendo*, a violation of Article 46, UCMJ, the appellant must demonstrate material prejudice. *See Adens*, 56 M.J. at 732 (holding that "violations of a [service member's] Article 46, UCMJ, rights that do not amount to constitutional error under *Brady* and its progeny must still be tested under the material prejudice standard of Article 59(a), UCMJ."). Article 59(a), UCMJ, states that "[a] finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." Without specifying the "substantial prejudice" to him, the appellant attributes it to defense counsel being "compelled . . . to rely on the observations and filtered crime scene investigative findings of NCIS and other government agents[.]"[209] The appellant, not the NCIS agents, was at the crime scene on the morning of 26 April 2006. His TDC were able to exploit the weaknesses in the chain of custody of the decedent's body and the appellant's alleged weapon. The government's case rested largely on the testimony of the appellant's squad mates—not evidence collected in Iraq or from Iraqi witnesses. The appellant has failed to articulate how his lost opportunity to conduct a site visit contributed to the members' findings and thus materially prejudiced him.

We turn now to whether the appellant's inability to conduct a site visit and independent on-site investigation and interviews deprived him of due process.

### 2. *Due process*

The appellant asserts a due process right to "the opportunity to conduct a meaningful and full investigation of the underlying conduct, which necessarily includes the opportunity to inspect the scene of the alleged

---

[209] Appellant's Brief at 148.

crime."[210] According to the appellant, "[t]he military judge's denial [of a site visit] limited the defense in its ability to inspect for evidence perhaps missed, overlooked or omitted by the government and infringed on due process rights."[211]

The Supreme Court has "long interpreted" the Due Process Clause of the Fourteenth Amendment "to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *Cal. v. Trombetta*, 467 U.S. 479, 485 (1984).[212] "To safeguard that right, the Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *Id.* (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). "Less clear from [the Court's] access-to-evidence cases is the extent to which the Due Process Clause imposes on the government the additional responsibility of guaranteeing criminal defendants access to exculpatory evidence beyond the government's possession." *Id.* at 486. "Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Id.* (citation omitted).

Due process does not demand government prescience. The Court has distinguished the government's obligation to recognize and preserve exculpatory evidence from an obligation to predict the exculpatory value of evidence or a source of evidence. A line of Supreme Court cases addressed the application of due process to "potentially exculpatory evidence" the government lost or destroyed, depriving the accused of the opportunity to extract something exonerative from independent investigation of that evidence. *See Illinois v. Fisher*, 540 U.S. 544, 548-49 (2004) (a plastic bag containing a white powdery substance forensics tests revealed to be cocaine); *Ariz. v. Youngblood*, 488 U.S. 51, 52 (1988) (semen samples from the victim's body and clothing); *Trombetta*, 467 U.S. at 481 (breath sample of a suspected drunken driver). The *Trombetta* Court found no due process violation when the government acted "'in good faith and in accord with their normal practice[,]'" and the loss or destruction of evidence was not attributable to a "conscious effort to suppress exculpatory evidence." *Id.* at 488 (quoting *Killian v. United States*, 368 U.S. 231, 242 (1961)). The constitutional duty to

---

[210] *Id.*

[211] *Id.*

[212] We acknowledge that the Fourteenth Amendment does not govern accused at courts-martial. But our superior court has found the same right to present a complete defense in the Fifth Amendment, applying *Trombetta* to courts-martial. *United States v. Webb*, 66 M.J. 89, 92 (C.A.A.F. 2008); *see also United States v. Bess*, 75 M.J. 70, 74 n.3 (C.A.A.F. 2016) (finding no reason the right to present a complete defense would be any narrower under the Fifth Amendment than the Fourteenth Amendment).

preserve evidence applies to material evidence, which "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. *See also United States v. Garries*, 22 M.J. 288, 292 (C.M.A. 1986); *United States v. Kern*, 22 M.J. 49, 51 (C.M.A. 1996). The Supreme Court subsequently confirmed that a due process violation requires evidence of "bad faith" on the part of the government when "potentially useful evidence"—but not "material exculpatory evidence"—is lost or destroyed. *Fisher*, 540 U.S. at 548-49 (citing *Youngblood*, 488 U.S. at 57). An accused cannot claim a due process right to evidence, or a source of evidence, with only the potential to yield something exculpatory, unless the government has lost or destroyed that evidence in bad faith.

Although the appellant frames this AOE as a denial of discovery, it is more accurately a denial of opportunity. He does not accuse the trial counsel or the government of withholding a piece of material exculpatory evidence. Instead, the government has allegedly withheld funding and support for an independent investigation that might have uncovered something exculpatory. At best, hypothetical evidence is potentially useful; therefore, the appellant must attribute its loss or destruction to bad faith on the part of the government. *Id.* Evidence of bad faith is missing here. We found no abuse of discretion in the military judge's decision to deny a site visit to Hamdaniyah. The appellant failed to demonstrate the required necessity of the site visit. Nor did we find an abuse of discretion in the military judge's conclusion that the government did not violate discovery obligations during the original trial defense counsel's site visit to Hamdaniyah in January 2007. The appellant's lost opportunity, attributable to circumstances beyond the U.S. government's control, does not equate to a lack of due process.

### 3. *Effective representation*

Invoking *United States v. Strickland*, 466 U.S. 668 (1984), the appellant implies that counsel must conduct a site visit and independent investigation to be competent.

Legal representation is deemed ineffective under *Strickland* when the appellant can demonstrate that "(1) his counsel's performance fell below an objective standard of reasonableness; *and* (2) the counsel's deficient performance gives rise to a 'reasonable probability' that the result of the proceeding would have been different without counsel's unprofessional errors." *United States v. Akbar*, 74 M.J. 364, 371 (C.A.A.F. 2015) (quoting *Strickland*, 466 U.S. at 688, 694). "Trial defense counsel have 'a duty to make *reasonable* investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Id.* at 379 (quoting *Strickland*, 466

U.S. at 691) (emphasis added). "The Supreme Court has 'rejected the notion that the same [type and breadth of] investigation will be required in every case.'" *Id*. at 380 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (additional citation omitted) (alteration in original)).

The appellant overreaches when he claims that the Army Court of Military Review "intimated" that "'failure to visit a crime scene ipso facto contributes to deficient performance of trial'" in *United States v. Boone*, 39 M.J. 541, 544 (A.C.M.R. 1994).[213] The court adopted this concession for sake of argument before summarily dismissing it in Boone's case. *Id*. Although Boone alleged his TDC's "failure to visit the crime scenes . . . led to a serious factual error in [his] closing argument[,]" the court found "there [was] no obvious prejudice to the appellant in [Boone's] case." *Id*. Nor has this court found "deficiencies in defense counsel's performance under the *Strickland* standards" when counsel "was denied the ability to view the crime scene by the Staff Judge Advocate and the military judge" and "had extreme difficulty in interviewing the witnesses[.]" *United States v. Ryan*, 2007 CCA LEXIS 111, *11-*12, unpublished op. (N-M. Ct. Crim. App. 2007), *rev'd. as to sentence*, 65 M.J. 328 (C.A.A.F. 2007) (summary disposition). In a case similar to the one before us, civilian defense counsel declined to pursue a site visit to the scene of an alleged murder in Afghanistan because "the area became so kinetic that U.S. forces withdrew from there altogether." *United States v. Lorance*, 2017 CCA LEXIS 429, *19 (A. Ct. Crim. App. 27 Jun 2017), *rev. denied*, __ M.J. __, 2017 CAAF LEXIS 1165 (C.A.A.F. 19 Dec 2017). The Army Court of Criminal Appeals found no merit in Lorance's claim of ineffective assistance of counsel in light of the defense team's overall performance and the lack of prejudice in the face of "overwhelming evidence against [him]." *Id*. at *18-*19. In the case before us, conditions on the ground in Hamdaniyah made trial defense counsel's request to travel there to investigate unreasonable.

Not only does the appellant fail to demonstrate that denial of a site visit robbed him of TDC performance within an objective standard of reasonableness, he fails to articulate how a site visit would have altered the outcome of his court-martial. His assertion of prejudice is detached from the facts of his case and is almost circular; instead he claims that denial of a site visit robbed him of his rights to a fair trial and due process. As discussed previously, we disagree.

Instead, we find that the appellant benefited from zealous, competent representation throughout his second court-martial. His TDC effectively challenged the evidence brought from Iraq, and there were no Iraqi witnesses

---

[213] Appellant's Brief at 146.

to impeach. The strength of the government's case lay in the testimony of the Marines and Navy corpsmen present in Hamdaniyah on the morning of 26 April 2006. Nothing in Iraq could have better equipped TDC to challenge their testimony.

The appellant does not point to a piece of evidence or witness whose testimony would have altered the outcome of his trial. His assertion of prejudice is speculative. Not only has he failed to demonstrate that "his counsel's performance fell below an objective standard of reasonableness," he has also failed to demonstrate that his "counsel's performance gives rise to a 'reasonable probability' that the result of the proceeding would have been different without counsel's unprofessional errors." *Akbar*, 74 M.J. at 371. Without either, there is no ineffective assistance of counsel.

## I. Admissibility of identification on autopsy report

The appellant claims that the military judge abused his discretion when he admitted an autopsy report whose relevance depended upon impermissible testimonial hearsay from Iraqi citizens who identified the body.

This AOE presents us with hearsay within hearsay—alleged testimonial hearsay appearing in a routine professional report prepared by and informing the testimony of an expert witness. Whether the imbedded evidence was testimonial hearsay is a question of law we review *de novo. United States v. Katso*, 74 M.J. 273, 278 (C.A.A.F. 2015) (citing *United States v. Tearman*, 72 M.J. 54, 58 (C.A.A.F. 2013)). We review the military judge's decision to admit evidence that contains testimonial hearsay for an abuse of discretion, "'considering the evidence in the light most favorable to the prevailing party.'" *Katso*, 74 M.J. at 278-79 (quoting *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F. 1996)).

### 1. Testimonial hearsay

First we examine the appellant's allegation of testimonial hearsay. "[A]dmission of 'testimonial statements of a witness who did not appear at trial'" violates the Sixth Amendment's Confrontation Clause unless the witness is "'unavailable to testify, and the [accused] had had a prior opportunity for cross-examination.'" *Id.* at 278 (quoting *Crawford*, 541 U.S. at 53-54); U.S. CONST., amend VI. In *Crawford*, the Supreme Court defined testimony as "typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' . . . An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." 541 U.S. at 51 (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)) (alteration in original). Our superior court has characterized a statement as testimonial "'if made under circumstances

which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Katso*, 74 M.J. at 278 *(*quoting *United States v. Sweeney*, 70 M.J. 296, 301 (C.A.A.F. 2011) (additional citations omitted). There are also three factors to guide this objective, but contextual, analysis, often referred to as *Rankin* factors:

> (1) the statement was elicited by or made in response to law enforcement or prosecutorial inquiry;

> (2) the statement involved more than a routine and objective cataloging of unambiguous factual matters; and

> (3) the primary purpose for making, or eliciting, the statement was the production of evidence with an eye toward trial.

*United States v. Squire*, 72 M.J. 285, 288 (C.A.A.F. 2013) (citing *United States v. Gardinier*, 65 M.J. 60, 65 (C.A.A.F. 2007)); *United States v. Rankin*, 64 M.J. 348, 352 (C.A.A.F. 2007)).

The appellant asserts that the identification of the body exhumed and autopsied in the course of investigating this case constitutes testimonial hearsay. The lead NCIS agent, Special Agent (SA) J.C., testified about his efforts to exhume the body of the man shot in the IED crater on 26 April 2006. The victim's family led a convoy of military personnel, including SA J.C., to the burial site, but an IED detonated under one of the vehicles in the convoy en route to the site. SA J.C. never reached the burial site that day. At SA J.C.'s request, the appellant's company commander visited the victim's family and obtained GPS coordinates for the burial site. The company commander testified during the second court-martial but was not asked to confirm that he collected GPS coordinates of the burial site from the family at SA J.C.'s request. Following the GPS coordinates, a second convoy traveled to the site, and SA J.C. led the exhumation. SA J.C. testified that the victim's brother accompanied him to the burial site, pointed to the grave, "and at one point, he started digging in the grave site."[214] No Iraqi witness was subject to cross-examination or made available for either trial of the appellant.

Applying the *Rankin* factors to this information, we find it constitutes testimonial hearsay. 72 M.J. at 288. First, the victim's family revealed the burial site location at the request of NCIS, a law enforcement entity supporting the Navy and Marine Corps. Second, the information involved the recent death of a family member. The family attributed the death to American service members and had pressed a complaint with the military leadership in the area. "[T]he statement involved more than a routine and

---

[214] Record at 1515.

objective cataloging of unambiguous factual matters[.]" *Id.* Finally, NCIS requested the information after securing an order to exhume the Iraqi citizen's remains with the intent to transport them to the United States for an autopsy. During cross-examination, SA J.C. acknowledged the difficulty in obtaining the exhumation order. As NCIS sought the autopsy in furtherance of its investigation of serious criminal offenses, presentation of the resulting evidence at court-martial was a possible, if not likely and intended, outcome.

## 2. *Admissibility of the autopsy report*

Having found there was testimonial hearsay in identification of the body autopsied, we now turn to whether it rendered the medical examiner's report and testimony inadmissible. TDC objected to admission of the autopsy report based on hearsay and lack of relevance. With regard to hearsay, the military judge ruled from the bench that the report satisfied the hearsay exception for records of regularly conducted activities under MIL. R. EVID. 803(6). As to relevance, TDC protested, "[t]hey haven't even identified the body yet, sir, if this is even the person that they should be doing [the] autopsy report on."[215] The military judge acknowledged, "that's certainly a link in the chain that the government—they got that problem."[216] But then the military judge posited that "wounds consistent to what witnesses have testified to being inflicted on [the victim]" were circumstantial evidence of identity and thus relevant and admissible.[217]

TDC did not explicitly invoke testimonial hearsay and the Confrontation Clause in his objection to the autopsy report. Nevertheless, the references to links in the chain on the record reveal the parties' cognizance of flaws in the body's chain of custody. Testimonial hearsay formed not just a weak link but the chain's questionable origin. To determine whether the testimonial hearsay should have resulted in exclusion of this report from evidence, we examine the significance of that testimonial hearsay to the report and testimony about it.

When testimonial hearsay is presented to the court through an expert witness, we determine whether that expert testimony violates the Confrontation Clause by asking:

> First, did the expert's testimony rely in some way on out-of-court statements that were themselves testimonial?

---

[215] *Id.* at 1814.

[216] *Id.*

[217] *Id.*

> Second, if so, was the expert's testimony nonetheless admissible because he reached his own conclusions based on knowledge of the underlying data and facts, such that the expert himself, not the out-of-court declarant, was the 'witness against [the appellant]' under the Sixth Amendment?

*Katso*, 74 M.J. at 279 (citing *Crawford*, 541 U.S. at 44, 51-52) (additional citations omitted). Put another way, we ask whether the expert witness "had sufficient personal knowledge to reach an independent conclusion as to the object of his testimony and his expert opinion." *Id*. at 280 (citing *United States v. Blazier* (*Blazier II*), 69 M.J. 218, 224-25 (C.A.A.F. 2010)).

Navy CAPT S.L., the Deputy Medical Examiner at the Armed Forces Medical Examiner at Dover Air Force Base, Delaware, conducted the autopsy, authored the report, and authenticated it while testifying at the appellant's second court-martial. After the NCIS-directed exhumation of the body identified as the shooting victim in this case, Master-at-Arms Second Class (MA2) I.D. accepted custody of the body from "mortuary affairs"[218] on 6 June 2006 and escorted it from Camp Fallujah, Iraq, to Dover. An NCIS agent met MA2 ID when he landed at Dover and took custody of the body from him. On 8 June 2006, CAPT SL, performed the autopsy.[219] His report of 6 July 2006 includes a "[p]resumptive identification . . . established by accompanying documentation and photographs."[220] CAPT S.L. testified that NCIS typically provided a history on a decedent "[t]o give us some background information. . . . You have to get something specific to focus your attention on."[221] Based on the information provided by NCIS, the decedent was "believed to be" H.I.A., a 52-year-old Iraqi civilian who died in Hamdaniyah, Iraq on 26 April 2006.[222] For the circumstances of death, "[i]nvestigation reports that United States Military Personnel detained this Iraqi civilian, bound him with flexible cuffs, and shot him multiple times at different ranges of fire."[223]

The remaining 14 pages of the report detailed CAPT S.L.'s external and internal examinations of the body and its injuries, his diagnosis, and his opinion. Descriptions of the gunshot wounds to the body comprised the majority of the report and supported CAPT S.L.'s diagnosis of multiple

---

[218] *Id*. at 1826.

[219] PE 88 at 1, 15.

[220] *Id*. at 1.

[221] Record at 1861.

[222] PE 88 at 1, Record at 1887.

[223] PE 88 at 1.

gunshot wounds as the cause of death. Responding to the information that the shooting victim was bound, CAPT S.L. noted that "[d]issection into the skin and soft tissues of the wrists and ankles revealed no hemorrhage or other injury, which might be expected if the individual was bound."[224] But the use of flexible cuffs and the advanced state of composition prevented him from excluding the possibility that he was bound. CAPT S.L. also commented on findings from which he could infer that the man "had some degree of difficulty with ambulation."[225] Nowhere in the report did CAPT S.L. appear to rely on any information from NCIS to form his opinion.

Qualified as an expert witness in forensic pathology, CAPT S.L. authenticated and explained his report, including the process of performing an autopsy and his specific findings in this case. TC asked CAPT S.L. about the trajectory of gunshot wounds, the existence of stippling and its evidence of the range of the shot, and his interpretation of metal fragments recovered from the body. CAPT S.L.'s testimony relied almost entirely on the application of his expertise to observations he made during an autopsy he performed.[226] He relied on the purported identity of the body, the circumstances surrounding the death, or anything else flowing from the testimonial hearsay only for the nexus they created between the body and this case. Presented with background details such as the possible use of flexible handcuffs, the purported victim's reported limp, and the location of gunshot wounds, he indicated whether his autopsy findings were consistent, or inconsistent, with such facts. Ultimately the relevance of the report, not the report's findings themselves, relied on testimonial hearsay.

With some reliance on the testimonial hearsay, we proceed to the second *Katso* factor—whether the expert's testimony was nonetheless admissible because he reached his own conclusions based on knowledge of the underlying data and facts, and his opinions, not those of an out-of-court declarant, were subject to the cross-examination required by the Confrontation Clause. 74 M.J. at 279. While testimonial hearsay formed the basis of the relevance of CAPT S.L.'s report and testimony to this case, the conclusions in the report and testimony suggest no reliance on that testimonial hearsay. CAPT S.L. carefully documented, in writing and on the stand, the scientific processes he followed and the data he relied on to support his conclusions. The transparency of the scientific process supports

---

[224] *Id.* at 15.

[225] *Id.*

[226] *See Bullcoming v. New Mexico*, 564 U.S. 647, 661 (2011) (holding that the Confrontation Clause requires that prosecutors call the analysts who write the reports to introduce them into evidence).

our conclusion that testimonial hearsay was incidental, not foundational, to CAPT S.L.'s report, testimony, and opinion. Furthermore, CAPT S.L. acknowledged early in cross-examination that he had not independently identified the body he autopsied through DNA, dental records, fingerprints, or other scientific methods. But other than reporting the background information NCIS provided, CAPT S.L. did not opine on the identity of the body in his report or his testimony. We conclude CAPT S.L. demonstrated sufficient personal knowledge, education, and expertise to reach the independent conclusions of his report and testimony. *Id.* at 280.

In his closing argument, TC minimized the significance of the identity of the body in the autopsy report and asked members "to consider the circumstantial evidence. Look at the wound patterns."[227] TC encouraged the members to compare the wounds CAPT S.L. highlighted on the autopsy report to the photograph of the man killed in the IED crater on 26 April 2006. This was circumstantial evidence from which the members could identify the body as that of the man killed in the IED crater on 26 April 2006. Even without the direct evidence of a fully documented chain of custody for the body, circumstantial evidence in the report tying the body to the victim in this court-martial was sufficient to render the report relevant. *See United States v. Hurt*, 27 C.M.R. 3, 31 (C.M.A. 1958) (citing *United States v. Walker*, 6 U.S.C.M.A. 158 (C.M.A. 1955) (holding that circumstantial evidence can be as dispositive as direct evidence).

The problems in the body's chain of custody and the reliance on testimonial hearsay to link the body to this case affected the weight of the autopsy report, not its admissibility. Testimonial hearsay and identity were not so imbedded in the expert's report and testimony as to violate the appellant's right of confrontation and render the report and subsequent testimony inadmissible. We find no abuse of discretion in the military judge's finding that the report and testimony were admissible.

## J. Failure to Grant a Mistrial

The appellant contends that the military judge abused his discretion when he declined to grant a mistrial after the lead NCIS agent testified before members that the appellant "invoked at the interview."[228]

"We will not reverse a military judge's determination on a mistrial absent clear evidence of an abuse of discretion." *Ashby*, 68 M.J. at 122 (citing *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A. 1990)).

---

[227] Record at 2306.

[228] *Id.* at 1417.

A military judge "may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). But "a mistrial is an unusual and disfavored remedy. It should be applied only as a last resort to protect the guarantee for a fair trial." *United States v. Diaz*, 59 M.J. 79, 90 (C.A.A.F. 2003). "A curative instruction is the preferred remedy, and the granting of a mistrial is an extreme remedy which should only be done when 'inadmissible matters so prejudicial that a curative instruction would be inadequate are brought to the attention of the members.'" *Diaz*, 59 M.J. at 92 (quoting R.C.M. 915(a), Discussion).

Inadmissible matters include mention that an accused exercised his or her rights under the Fifth Amendment to the Constitution or Article 31(b), UCMJ, by remaining silent, refusing to answer a question, requesting counsel, or requesting to terminate an interview. MIL. R. EVID. 301(f)(2). The erroneous presentation of such evidence to members implicates constitutional rights; therefore, to be harmless, "'the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'" *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). The inadmissible evidence must not have contributed to the verdict. *Id*. To determine an error does not contribute to the verdict is "'to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *Id*. (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991)).

1. *"[H]e invoked"*

In this case, the inadmissible evidence of the appellant's invocation of his right to remain silent came from the lead investigator, SA J.C. SA J.C. was on the stand authenticating physical evidence in the government's case. The prosecutor asked him if he confronted the appellant with the appellant's after-action report about the shooting, and SA J.C. responded:

> Well, I don't remember specifically showing that to him at that time. But like I said, eventually after a time into the interview, it was time to start playing some of our cards that we had developed through some of the other interviews through some of the other squad members from earlier in the day. And at which time, he invoked at the interview.[229]

---

[229] *Id*.

TDC objected immediately, requested a mistrial, and protested, "[h]e's going into Sergeant Hutchins's Constitutional right to remain silent."[230] At a brief Article 39(a), UCMJ, session immediately following the comments and objection, the military judge decided to give the members a curative instruction right away but to postpone litigation of the motion for a mistrial until the next morning. As soon as the members reassembled in the courtroom, the military judge admonished them to disregard any invocation of rights by the appellant[231] and then confirmed with them as a group that they understood.

The following day, after hearing arguments from both parties, the military judge adopted TDC's proposed curative instruction[232] and agreed to conduct individual *voir dire* of the members. We must now determine whether—in light of the requirement that the members' exposure to the inadmissible evidence be harmless beyond a reasonable doubt—the military judge abused his discretion in declining to declare a mistrial. He briefly made findings of fact from the bench:

> [W]hat I found here is that this was a [sic] isolated reference to a singular invocation of rights by the witness. It was extremely brief. There are no details about the rights invoked or the offense or offenses to which the rights were invoked. We immediately called a[n Article] 39(a) [session]. I immediately gave instructions to disregard. I find that the inadmissible invocation testimony didn't have any direct bearing on the

---

[230] *Id.*

[231] The military judge told the members:

> Members, you heard some testimony that suggesting, perhaps, that the accused in this case may have invoked some rights when being questioned by this witness. That's a completely improper discussion point for us here. It's irrelevant to your consideration, and it's never, ever, to be held against anyone accused of a crime that they invoked, whether they invoked, whether they didn't invoke.
>
> It's not to be considered by you for any reason whatsoever. That testimony is stricken, and it's to be completely disregard [sic] by you for any purpose whatsoever. It will not be held against Sergeant Hutchins in any manner whatsoever. If you all understand that, could you please indicate by raising your hand.
>
> That's an affirmative response from all the members.

*Id.* at 1419-20.

[232] AE CXLVIII; Record at 1450-51.

testimony prior to it. It was toward the end and was unrelated to the other issues in any substantive manner.[233]

The military judge did not articulate the legal standard he followed, but he referred counsel to two cases: *United States v. Sidwell*, 51 M.J. 262 (C.A.A.F 1999) and *United States v. Boore*, 2014 CCA LEXIS 609, unpublished op. (A.F. Ct. Crim. App. 21 Aug 2014) (per curiam).

### 2. *Sidwell test*

In *Sidwell*, the CAAF analyzed testimony from a law enforcement agent who uttered, "[s]*ubsequent to [Sidwell] invoking his rights*, he made – " before being interrupted by trial defense counsel's objection. 51 M.J. at 263 (emphasis in original). To assess the possible prejudice resulting from this erroneous admission and gauge whether it was, instead, harmless beyond a reasonable doubt, the CAAF considered three things: the nature of the comment, the curative instruction given, and the "effect of the error on the other prosecution and defense evidence presented in the case." *Id.* at 265 (citing *United States v. Riley*, 47 M.J. 276, 279-80 (C.A.A.F. 1997)). The CAAF concluded that, "viewed in its entirety, [the error] did not have great potential to prejudice appellant." *Id.* In support of their conclusion, the CAAF cited the isolated nature of the reference, its extreme brevity, the immediacy with which the military judge called an Article 39(a), UCMJ, session, the prompt instruction to the members to disregard the evidence, and trial counsel's silence about Sidwell's invocation in argument. *Id.*

The military judge's factual findings mirrored those on which the CAAF relied, in part, in *Sidwell*. The record supports his characterization of SA J.C.'s comment as isolated and extremely brief. Aside from the trial counsel's question about the appellant's after-action report and SA J.C.'s reference to the other squad members' interviews, this statement was bereft of context. Trial defense counsel's objection, the Article 39(a), UCMJ, session, and the initial curative instruction came in quick succession. TC then asked SA J.C. one more brief question about the appellant's interview and his after-action report before returning to the authentication of physical evidence.

The next day, the military judge adopted the appellant's proposed curative instruction and read it to members before TDC began his cross-examination of SA J.C. While the appellant does not object to the content of his own curative instruction, we nevertheless note that it closely hews to the curative instruction in *United States v. Garrett*, 24 M.J. 413, 417 (C.M.A. 1987), which the CAAF has endorsed. *See Sidwell*, 51 M.J. at 265; *United States v. Whitney*, 55 M.J. 413, 416 (C.A.A.F. 2001). After reminding the

---

[233] Record at 1435.

members that they all enjoyed the "absolute and moral right to exercise their constitutional privileges," the military judge echoed the *Garrett* instruction in stating:

> The only thing that matters in this case is that Sergeant Hutchins always has a constitutional right to exercise his legal prerogative and no adverse result may obtain from his exercise of those constitutional rights. You may not infer guilt, nor may you infer any other fact based on Sergeant Hutchins' proper exercise of his constitutional rights.[234]

The military judge then conducted individual *voir dire* of the members, confirming their ability to follow the instruction. "Absent evidence to the contrary, court members are presumed to comply with the military judge's instructions." *United States v. Thompkins*, 58 M.J. 43, 47 (C.A.A.F. 2003) (citations omitted). There is no evidence the members disregarded the military judge's instructions.

Finally, we consider the impact of the error on the subsequent presentation of evidence. The appellant does not allege any impact on the rest of the case. Suppression of the appellant's statements to NCIS and the related reversal of his first court-martial had already transformed the appellant's statements to SA J.C. into a third rail for the government. The prosecution focused some attention on the appellant's after-action report, which was the subject of the only false official statement charge against the appellant. But the appellant's interviews with NCIS were otherwise absent from the government's case. Nor did the trial counsel allude to the appellant's invocation in his closing argument.

Errant mention of the invocation did not affect the trial defense team's presentation of evidence either. Recognizing that the strongest evidence against the appellant lay in the testimony of his squad mates, TDC focused on attacking their interrogations and testimony at the first court-martial. According to the defense theory, the appellant's guilt was an NCIS fabrication imposed on the frightened and coerced members of the appellant's squad. SA J.C. had not confronted the appellant with a truth he could not refute. SA J.C. had confronted the appellant with a concocted version of events. The appellant's decision to remain silent did not matter.

Instead of pointing to where the error manifested elsewhere in the trial, the appellant alleges substantial prejudice by framing SA J.C.'s brief statement as improper lie detector testimony. According to the appellant, members were left with the impression that SA J.C. "determined Sgt

---

[234] *Id.* at 1451.

Hutchins was lying during the initial portion of the interrogation, so then he confronted Sgt Hutchins with the overwhelming evidence of guilt—the 'cards'—, and that caused Sgt Hutchins to opt for silence because he could not explain it away."[235]

We do not find that argument persuasive. The members acquitted the appellant of the sole specification of false official statement for submitting his after-action report. This acquittal indicates that their findings of guilty did not rely on their assessments of the appellant's credibility. Nor do we believe their findings relied on SA J.C.'s assessment of his credibility. Without the context of the appellant's interrogations, SA J.C.'s comment came in a vacuum and simply did not carry the weight the defense alleges. SA J.C. was not an expert or other authoritative witness on whom members might unduly rely for his insight. *Cf Diaz*, 59 M.J. at 93 (concluding that a curative instruction was inadequate to correct the expert witness's testimony that Diaz murdered the victim).

Secondly, the appellant argues that the members would interpret the invocation in conjunction with their knowledge of a prior trial set aside for some technicality and assume only someone guilty would face retrial. This argument requires us to assume the members disregarded the military judge's clear instruction about everything from the presumption of innocence and the burden of proof to inferring guilt from the act of invocation. Without any evidence to support such an assumption, we decline to do so.

We find no clear error in the military judge's finding that the reference to invocation was so brief and isolated as to be effectively cured by the instructions he promptly gave. Notably, those curative instructions were consistent with curative instructions the CAAF has favorably endorsed under similar circumstances. *See Sidwell*, 51 M.J. at 265. We conclude that the military judge did not abuse his discretion in denying the appellant's motion for a mistrial.

## K. Cumulative error

The appellant urges us to set aside the findings and sentence based on the cumulative effect of the errors in this case.

"The cumulative effect of all plain errors and preserved errors is reviewed *de novo*." *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011). When the accumulation of errors deprived the appellant of a fair trial, Article 59(a), UCMJ, compels us to reverse it. *United States v. Banks*, 36 M.J. 150, 171 (C.M.A. 1992).

---

[235] Appellant's Brief at 161.

Despite the military judge's failure to consider the appellant's proffered acquittal of conspiring to kill anyone other than S.G., we ultimately found no error in the admission of the evidence of a conspiracy to commit Plans B and C.

We found only one error in the course of this trial—NCIS SA J.C.'s reference to the appellant's invocation of his right to remain silent. As previously discussed in section J., not one but two curative instructions sufficiently addressed any risk of prejudice from the members' brief exposure to evidence the appellant invoked his right to remain silent.

These two errors, even in aggregate, did not deprive the appellant of a fair trial, and Article 59(a), UCMJ, does not require reversal. Further, we decline the appellant's invitation to set aside the findings and sentence under Article 66(c).[236]

## L. Sentence appropriateness

The appellant argues that his sentence "was excessive and disproportionate," particularly in light of his squad members' and co-conspirators' sentences.

Article 66(c), UCMJ, requires us to approve a court-martial sentence only if we find it "correct in law and fact and [determine], on the basis of the entire record, [that it] should be approved." "The power to review a case for sentence appropriateness, which reflects the unique history and attributes of the military justice system, includes but is not limited to considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citing *United States v. Lacy*, 50 M.J. 286, 287-88 (C.A.A.F. 1999)) (additional citation omitted). Uniformity in sentencing is typically subsumed in the discretionary assessment of appropriateness encompassed in our Article 66, UCMJ, review authority. But in certain circumstances, sentence disparity can rise to a question of law.

### 1. Sentence disparity

Assessing sentence appropriateness by comparison to other cases has long been disfavored, except in specific circumstances. *See United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985) ("It is well settled that, except in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases, such as those of accomplices, sentence appropriateness should be determined without reference to or comparison with the sentences received by other offenders." (citation omitted)). The burden falls on the appellant to demonstrate those exceptional circumstances: (1) the cases the

---

[236] *Id.* at 163-64.

appellant cites for comparison are "'closely related' to his or her case" and (2) "the sentences are 'highly disparate.'" *Lacy*, 50 M.J. at 288 (internal citations omitted in original). If the appellant succeeds on both prongs, then the burden shifts to the government to "show that there is a rational basis for the disparity." *Id.*; *see also United States v. Kelly*, 40 M.J. 558, 570 (N.M.C.M.R. 1994) (noting that Article 66, UCMJ, authorizes reduction of "widely disparate dispositions or sentences" between "closely related" cases when "unsupported by good and cogent reasons").

Cases may be "closely related" by virtue of "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared[.]" *Lacy*, 50 M.J. at 288. *See also Kelly*, 40 M.J. at 570 (defining "closely related" cases as those that "involve offenses that are similar in both nature and seriousness or which arise from a common scheme or design"). The appellant and his seven squad mates were accused of being party to the same conspiracy. The charges referred against all of them arose from the same course of events. We need not belabor our determination that the appellant's case is closely related to his squad mates' and co-conspirators' cases. Thus we turn to whether the outcomes were highly disparate.

On appeal, the appellant alleges that his sentence is highly disparate because none of his squad mates served more than 18 months of confinement, and only two left the Marine Corps with bad-conduct discharges.[237] To meet his burden, the appellant submits his squad mates' "final approved sentences" and details their convictions, punitive discharges where applicable, and confinement served.[238] However, we gauge disparity among closely related cases based on adjudged sentences, not approved sentences. *See United States v. Roach*, 69 M.J. 17, 21 (C.A.A.F. 2010) (clarifying that Courts of Criminal Appeals compare the adjudged sentences of closely related cases because "there are several intervening and independent factors between trial and appeal—including discretionary grants of clemency and limits from pretrial agreements—that might properly create the disparity in what are otherwise closely related cases"). Disparity is also relative to the maximum punishment an accused faces. *Lacy*, 50 M.J. at 289.

The appellant was found guilty of conspiracy to commit larceny, false official statements, murder, and obstruction of justice, unpremeditated murder, and larceny of a shovel and an AK-47 assault rifle and faced a dishonorable discharge and life imprisonment.[239] He was sentenced to a bad-

---

[237] *Id.* at 166.

[238] *Id.* at 165-66.

[239] AE CXCIII.

conduct discharge and 2,627 days' confinement, which equated to time served.[240] Military judges awarded all five of the most junior members of the appellant's squad *dishonorable* discharges and sentences to confinement ranging from five to 14 years.[241] Only PFC Jodka received a shorter sentence of confinement than the appellant. With the exception of LCpl Pennington, the junior squad members pleaded guilty to less serious charges and faced far less than confinement for life. Only LCpl Pennington pleaded guilty to conspiracy to commit murder, and he was awarded 14 years' confinement. Pursuant to pretrial agreements, the CA significantly reduced their terms of confinement and disapproved their punitive discharges. Any disparity between the appellant's sentence and his junior squad members' adjudged sentences lay in the relative leniency he received. Perhaps for this reason, the appellant asks us to limit the pool of closely related cases to Cpl Thomas and Cpl Magincalda. But he cites no authority for his self-serving selection of comparables.

Both Cpl Thomas and Cpl Magincalda pleaded not guilty to all charges before panels with enlisted representation but were convicted of conspiracy to commit murder and other less serious charges.[242] Members sentenced Cpl Thomas to a bad-conduct discharge and reduction to pay grade E-1.[243] Cpl Magincalda was awarded 448 days' confinement (time served) and reduction to pay grade E-1.

Assuming, *arguendo*, we disregard the sentences military judges handed down and find the appellant's sentence to be highly disparate among members' sentences, we look at whether the government has offered "a rational basis for disparity." *Lacy*, 50 M.J. at 288. The government argues that the appellant's position as squad leader and highest ranking member of the conspiracy is the rational basis for the disparity. Citing squad member testimony, the government asserts that the appellant

> first raised the topic and hatched the scheme to commit murder, . . . asked each junior Marine and Sailor to agree to engage in the plot, . . . gave the order to fire, . . . [and] held two meetings with the squad to encourage them to "stick to the story." In short, Appellant was the mastermind of this plot—from inception, to firing the fatal shots into the Victim's face as

---

[240] AE CXCVII.

[241] Staff Judge Advocate's Recommendation of 18 Sep 2015, Enclosures (4)–(8).

[242] *Id.*, Enclosures (9) and (10).

[243] *Id.*, Enclosure (9).

he gurgled his last breathes [sic], to orchestrating the cover-up.[244]

The record supports the appellant's leadership role in the formation and execution of the conspiracy and lacks any evidence that one of the more combat-experienced corporals superseded him. While we do not find the appellant's sentence to be highly disparate, the presence of a rational basis and good and cogent reasons for a more severe sentence for the appellant effectively rebuts the appellant's claim of a highly disparate sentence among closely related cases. *See e.g., United States v. Fee*, 50 M.J. 290, 291-92 (C.A.A.F. 1999) (upholding this court's affirmation of allegedly highly disparate sentences awarded to a wife and husband based on the identification of "a rational basis for the differences in the sentences").

Thus we are left with the more generalized assessment of the appropriateness of the appellant's sentence.

### 2. Sentence appropriateness

Article 66, UCMJ, obliges us to evaluate the appellant's sentence independently for appropriateness. *See United States v. Baier*, 60 M.J. 382, 384-85 (C.A.A.F. 2005). We review sentence appropriateness *de novo. United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006).

"Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *Healy*, 26 M.J. at 395. This requires our "'individualized consideration' of the particular accused 'on the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1988) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180-81 (C.M.A. 1959)). In making this assessment, we analyze the record as a whole. *Healy*, 26 M.J. at 395. Notwithstanding our significant discretion to determine appropriateness, we may not engage in acts of clemency, which is the prerogative of the CA. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

As the appellant requests, we may consider approved as well as adjudged sentences in companion cases when assessing sentence appropriateness. *See Roach*, 69 M.J. at 21 ("In contrast, when the CCA (Courts of Criminal Appeals) is exercising its power over sentence appropriateness generally, it may consider both adjudged and approved sentences."). The CA in this case negotiated pretrial agreements with the five junior squad members and granted clemency to LCpl Pennington, greatly reducing their sentences. But even Article 66, UCMJ, does not grant CCAs the same unfettered discretion

---

[244] Answer on Behalf of Appellee of 20 Dec 2016 at 150-51 (citations omitted).

CAs enjoyed under Article 60, UCMJ, or command prerogative. *See Nerad*, 69 M.J. at 145. "While the CCA clearly has the authority to disapprove part or all of the sentence and findings, nothing suggests that Congress intended to provide the CCAs with unfettered discretion to do so for any reason, for no reason, or on equitable grounds[.]" *Id.* Uniformity of sentence is but one consideration when evaluating appropriateness,[245] and equity is not a proper basis for disapproving a sentence.

Considering the entire record, there is nothing excessive or disproportionate about a sentence to a bad-conduct discharge and less than eight years' confinement for the murder of the unknown Iraqi man in this case. The appellant's widespread reputation as a charismatic and effective leader of Marines and his compelling account of his confinement following his first court-martial earned him significant extenuation and mitigation and spared him a dishonorable discharge and a return to confinement. Further reduction of his sentence would not be an act of justice but of mercy, or perhaps equity, and beyond our authority under Article 66, UCMJ. *See id.*

## M. Legal and factual sufficiency

Finally, the appellant alleges that the case against him was legally and factually insufficient.

We review the legal and factual sufficiency of evidence *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for the legal sufficiency of evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In resolving questions of legal sufficiency, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

"For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the [appellate court] are themselves convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial

---

[245] *See Snelling*, 14 M.J. at 268 ("However proper it may be for the convening authority and [Courts of Criminal Appeals] to consider sentence comparison as an aspect of sentence appropriateness, it is only one of many aspects of that consideration.") (citations omitted).

court saw and heard the witnesses." *Washington*, 57 M.J. at 399. "By 'reasonable doubt' is not intended a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. . . . The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt." *United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994).

The remarkably detailed and consistent testimony of the five squad members provided overwhelming evidence of the appellant's guilt, covering all elements of the offenses of which he was convicted. Although we were unable to personally observe the squad members testify at the first and second courts-martial, the minute details that brought their depictions to life, including specifics with no real bearing on the offenses, conveyed their credibility. Details varied depending on the role each member played—providing security, participating in the initial planning discussion, stepping off with the snatch team, or remaining behind. But the squad members corroborated each other, and their narratives wove together to form a complete and clear account of the night's events.

The appellant challenges his squad mates' testimony as a fabrication forced upon them during coercive interrogations. TDC accused Hospitalman Second Class (HM2) S., the platoon's other Navy corpsman and a member of the Quick Reaction Force that responded to the scene minutes after the shooting, of framing his close friend and mentor, HM3 Bacos, the appellant and the other members of the squad for murder. According to the appellant, HM2 S. is the source of the elaborate conspiracy to kill S.G. or someone close to him. Although HM2 S. admitted to later fabricating a threatening note in order to escape the squad he had implicated and their platoon, no convincing motive for such a large-scale fiction as this conspiracy ever came to light. Instead, HM3 Bacos's testimony foreshadowed the crisis of conscience that prompted him to confide in HM2 S., who later reported those confidences to NCIS.

According to the appellant, multiple NCIS agents then forced HM3 Bacos to adopt HM2 S.'s statement and forced the other members of the squad to adopt HM3 Bacos's statement. Again, the appellant offers no plausible motive for an entire team of investigators to strong-arm him and five other members of his squad into parroting the statement of a non-participant. Nor does he credibly explain how a relatively brief interview between NCIS agents and HM2 S. evolved into the robust testimony before us. The conspicuously uniform affidavits from HM3 Bacos, LCpl Pennington, LCpl Shumate, and PFC Jodka alleging coercive interrogations and resulting perjury are insufficient to raise reasonable doubt, even in light of our superior court's

suppression of the appellant's confession. The overwhelming weight of the testimony of the appellant's co-conspirators also renders the autopsy, physical evidence collected, and the testimony of lead SA J.C., who did little more than authenticate the evidence, inconsequential.

Not only do we find the evidence legally sufficient, but we also find it factually sufficient.

### III. CONCLUSION

The findings and sentence are affirmed.

Chief Judge GLASER-ALLEN and Senior Judge HUTCHISON concur.

For the Court



R.H. TROIDL
Clerk of Court